# EXHIBIT "A"

# CHRISTIE PABARUE AND YOUNG

HEATHER TERESHKO
215.587.1616
HTERESHKO@CPMY.COM

A PROFESSIONAL CORPORATION
1880 JOHN F. KENNEDY BOULEVARD
10TH FLOOR
PHILADELPHIA, PA 19103
TEL: 215.587.1600 ▸ FAX: 215.587.1699 ▸ WWW.CPMY.COM

June 5, 2014

**Via Email and First Class Mail**
Leon Aussprung, MD, JD, LL.M
James E. Hockenberry, Esq.
Law Office of Leon Aussprung, MD, LLC
One Commerce Square
2005 Market Street, Suite 2300
Philadelphia, PA 19103

      Re:    **Estate of Abraham Strimber v. AMH, et al**
              **Our File No.: 850-103**

Dear Counsel:

      Enclosed please find Defendant, Abington Memorial Hospital's, Responses to Plaintiffs' Supplemental Interrogatories and Request for Production of Documents (Set IV) regarding Plaintiffs' EMTALA claim and Responses to Plaintiffs' Request for Admissions Set II.

      If you have any questions concerning this correspondence, please contact me directly.

      Very truly yours,

      HEATHER TERESHKO

HAT/al
Enclosure
cc:    Via email and first class mail
      John P. Shusted, Esquire
      Donald N. Camhi, Esquire

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARY B. FREEDMAN, ESQUIRE, | : | |
| Administrator of the ESTATE OF ABRAHAM | : | |
| STRIMBER, Deceased | : | |
| and | : | No. 2:13-cv-03145 |
| BRACHA STRIMBER | : | |
| | : | |
| v. | : | |
| | : | |
| STEVEN FISHER, M.D., | : | |
| MARGO TURNER, M.D., | : | |
| KRISTINA A. MARTINEZ, CRNP, | : | |
| MANOJ R. MUTTREJA, M.D., | : | |
| ABINGTON MEDICAL SPECIALISTS | : | |
| ASSOCIATION, P.C., D/B/A ABINGTON | : | |
| MEDICAL SPECIALISTS AND D/B/A AMS | : | |
| CARDIOLOGY, | : | |
| ABINGTON EMERGENCY PHYSICIAN | : | |
| ASSOCIATES AND | : | |
| ABINGTON MEMORIAL HOSPITAL | : | |

### DEFENDANT, ABINGTON MEMORIAL HOSPITAL'S, RESPONSES TO PLAINTIFFS' SUPPLEMENTAL INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS (SET IV) REGARDING PLAINTIFF'S EMTALA CLAIM

1.     Are you aware of any written or electronic policies, procedures, protocols and/or guidelines regarding the care and treatment of individuals who present to the Abington Memorial Hospital Emergency Department with a complaint of "chest pain?"  **PLEASE CONSIDER THIS A REQUEST TO PRODUCE ANY SUCH POLICIES, PROCEDURES, PROTOCOLS AND/OR GUIDELINES.**

**RESPONSE: Objection.  This interrogatory is objected to as vague with respect to the time and scope, and with reference to the "you" within the context of these**

876096.1

interrogatories.   Subject to and without waiver of the foregoing objection, Defendant Abington Memorial Hospital, on behalf of itself only, directs plaintiff's attention to the policy titled, "Myocardial Infarction – Primary Percutaneous Coronary Intervention for Acute ST Segment Elevation/New Left Bundle Branch Block Myocardial Infarction" produced in response to Plaintiff's First Supplemental Request for Production of Documents.  Also, Plaintiff is directed to the policy titled "Protocol Orders" and the protocol order set which addressed patient complaints of chest pain, which did not apply to Mr. Strimber because he specifically denied chest pain to any of the healthcare providers who evaluated and treated him.

2.      Are you aware of any written or electronic policies, procedures, protocols, and/or guidelines regarding the care and treatment of individuals who present to the Abington Memorial Hospital Emergency Department with a complaint of "abdominal pain" and/or "epigastric pain?" **PLEASE CONSIDER THIS A REQUEST TO PRODUCE ANY SUCH POLICIES, PROCEDURES, PROTOCOLS AND/OR GUIDELINES.**

RESPONSE: Objection.  This interrogatory is objected to as vague with respect to the time and scope, and with reference to the "you" within the context of these interrogatories.  Subject to and without waiver of the foregoing objection on behalf of Abington Memorial Hospital only, there are no written policies, procedures and/or guidelines regarding the care and treatment of individuals who present to the Abington Memorial Hospital Emergency Trauma Center with a complaint of "epigastric pain."  By way of further response, Plaintiff is directed to the policy titled "Protocol Orders" and the protocol order set for abdominal pain which was

2

previously produced, but which did not apply to Mr. Strimber since the patient was evaluated immediately upon presentation to the Emergency Trauma Center.

3.      Are you aware of any written or electronic policies, procedures, protocols, and/or guidelines regarding the Emergency Medical Treatment and Act Labor Act, 42 U.S.C. §1395dd, regarding individuals who present to the Abington Memorial Hospital Emergency Department? **PLEASE CONSIDER THIS A REQUEST TO PRODUCE ANY SUCH POLICIES, PROCEDURES, PROTOCOLS AND/OR GUIDELINES.**

> **RESPONSE:**      Objection.    This interrogatory is objected to as vague with respect to the time and scope, and with reference to the "you" within the context of these interrogatories. Subject to and without waiver of the foregoing objection, a copy of Abington Memorial Hospital's EMTALA policy which was in effect on February 22, 2012 is attached to these responses.

4.      Please disclose all, whether written or electronic, of the Abington Memorial Hospital Emergency Department patient sign-in sheet(s) and/or triage log(s)/sheet(s) for all patients between 2/8/2012 and 3/7/2012 (**all names and specific identifying information may be redacted**).

> **RESPONSE:**      Objection.    This interrogatory is objected to as overly broad and unreasonably burdensome.    This interrogatory is further objected to as seeking information which is not material or relevant, and is not reasonably calculated to lead to the discovery of material or relevant information or evidence which would be admissible at the time of trial.

876096.1

5.    Please disclose all of the complete Abington Memorial Hospital Emergency Department records and/or medical records for any and all persons who presented with a complaint of "chest pain," including, but not limited to, as noted in the registration system ("STAR System") and/or in the Emergency Department medical record and/or the triage log sheet and/or the patient sign-in sheet, in the Abington Memorial Hospital Emergency Department between 2/8/2012 and 3/7/2012. (All names and specific identifying information may be redacted)."

> **RESPONSE:**    Objection.  This interrogatory is objected to as overly broad and unreasonably burdensome.  This interrogatory is further objected to as seeking information which is not material or relevant, and is not reasonably calculated to lead to the discovery of material or relevant information or evidence which would be admissible at the time of trial.   Further, this interrogatory and request to produce is objected to as seeking information which is privileged and protected under Patient Privacy Laws and the Health Insurance Portability and Accountability Act of 1996.  Defendant Abington Memorial Hospital further objects to this interrogatory because Mr. Strimber denied chest pain to all of the healthcare providers who evaluated and treated him at the Abington Memorial Hospital Emergency Trauma Center.   See attached deposition testimony from Dr. Turner, Dr. Muttreja, Dr. Fisher, Nurse Lynn Stebulis, and Nurse Lori Ischinger.

876096.1

6. Was a determination ever made that Abraham Strimber had an "emergency medical condition" on 2/22/2012 as defined by 42 U.S.C. §1395(e)(1)? If so, at what specific time on 2/22/2012 (hour and minute) as such determination made and by whom?

**RESPONSE: Objection. This interrogatory is objected to as vague as phrased. This interrogatory is further objected to as seeking information which is within the knowledge of one or more co-defendants and involves their mental processes about which Defendant Abington Memorial Hospital does not possess information beyond the medical records and sworn deposition testimony. This interrogatory is also objected to as seeking information which calls for a legal conclusion and/or medical expert opinion with regard to interpretation of statutory language. Subject to and without waiver of the foregoing objection, after reasonable investigation, answering defendant is without sufficient knowledge or information to provide a response to this interrogatory as posed, but does acknowledge that Mr. Strimber arrived at Abington Memorial Hospital's Emergency Trauma Center with complaint and was evaluated and provided appropriate care in response to those complaints.**

7. What was the determination as to whether or not Abraham Strimber had an "emergency medical condition" on 2/22/2012 as defined by 42 U.S.C. §1395(e)(1)?

**RESPONSE: See response to Interrogatory number 6, incorporated by reference.**

8. If your answer to the foregoing interrogatory is in the affirmative, state what, if any, further medical examination and/or treatment was done "to stabilize" Abraham Strimber on 2/22/2012 as defined by 42 U.S.C. §1395dd (e)(3)(A) and (B).

5

876096.1

**RESPONSE:   See response to Interrogatory number 6, incorporated by reference. By way of further response, Plaintiff is directed to the records of Abington Memorial Hospital provided to Plaintiff during discovery as well as the sworn deposition testimony of all deponents including but not limited to Dr. Fisher, Dr. Turner, Dr. Muttreja, Nurse Lynn Stebulis, and Nurse Lori Ischinger.**

9.     Who performed the "medical screening examination" required by 42 U.S.C. §1395dd(a) with regard to Abraham Strimber on 2/22/2012 at Abington Memorial Hospital Emergency Department.

**RESPONSE: This interrogatory is objected to as vague as phrased.   This interrogatory is further objected to as seeking information which calls for a legal conclusion and/or medical expert opinion with regard to interpretation of statutory language.   Subject to and without waiver of the foregoing objections, the medical records demonstrate that Mr. Strimber was evaluated and treated by multiple physicians during the course of his treatment at Abington Memorial Hospital, including but not limited to the Emergency Trauma Center nurses, Dr. Steven Fisher, Dr. Margo Turner, and Dr. Manoj Muttreja.   See medical records, and relevant portions of the deposition testimony attached.**

10.     Who completed the "medical screening examination" required by 42 U.S.C. §1395dd(a) with regard to Abraham Strimber on 2/22/2012 at Abington Memorial Hospital Emergency Department.

**RESPONSE: See response to Interrogatory Number 9 incorporated herein by reference.**

11.    At what time was Abraham Strimber no longer a patient in the Abington Memorial Hospital Emergency Department on 2/22/2012?

**RESPONSE: After reasonable investigation, answering defendant is without sufficient knowledge or information to provide a specific response to this interrogatory.  By way of further response, the medical records document an order by Dr. Steven Fisher at 14:27 on February 22, 2012 placing the patient in observation status and he was transferred to the observation unit shortly thereafter.**

12.    On 2/22/2012 was Abington Memorial Hospital a "participating hospital" as defined by 42 U.S.C. §1395(e)(2)?

**RESPONSE: Yes.**

13.    State the name, title, and position held of the individual at Abington Memorial Hospital with the most knowledge and information concerning Abington Memorial Hospital's compliance with the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §1395dd on 2/22/2012.

**RESPONSE: Objection.  This interrogatory is objected to as vague and overly broad, and not limited by scope.**

876096.1

CHRISTIE, PABARUE & YOUNG
*A Professional Corporation*

BY: _____

JAMES A. YOUNG, ESQ.
HEATHER A. TERESHKO, ESQ.
Attorney for Defendants, Margo Turner, M.D. and
Abington Memorial Hospital

Dated: 6/5/14

8

| **Abington** Health | **Department Manual:**<br>Nursing | **Policy Number:**<br>14.53 |
|---|---|---|
| **Title:** Emergency Trauma Center/ Emergency Department Plan for Compliance with EMTALA | **Category:**<br>Patient Care | **Original Date:**<br>2/2011 |
| **Policy Owner:** Nurse Director Professional Practice | **Keywords:** EMTALA | **Last Review Date:**<br>2/2011 |
| **Referenced With:** Administrative Policy #5.09 – Interfacility Patient Transfers | **Review Cycle:**<br>yearly | **Last Revision Date:** |

**PURPOSE:**
The purpose of this policy is to set forth the plan of action for complying with the 1986 Emergency Medical Treatment and Active Labor Act (EMTALA) both in receiving and sending patients between healthcare facilities. This policy provides a chain of command and immediate support to the staff and physicians at Abington Health (AH) to seek guidance related to EMTALA.

**OBJECTIVES:**
1. To assure that patients presenting for treatment are provided with a medical screening exam (MSE) to exclude the presence of an emergency medical condition (EMC).
2. To assure that patients identified as having an EMC are provided with appropriate medical stabilization and treatment.
3. To provide for appropriate safe transfer of patients, when medically necessary or by request, to other facilities.
4. To assure that patients being transferred to AH are accepted using appropriate procedures.
5. To assure that patients are being transferred to other facilities with a process that is consistent with EMTALA guidelines.
6. To outline a procedure for the AH employees and professional staff to report potential EMTALA violations.

**PROCEDURE:**
A. Patients Arriving to the Hospital
   a. Persons presenting to an area within the hospital's main campus other than the dedicated ETC/ ED will receive a MSE, if they request or have a request made on their behalf for examination or treatment for what may be an EMC. When there is no verbal request, a request for an MSE will be considered to exist if a prudent layperson observer would conclude, based on the person's appearance and/or behavior, that the person needs emergency examination or treatment. These persons shall be escorted/ transported to the ETC/ ED for MSE when appropriate.

B. Patients Arriving to the Emergency Trauma Center (ETC) or Emergency Department (ED)
   a. All patients requesting services in the ETC/ ED are provided a MSE.
   b. Patients presenting to the ETC/ ED are categorized based on the triage nurse's assessment. The initiation of treatment is prioritized by the severity level.
   c. The MSE will be performed by the attending physician either alone or in conjunction with the Advanced Practice Professional (APP). APPs are supervised by the attending physician. When an emergency medical condition exists, appropriate stabilization and treatment will be rendered. In addition to the emergency physician's determination of an EMC, patients requiring a MSE also include:
      i. Women in active labor

**Emergency Trauma Center Plan for Compliance with EMTALA**
**Policy and Procedure**

    ii.  Patients with substance abuse complaints
   iii.  Patients with behavioral health complaints
   iv.  Other conditions as amended by government regulatory agencies.

d.  There will be no delay in the provision of the MSE while obtaining demographic or insurance information.

e.  For the convenience of patients, insurance information may be requested at the time of registration. However, requests for insurance information shall not be a source of delay in providing appropriate medical screening exams.

C.    Stabilization and Treatment

a.  Pursuant to the ETC/ ED physician's determination, patients with emergency medical conditions are provided appropriate stabilization and treatment.

b.  Patients whose conditions demand treatments that are not available at AH are stabilized within the existing capabilities of the hospital.  Arrangements shall be made to safely transfer the patient to a facility capable of providing the medically necessary care.

D.    Transfer of Patients to Another Facility

a.  Refer to  Administrative Policy # 5.09 - Interfacility Patient Transfers

b.  Patients other than involuntary commitments may refuse to be transferred and shall be counseled regarding the risks of refusal.

E.    Receipt of Transferred Patients

a.  The hospital may receive patients being transferred from another facility.

b.  Patients being transferred from another facility to a designated unit within the hospital should be referred to that unit as a direct admission.

c.  The appropriate AH attending physician or designee is responsible for accepting transfers from other health care facilities to AH.

F.    Reporting Potential EMTALA Violations

a.  Patients transferred to AH from another facility without prior authorization may represent potential EMTALA violations and should be reported.

b.  Refusals by a facility (including AH) to accept a patient in transfer when the facility has the capacity and capability to care for the patient may represent a potential EMTALA violation and should be reported.

c.  When a member of the AH staff suspects a potential violation of EMTALA, the event shall be reported to the appropriate Director/Designee. The staff member may use the corporate compliance hotline if they wish to remain anonymous.

d.  The Director or his/her designee reviews the incident with the reporting staff member.

e.  The report of any significant incident is forwarded to the AH Compliance Officer, Legal Services, Chief of Staff, Director of Patient Safety, Chief Operating Officer and the Senior Vice President of Patient Care Services.

f.  The hospital will not take adverse action or retribution against a staff member for reporting an EMTALA violation.

g.  A determination of the necessity to report potential EMTALA violations is coordinated by the Department of Patient Safety/Corporate Compliance.



Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

GARY B. FREEDMAN,          : NO.
ESQUIRE, Administrator : 2:13-cv-3145-CDJ
of the ESTATE OF          :
ABRAHAM STRIMBER,         :
deceased                  :
and                       :
BRACHA STRIMBER,          :
                          :
        Plaintiffs,       :
                          :
        v.                :
                          :
STEVEN FISHER, M.D.,      :
et al.,                   :
                          :
        Defendants. :


- - -


Thursday, April 10, 2014

- - -


        Oral deposition of LORI
ISCHINGER, taken pursuant to notice, was
held at Abington Hospital, 1200 Old York
Road, Abington, Pennsylvania, commencing
at 10:10 a.m., on the above date, before
Amy M. Murphy, a Professional Court
Reporter and Notary Public there being
present.

- - -


MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com
MAGNA LEGAL SERVICES



Page 17

1        Q.      Because they were kind of an

2   unusual --

3        A.      Yes.

4        Q.      Diet.

5                And again, it feels like a

6   conversation.  Try not to talk when I'm

7   talking and I'll try to do the same.  We

8   both fall into it.

9        A.      Okay.

10       Q.      You said you remembered he

11  was in distress, you said.  What do you

12  remember about that?

13       A.      I remember him being in a

14  lot of pain.

15       Q.      Do you remember where his

16  pain was?

17       A.      He told me it was abdominal.

18       Q.      Do you remember anything

19  else -- and we're going to look at what

20  you wrote down in a moment, but do you

21  remember anything else from that

22  interaction other than he had some

23  unusual things he had eaten recently and

24  that he was in significant distress?



Page 52

1          Q.     Could you list all the

2    clinical factors that went into that

3    determination of his ESI level that you

4    used?

5          A.     The patient stated to me

6    that he felt like his abdomen was going

7    to explode, he had multiple complaints.

8    I can recall that he was in a lot of pain

9    and very uncomfortable at triage.  So,

10   that would influence my decision making.

11         Q.     Okay.  In the HPI, that's

12   something that's written by the

13   physician; correct?  SF is Dr. Fisher?

14         A.     Yes.

15         Q.     There's a description that

16   pain began in his epigastrium and then

17   slammed up into his jaw.  Did you ever

18   get any kind of description as the pain

19   moving up his body?

20         A.     I can only tell you what I

21   wrote in my assessment.  I don't recall.

22   I mean, I wrote that he had complaint,

23   legs vibrating and he felt like his

24   abdomen was going to explode, and he



Page 53

1    specifically denied chest pain to me.

2           Q.    But he did have, as you

3    describe, epigastric pain?

4                 MS. TERESHKO:  She didn't

5           use the word epigastric.

6    BY MR. AUSSPRUNG:

7           Q.    Where was the location of

8    Mr. Strimber's pain based upon everything

9    you know and the medical record that you

10   documented?

11                MR. GOEBEL:  At the time of

12          her assessment?

13                MR. AUSSPRUNG:  Correct.

14                THE WITNESS:  In his

15          abdomen.

16   BY MR. AUSSPRUNG:

17          Q.    Okay.  That's a fairly

18   diffuse area.  Can you be more specific?

19          A.    I can't be more specific

20   other than what I wrote, that it was in

21   his abdomen and that he said it was not

22   in his chest.

23          Q.    Do you have any knowledge or

24   information as to whether or not the pain



Page 1

1           UNITED STATES DISTRICT COURT
2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                   -  -  -
3  GARY B. FREEDMAN, ESQUIRE, :
   Administrator of the ESTATE:
4  OF ABRAHAM STRIMBER,        :
   deceased.                   :
5                              :
           and                 :
6                              :
   BRACHA STRIMBER             :
7                              :
           Plaintiffs,         :
8                              :No. 2:13-cv-3145-CDJ
           vs.                 :
9                              :
   STEVEN FISHER, ET AL.,      :
10                             :
           Defendant .         :
11
                   -  -  -
12
           Monday, March 31, 2014
13
                   -  -  -
14
15           Oral deposition of LYNNE STEBULIS, taken
16  at Abington Hospital, 1200 Old York Road, Rorer
17  Conference Room 4, Abington, Pennsylvania,
18  commencing at 10:14 a.m., before Theresa F.
19  Franco, a Court Reporter and Notary Public.
20
21
22
23
       VERITEXT NATIONAL COURT REPORTING COMPANY
24           MID-ATLANTIC REGION
       1801 Market Street, Suite 1800
25          Philadelphia, PA 19103

Page 55

1                    LYNNE STEBULIS

2        A.      Yes.

3        Q.      -- there's a heading that says,

4    Complaint; what does that say?

5        A.      Chest pain.

6        Q.      And immediately under the heading

7    Complaint, it says Assessment, true?

8        A.      Correct.

9        Q.      What does it say about chest pain

10   under the heading of Assessment?

11       A.      "Patient denies chest pain."

12       Q.      Do you have experience, by the way,

13   do you do triage occasionally?

14       A.      Occasionally.

15       Q.      Are there times when patients

16   complain of triage -- I'm sorry, complain of

17   chest pain at triage, and then a few minutes

18   later when they're seen, they deny chest pain?

19       A.      Yes.

20       Q.      That assessment, "denies chest

21   pain," is that actually written by the triage

22   nurse?

23       A.      Yes.

24       Q.      And is it written -- according to

25   the timing of these notes, it's actually

Page 56

1              LYNNE STEBULIS

2   written at the same time or immediately after a

3   complaint of chest pain, right?

4        A.    Yes.

5        Q.    Is that triage assessment of

6   "denies chest pain" consistent with your

7   nursing assessment?

8        A.    Yes.

9        Q.    Can you go -- do you have your

10  nursing assessment in front of you?

11       A.    Yes.

12       Q.    Under the heading of

13  Respiratory/Chest, you wrote, "No complaint of

14  pain."  And my question is, where did you get

15  the information in order for you to document

16  under the heading Respiratory/Chest, "no

17  complaint of pain?"

18       A.    I asked.

19       Q.    What type of question do you ask in

20  order to get that answer?

21       A.    Do you have any chest pain.

22       Q.    The timing of that note, by the

23  way, is what time, 12:08?

24       A.    Yes.

25       Q.    Had, up until 12:08, Mr. Strimber

Page 57

LYNNE STEBULIS

1
2    received any type of pain medicine from the
3    time of his arrival until 12:08?
4         A.    No.
5         Q.    Underneath the heading of
6    Respiratory/Chest, there's a block that's
7    labeled Cardiovascular, true?
8         A.    Yes.
9         Q.    What did you write -- what are the
10   first words after the heading of
11   Cardiovascular?
12        A.    "Patient denies chest pain."
13        Q.    Was that written by you at 12:08?
14        A.    Yes.
15        Q.    And in order for you to write the
16   words "Patient denies chest pain," what do you
17   need to ask the patient?
18        A.    Do you have any pain in your chest?
19   Do you have chest pain?
20        Q.    And you documented that he denied
21   chest pain?
22        A.    Correct.
23        Q.    By the way, in addition to the
24   documentation, do you have a memory of him
25   denying chest pain?

Page 62

1                      LYNNE STEBULIS

2      they get seen.

3                 MR. CAMHI:  I don't have any other

4           questions.

5                         -  -  -

6                      EXAMINATION

7                         -  -  -

8      BY MR. AUSSPRUNG:

9           Q.      Did you have an understanding, you

10     took care of Mr. Strimber, that he said he had

11     chest pain because he thought he would be seen

12     quicker?

13                 MS. TERESHKO:  Did he say that to

14          her?

15                 MR. AUSSPRUNG:  Yeah.

16     BY MR. AUSSPRUNG:

17          Q.      Is that what you -- you had that

18     record.  You saw all the complaints in triage

19     when you cared for him, right?

20          A.      I saw his triage assessment, yes.

21          Q.      And you asked him whether he, in

22     fact, had the complaint of chest pain, correct?

23          A.      Correct.

24          Q.      And he denied it, right?

25          A.      Correct.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

GARY B. FREEDMAN,        : NO.

ESQUIRE, Administrator: 2:13-CV-3145-CDJ

of the ESTATE OF        :

ABRAHAM STRIMBER,        :

deceased, and        :

BRACHA STRIMBER        :

        :

        v.        :

        :

STEVEN FISHER, M.D.,   :

et al.        :

- - -

February 24, 2014

- - -

        Oral deposition of STEVEN

FISHER, M.D., taken pursuant to notice,

was held at Abington Memorial Hospital,

1200 Old York Road, Abington,

Pennsylvania 19001, beginning at 9:14

a.m., on the above date, before Holli

Goldman, a Court Reporter and Notary

Public in and for the Commonwealth of

Pennsylvania.

- - -

MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



Page 154

1  migration --
2       A.   I believe that's an actual
3  time.
4       Q.   Okay.  So around 14:09, you
5  entered into the computer the patient's
6  final primary diagnosis, correct?
7       THE WITNESS:  Please forgive
8  me.
9       MR. CAMHI:  Do you need to
10  get it?
11       We can go off if you do.
12       THE WITNESS:  No.  I don't
13  need to get it.
14                - - -
15       (Whereupon, a discussion was
16  held off the record.)
17                - - -
18       MR. AUSSPRUNG:  I'm going to
19  ask a fresh question.
20       MR. CAMHI:  New question.
21  Here we go.
22  BY MR. AUSSPRUNG:
23       Q.   Am I correct that at
24  approximately 14:09, you entered into the

Page 155

1  medical record your final primary
2  diagnosis for the patient in the
3  emergency department?
4       A.   Well, I don't consider chest
5  pain or epigastric pain to be a
6  diagnosis.
7       Q.   Who entered the words "chest
8  pain" there under final primary
9  diagnosis?
10       A.   I did.
11       Q.   Okay.  Why did you enter
12  chest pain?
13       A.   Well, I think my primary
14  concern at that point was making sure
15  that there was an indication for the
16  patient to get further telemetry.
17       Q.   I thought you told me the
18  patient never complained to you of chest
19  pain.
20       A.   He did not.
21       Q.   But you were aware that the
22  patient had complained to the nurse of
23  chest pain, correct?
24       A.   Well, the primary nurse

Page 156

1  taking care of the patient said that the
2  patient denies chest pain.
3       Q.   But it's written "chest
4  pain" in multiple spots on the triage and
5  nursing assessment, right?
6       A.   The lack of chest pain is
7  documented on several more important
8  spots on the chart.
9       Q.   So both chest pain and a
10  lack of chest pain are documented in the
11  medical record, correct?
12       A.   Right.  I -- correct.
13       Q.   Why?
14       A.   I can't speculate as to, you
15  know, what someone else heard or was
16  thinking at the triage window.
17       Q.   Was this patient's
18  evaluation partly based upon Abington
19  Memorial Hospital's pain protocol?
20       A.   The patient didn't have
21  chest pain.
22       Q.   But the patient got a
23  reflexive EKG, correct?
24       A.   So you're surmising that

Page 157

1  EKGs are limited solely to people that
2  have chest pain.
3       Q.   Do you all patients with
4  abdominal pain in Abington Memorial
5  emergency department get an EKG?
6       A.   Any patient that's 61 that
7  has abdominal pain and is sweaty will get
8  an EKG.
9       Q.   Is that a standing order
10  that the nurses can do without a
11  physician intervention?
12       A.   Well, it obviously is,
13  because it happened.  It was the first
14  thing that happened.
15       Q.   Well, I know it happened,
16  but that doesn't mean there was an order
17  for it.
18       A.   Right.  But the EKG occurred
19  prior to my interactions with the
20  patient.
21       Q.   Does Abington Memorial
22  Hospital emergency department have
23  standing orders that nurses can follow
24  without getting a physician's approval?

Page 186

```
1        Q.   And you're very concerned
2   that they get the best treatment they
3   can?
4           MR. AUSSPRUNG: Objection.
5   Relevance.
6           THE WITNESS: Unequivocally.
7   BY MR. SHUSTED:
8        Q.   Okay. And you're not really
9   concerned about billing entries whatever;
10  you just want to make sure that they get
11  the best treatment and you don't throw
12  somebody out on the street; is that
13  right?
14       A.   That's, I think, established
15  by our patients' customary evaluations of
16  our service.
17       Q.   And as a matter of fact,
18  you're now the chairman of the department
19  of emergency medicine; is that right?
20       A.   That is correct.
21       Q.   So for this particular
22  patient, Mr. Strimber, you wanted to have
23  him have further workup on a telemetry
24  unit; is that fair?
```

Page 187

```
1        A.   Yes.
2        Q.   And the reason why you would
3   do it on a telemetry unit, so there could
4   be continuous type of monitoring of his
5   vital signs; is that correct?
6        A.   We needed more information
7   regarding the patient.
8        Q.   And is that the reason why
9   "chest pain" as the final diagnosis
10  appears on the chart where you wrote it
11  in there?
12       A.   I think that's reasonable to
13  conclude.
14       Q.   Okay. So let's go back in
15  time to when Mr. Strimber first presented
16  to the emergency department, because I
17  have entries here, some of which deny
18  chest pain, some which say there's chest
19  pain there, and I just want to make sure
20  that we have an understanding as to what
21  that means.
22           So I'm looking at page 1 of
23  12, and Dr. Aussprung questioned you
24  about that and noted that the complaint
```

Page 188

```
1   states chest pain in two different
2   locations.
3           Do you see that by the
4   nursing staff?
5        A.   I do.
6        Q.   All right. Underneath that
7   second place where it says "Complaint:
8   Chest pain," is there an assessment in
9   there?
10       A.   There is.
11       Q.   All right. Now, is there an
12  assessment of chest pain in there?
13       A.   There is, that the patient
14  specifically denies it.
15       Q.   Is that a quote where it
16  says "Patient denies chest pain"?
17           MR. CAMHI: You mean, does
18      it exactly say "Patient denies
19      chest pain"?
20  BY MR. SHUSTED:
21       Q.   Are the words, quote,
22  Patient denies chest pain, close quote,
23  in the chart?
24       A.   They are, under the nursing
```

Page 189

```
1   assessment.
2        Q.   Okay. How did that affect
3   your assessment of the patient?
4        A.   Well, it's part of the
5   overall assessment. However, I place the
6   majority of my practice based upon, you
7   know, what I directly hear from the
8   patient and what I glean from them by
9   their history and physical examination.
10       Q.   Okay. And on page 1 of 12,
11  your history of present illness is in
12  there; is that right?
13       A.   Yes.
14       Q.   Did you record a history of
15  chest pain?
16       A.   I did not.
17       Q.   Would you have asked the
18  patient if he had chest pain?
19       A.   Yes.
20       Q.   And if that patient had told
21  you he had chest pain, would that have
22  been in your HPI?
23       A.   Yes.
24       Q.   And on page 2 of 12, there's
```

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

— — —

GARY B. FREEDMAN,             :
ESQUIRE, Administrator : NO.
of the ESTATE OF             : 2:13-cv-3145-CDJ
ABRAHAM STRIMBER,             :
deceased                      :
and                           :
BRACHA STRIMBER,              :
                              :
            Plaintiffs,  :
                              :
        v.                   :
                              :
STEVEN FISHER, M.D.,         :
et al.,                       :
                              :
            Defendants. :

— — —

Tuesday, March 18, 2014

— — —

Videotape deposition of
MARGO E. TURNER, M.D., taken pursuant to
notice, was held at the law offices of
Christie, Pabarue & Young, 1880 JFK
Boulevard, 10th Floor, Philadelphia,
Pennsylvania, commencing at 10:40 a.m.,
on the above date, before Amy M. Murphy,
a Professional Court Reporter and Notary
Public there being present.

— — —

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com

MAGNA LEGAL SERVICES



Page 34

1 had eaten in the hours prior to that,
2 what evaluation had been done in the ER
3 to evaluate those symptoms and what the
4 reason for admission would be.
5     Q.  Did Dr. Fisher, in that
6 initial conversation, mention to you that
7 Mr. Strimber had an artificial heart
8 valve?
9     A.  He did.
10     Q.  Did he mention -- did Dr.
11 Fisher mention to you anything about pain
12 in the chest?
13     A.  He did not.
14     Q.  Did Dr. Fisher mention to
15 you anything about pain that went through
16 to the patient's back?
17     A.  We talked about his
18 abdominal pain, nausea, vomiting, and
19 diarrhea. That's what I recall.
20     Q.  Do you have any recollection
21 of how the abdominal pain was described
22 to you?
23     A.  I do not.
24     Q.  So you don't know whether it

Page 35

1 was described as going through to the
2 back or not?
3     A.  I don't.
4     Q.  Did you discuss Mr.
5 Strimber's EKG in that initial
6 conversation?
7     A.  Yes.
8     Q.  So it had been done by then?
9     A.  Yes.
10     Q.  Had Mr. Strimber's -- did
11 you discuss Mr. Strimber's CAT scan
12 results?
13     A.  We did.
14     Q.  So you believe the CAT scan
15 was completed before you first came to
16 the emergency department?
17     A.  Yes.
18     Q.  That helps give us a little
19 bit of a timeline.
20         It looks like the CAT scan
21 report is at least timed around 1:30 or
22 so.
23         Anything else about that
24 conversation with Dr. Fisher that you

Page 36

1 remember?
2     A.  No.
3     Q.  Was the next thing you did
4 go and see the patient?
5     A.  Yes.
6     Q.  Where was the patient
7 located?
8     A.  In one of the holding areas,
9 one of the rooms in the ER.
10     Q.  Was it a room?
11     A.  They're like partitioned
12 cubicles.
13     Q.  And what do you recall from
14 that initial interaction with Abraham
15 Strimber?
16     A.  I remember Mr. Strimber was
17 sitting there. I interviewed Mr.
18 Strimber initially to just evaluate what
19 symptoms presented him to the hospital
20 for admission. I conducted a physical
21 examination. I left, reviewed the data
22 then that I had, and I returned back to
23 him to describe to him the plan of action
24 of what was going to happen subsequent to

Page 37

1 the admission.
2     Q.  One of the things you did
3 was you took -- you did a history and
4 physical?
5     A.  That's correct.
6     Q.  You did it in the emergency
7 department?
8     A.  Yes.
9     Q.  So as part of that history,
10 you, again, confirmed that he had an
11 artificial heart valve?
12     A.  Yes.
13     Q.  And as part of the history,
14 did you get a description of his pain?
15     A.  Yes.
16     Q.  And what do you recall --
17 and we'll look at the note in a minute,
18 but what do you recall of that
19 description?
20     A.  I remember there was
21 abdominal pain, feeling like something
22 exploded in his abdomen and just went up
23 to the top of his head, and that he had
24 eaten a series of things that are listed

MAGNA⊙
LEGAL SERVICES

Page 38

1 in the medical record earlier that day.
2 He had one episode of diarrhea earlier
3 and had an episode of vomiting in the ER.
4 When I saw him, the abdominal pain had
5 subsided.
6     Q.   So, the abdominal pain was
7 no longer present when you saw him?
8     A.   That's correct.
9     Q.   You said something in his
10 abdomen that went up, and I think you
11 just said to the top of his head?
12     A.   He -- in the medical record,
13 my description in the history of present
14 illness will be a description of how he
15 described that abdominal pain to me.  If
16 we can refer to that, the details of it,
17 I'd be more clear about it.
18     Q.   Did you understand that his
19 pain was limited to his abdomen or that
20 it went up through his chest to his head?
21     A.   My understanding was that he
22 felt something like -- I think he
23 described it as a vibrating sensation in
24 his abdomen.  Again, if I could refer to

Page 39

1 that I could tell you exactly.  What I
2 wrote in that history of present illness
3 will reflect what his words were which is
4 then how I interpreted those things.
5     Q.   I'm just trying to figure
6 out what you recall from your memory.
7     A.   I understand.
8     Q.   All right.  Do you remember
9 anything else in the history that he told
10 you?
11     A.   I noted that there had been
12 a complaint of chest pain given to the
13 triage nurse.  So, I asked if he was
14 experiencing chest pain at the time that
15 I saw him.
16     Q.   And was he?
17     A.   He was not.
18     Q.   And in fact, he wasn't even
19 experiencing abdominal pain when you saw
20 him?
21     A.   That's correct.
22     Q.   Had he received any
23 analgesics in the emergency department
24 before you saw him?

Page 40

1     A.   I believe he had received
2 morphine before I saw him.
3     Q.   What do you remember of your
4 physical examination, if anything?
5     A.   I remember my physical
6 examination to reveal to be within normal
7 limits and not to reveal any
8 abnormalities on the examination.
9     Q.   Did you palpate his abdomen?
10     A.   I did.
11     Q.   Did you specifically feel
12 for aortic pulsations?
13     A.   I did.
14     Q.   Did you detect them?
15     A.   I did not.
16     Q.   Are you aware that there was
17 a note in the emergency department record
18 that they found he did have unusual
19 aortic pulsations?
20     A.   I saw that note.
21     Q.   What did you understand that
22 to mean?
23     A.   I thought that that was
24 probably directing attention to whether

Page 41

1 there was an aneurism present.
2     Q.   But on your exam you did not
3 have that same finding?
4     A.   I did not.
5     MR. AUSSPRUNG:  I'm going to
6 mark as Exhibit-4 a big packet of
7 papers, I think it's 12 pages
8 long, which is the emergency
9 department record, because I
10 believe Dr. Turner has some orders
11 and things in it.
12     THE WITNESS:  Yes.
13     - - -
14     (Whereupon, Exhibit Turner-4
15 was marked for identification.)
16     - - -
17 BY MR. AUSSPRUNG:
18     Q.   Now, Dr. Turner, the first
19 place -- which might not be totally
20 accurate -- that I saw anything was on
21 the third page of this document under the
22 orders.
23     A.   Yes.
24     Q.   I want to start in the

COPY

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

GARY B. FREEDMAN,          :
ESQUIRE, Administrator     :
of the ESTATE OF           : NO.
ABRAHAM STRIMBER,          : 2:13-cv-3145-CDJ
deceased                   :
and                        :
BRACHA STRIMBER,           :
                           :
            Plaintiffs,    :
                           :
       v.                  :
                           :
STEVEN FISHER, M.D.,       :
et al.,                    :
                           :
            Defendants.    :

- - -

Friday, March 28, 2014

- - -

Videotape deposition of
MANOJ R. MUTTREJA, M.D., taken pursuant
to notice, was held at the law offices of
German, Gallagher & Murtagh, The
Bellevue, 200 S. Broad Street, 5th Floor,
Philadelphia, Pennsylvania, commencing at
10:50 a.m., on the above date, before Amy
M. Murphy, a Professional Court Reporter
and Notary Public there being present.

- - -

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com

MAGNA LEGAL SERVICES



Page 34

```
 1          statement that was made by him at
 2          his deposition in another case; is
 3          that the question?
 4  BY MR. AUSSPRUNG:
 5          Q.     Do you agree that a physical
 6  exam cannot determine whether or not
 7  somebody is having chest pain?
 8          A.     Yes.
 9          Q.     Do you agree that chest pain
10  is subjective information?
11          A.     Yes.
12          Q.     So, the patient presented
13  with chest pain; correct?
14          A.     The initial triage from the
15  ER said chest pain.
16          Q.     Do you have any reason to
17  believe that the patient did not present
18  with chest pain?
19          A.     In every assessment that was
20  made after that the patient denied chest
21  pain.  And the assessment that was made
22  by nursing right after that said he did
23  not have chest pain.  And when I spoke
24  with him, he did not describe any chest
```



Page 35

1   pain to me.

2           Q.    Thank you, but that wasn't

3   what my question was.

4               MR. AUSSPRUNG:  Can you read

5           back my question?

6                   -   -   -

7               (Whereupon, the pertinent

8           portion of the record was read.)

9                   -   -   -

10  BY MR. AUSSPRUNG:

11          Q.    My question was that the

12  patient did not present with chest pain.

13  Do you have any reason to believe that?

14              MR. SHUSTED:  Objection.  He

15          answered your question but you can

16          answer that question that he just

17          posed to you.

18              THE WITNESS:  The history

19          that was listed in the chart did

20          not mention any chest pain that he

21          had.

22  BY MR. AUSSPRUNG:

23          Q.    What was the final diagnosis

24  of the emergency department; do you know?



Page 36

1          A.      Chest pain.

2          Q.      Do you think that diagnosis

3    was incorrect?

4          A.      I can't comment on whether

5    that diagnosis was correct or incorrect.

6    I'm just commenting on what the objective

7    information was that I reviewed.

8          Q.      Did you think that the

9    patient did not need to complete his

10   rule-out for myocardial infarction?

11         A.      I did not feel that any

12   change needed to be made in the plans by

13   the primary team of ruling him out for a

14   myocardial infarction.

15         Q.      So, you agreed that

16   additional cardiac enzymes were necessary

17   to rule out a myocardial infarction;

18   correct?

19         A.      Yes.

20         Q.      So -- and the reason that

21   myocardial infarction was being ruled out

22   was why?

23         A.      He did have a cardiac

24   history and did present with a multitude



Page 144

1    lists the patient's diagnoses at the

2    hospital at the end, the end of the

3    admission; right?

4          A.    Okay.

5          Q.    And what does it list as his

6    admitting diagnosis?

7          A.    Unspecified chest pain.

8          Q.    Do you disagree with that

9    diagnosis?

10               MR. SHUSTED:  Objection.

11          We've been over this quite a

12          number of times.  You can answer

13          the question.

14               THE WITNESS:  There were

15          many different symptoms that he

16          had when he was admitted.  He

17          denied chest pain to the ER doctor

18          and to myself and to the other

19          physicians.

20   BY MR. AUSSPRUNG:

21          Q.    That wasn't my question

22   though.

23               MR. CAMHI:  And to others.

24               THE WITNESS:  And to others.

