# Exhibit F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GARY B. FREEDMAN, ESQUIRE,  :
Administrator of the ESTATE OF ABRAHAM  :
STRIMBER, Deceased  :
     and  :     No. 2:13-cv-03145-CDJ
BRACHA STRIMBER  :
   :
     v.  :
   :
STEVEN FISHER, M.D.,  :
MARGO TURNER, M.D.,  :
KRISTINA A. MARTINEZ, CRNP,  :
MANOJ R. MUTTREJA, M.D.,  :
ABINGTON MEDICAL SPECIALISTS  :
ASSOCIATION, P.C., D/B/A ABINGTON  :
MEDICAL SPECIALISTS AND D/B/A AMS  :
CARDIOLOGY,  :
ABINGTON EMERGENCY PHYSICIAN  :
ASSOCIATES AND  :
ABINGTON MEMORIAL HOSPITAL  :

## DEFENDANT, ABINGTON MEMORIAL HOSPITAL'S, SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SUPPLEMENTAL REQUEST FOR PRODUCTION OF DOCUMENTS

1.    <u>See</u> attached Chest Pain Protocol orders which were in effect at the relevant time period.

CHRISTIE, PABARUE & YOUNG,
*A Professional Corporation*

BY: *Heather Tereshko*

HEATHER A. TERESHKO, ESQ.
Attorney for Defendants, Margo Turner, M.D., Kristina A.
Martinez, CRNP, and Abington Memorial Hospital

Dated: <u>March 17, 2014</u>

# Exhibit G

| Name | 20. <font color=#8B008B>(Protocol) Chest Pain | | |
|---|---|---|---|
| Type | Clinical Pathway ▼ | | |
| Alt | | | |
| Status | Active ▼ | | |
| Record Started | Sat Nov 06, 2010 00:55 by 0 | Record Changed | Tue May 24, 2011 11:20 by Judith M. Mack |

| Change | | | |
|---|---|---|---|

| Laboratory | | | | |
|---|---|---|---|---|
| 02820 | Basic Metabolic Panel 🗑 | 02155 | Cardiac BNP | 🗑 |
| 02152 | Cardiac Troponin 🗑 | 03400 | CBC/Diff/Platelets | 🗑 |
| 02226 | CK w/Reflexive MB 🗑 | 06090 | Digoxin Level | |
| 03285 | Protime.. 🗑 | | | |

| Nursing | | | | |
|---|---|---|---|---|
| NURETC0565 | Blood Pressure - BILATERAL 🗑 | NURETC0195 | Cardiac Monitor | 🗑 |
| NURETC0212 | Infusor - Insert 🗑 | ETC00711 | O2 Therapy Cannula | 🗑 |
| NURETC0268 | Pulse Ox Monitor 🗑 | | | |

| Cardiology | | |
|---|---|---|
| 30940*5 | EKG 12 Lead - Chest Pain 🗑 | |

| General Radiology | | | |
|---|---|---|---|
| 00048*5 | Chest - 2 Views (PA-LAT) Chest Pain 🗑 | 38808*8 | Chest Portable - Chest Pain 🗑 |

| POC | |
|---|---|
| NURETC0615 | Blood Glucose Monitor POC 🗑 |

SVC  CPT  ICD-9  ICD-10  MED  Combo Med



| Name | 20. <font color=#8B008B>(Protocol) Abdominal Pain | |
|---|---|---|
| Type | Clinical Pathway ▼ | |
| Alt | | |
| Status | Active ▼ | |
| Record Started | Sat Nov 06, 2010 00:55 by 0 | Record Changed | Tue May 24, 2011 11:48 by Judith M. Mack |
| | Change | |

| Laboratory | | | | | |
|---|---|---|---|---|---|
| 02150 | Amylase | 🗑 | 03400 | CBC/Diff/Platelets | 🗑 |
| 02830 | Comprehensive Metabolic Pnl | 🗑 | 06300 | HCG W/Titer | 🗑 |
| 02455 | Lipase | 🗑 | | | |

| Nursing | | | | | |
|---|---|---|---|---|---|
| NURETC0212 | Infusor - Insert | 🗑 | | | |

| Cardiology | | | | | |
|---|---|---|---|---|---|
| 30940*2 | EKG 12 Lead - Pain Abd | 🗑 | | | |

| Nutrition | | | | | |
|---|---|---|---|---|---|
| DIETETC0076 | NPO Diet | 🗑 | | | |

| POC | | | | | |
|---|---|---|---|---|---|
| NURETC0615 | Blood Glucose Monitor POC | 🗑 | NURETC0622 | Pregnancy Urine test POC | 🗑 |
| NURETC0620 | Urinalysis POC | 🗑 | | | |

| Urinalysis | | | | | |
|---|---|---|---|---|---|
| 03785 | UA w/culture if indicated. | 🗑 | | | |

SVC   CPT   ICD-9   ICD-10   MED   Combo Med

# Exhibit H

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

&mdash;   &mdash;   &mdash;

GARY B. FREEDMAN,          : NO.
ESQUIRE, Administrator : 2:13-cv-3145-CDJ
of the ESTATE OF          :
ABRAHAM STRIMBER,         :
deceased                  :
and                       :
BRACHA STRIMBER,          :
                          :
        Plaintiffs,       :
                          :
        v.                :
                          :
STEVEN FISHER, M.D.,      :
et al.,                   :
                          :
        Defendants. :

&mdash;   &mdash;   &mdash;

Thursday, April 10, 2014

&mdash;   &mdash;   &mdash;

        Oral deposition of STEVEN
FISHER, M.D., taken pursuant to notice,
was held at Abington Hospital, 1200 Old
York Road, Abington, Pennsylvania,
commencing at 9:10 a.m., on the above
date, before Amy M. Murphy, a
Professional Court Reporter and Notary
Public there being present.

&mdash;   &mdash;   &mdash;

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com
MAGNA LEGAL SERVICES



Page 6

1               Could you state your name

2    for the record?

3          A.    Steven Fisher.

4          Q.    Again, I'm Leon Aussprung,

5    we met before.  I represent the Plaintiff

6    in a lawsuit that's been brought against

7    you, Abington Hospital, and some others.

8               In preparation for today's

9    deposition, did you review any documents?

10         A.    I did.

11         Q.    What did you review?

12         A.    I reviewed different

13   protocols, as well as the chest pain

14   protocol orders, as well as Linda Cohen's

15   article.

16         Q.    Same instructions as before.

17   If you don't understand my question for

18   any reason, let me know; all right?

19         A.    Yes.

20         Q.    To the extent you provide us

21   with answers, we're going to assume you

22   understood my question; okay?

23         A.    Yes.

24         Q.    I don't think we're going to



1  be here all that long.  If you need to

2  take a break, talk to your attorney, just

3  let us know.

4              MR. AUSSPRUNG:  Off the

5        record.

6                    -   -   -

7              (Whereupon, a discussion was

8        held off the record.)

9                    -   -   -

10             (Whereupon, Exhibit Fisher-6

11       was marked for identification.)

12                   -   -   -

13 BY MR. AUSSPRUNG:

14       Q.    I'm marking as Exhibit-6 a

15 one-page document, which was recently

16 disclosed by Abington Memorial Hospital,

17 which is entitled Chest Pain Clinical

18 Pathway.  And I'm told that this is an

19 order set.

20             Is this one of the documents

21 you reviewed, Doctor?

22       A.    Yes.

23       Q.    What is your understanding

24 as to what is this document?



Page 8

1         A.    These are a set of orders
2    that could be exercised if there's a
3    backlog of patients who are physician
4    directed.
5         Q.    Were you involved in
6    developing this order set?
7         A.    No.
8         Q.    Were you involved in
9    approving this order set?
10         A.    No.
11         Q.    Do you have any knowledge as
12    to how long this order set has been in
13    use here at Abington Memorial Hospital?
14         A.    I don't.
15         Q.    Is this order set currently
16    in use at Abington Memorial Hospital?
17         A.    Infrequently.
18         Q.    My question is, but is it
19    something that's active at the hospital?
20         A.    I believe so, yes.
21         Q.    And do you have any
22    understanding as to whether or not this
23    order set was active during the time
24    period of Mr. Strimber's care?



Page 9

1          A.     I believe so, yes.

2          Q.     What is your understanding

3   as to the purpose of the order set?

4          A.     It's to initiate care if

5   there's a physician backlog.

6          Q.     And who determines if

7   there's a physician backlog and this

8   order set is to be initiated?

9          A.     The physician or charge

10  nurse or team leader.

11         Q.     Team leader being an RN?

12         A.     Correct.

13         Q.     What is your understanding

14  as to why the emergency department at

15  Abington Hospital has this order set?

16         A.     Again, to initiate care if

17  there's a physician backlog.

18         Q.     So, do you have an

19  understanding as to whether this order

20  set represents a standard evaluation for

21  chest pain?

22              MS. TERESHKO:  Object to the

23         form.

24              MR. GOEBEL:  Object to the



Page 10

```
1            form.

2                   MR. CAMHI:  Can you just

3            repeat it, please?

4                      -   -   -

5            (Whereupon, the pertinent

6            portion of the record was read.)

7                      -   -   -

8                   THE WITNESS:  The order set

9            in total does not.  These are

10           orders that could be placed if

11           someone were to have chest pain

12           and there was a physician backlog.

13   BY MR. AUSSPRUNG:

14       Q.    Is it your understanding

15   that this order set permits, in cases

16   where there's a patient backlog, a nurse

17   to carry out these orders without a

18   specific physician order?

19       A.    It does allow the nurse to

20   exercise some of these orders, yes.

21       Q.    So in most situations, in

22   order for a nurse to order a laboratory

23   test or a study like an EKG, it requires

24   a physician order; correct?
```



```
 1        A.     Yes.

 2        Q.     So, this is kind of a

 3   pre-approved order set so that if there's

 4   a patient backlog, a nurse can go ahead

 5   and get these things without a specific

 6   order covering just this patient?

 7             MR. GOEBEL:  Object to the

 8        form.

 9             MS. TERESHKO:  Join.

10             MR. CAMHI:  Could you repeat

11        it one more time, please?

12                  -   -   -

13             (Whereupon, the pertinent

14        portion of the record was read.)

15                  -   -   -

16             MR. CAMHI:  It was kind of

17        in a statement form.  Could you

18        just put it --

19             MR. AUSSPRUNG:  Yes.  Let me

20        just ask it again.

21   BY MR. AUSSPRUNG:

22        Q.     Am I correct that this order

23   set allows a nurse to carry out the

24   orders within this set without a
```



Page 12

1    physician's specific order concerning a

2    particular patient?

3            A.    It could, yes.

4            Q.    Is it your understanding

5    that when the order set is activated,

6    that the nurse is to obtain all the

7    components of the order set or that the

8    nurse may select and choose the

9    components that he or she feels

10   appropriate?

11           A.    The nurse can select the

12   components that he or she feels are

13   relevant.

14           Q.    And what do you base that

15   understanding on?

16           A.    Common practice.

17           Q.    Have you seen this order set

18   utilized by nurses at Abington Memorial

19   Hospital?

20           A.    Very infrequently.

21           Q.    So, it isn't that -- cause

22   it says at the top it's a clinical

23   pathway; do you see that?

24           A.    I do.



Page 13

1          Q.     But it's your understanding

2     that if this clinical pathway is

3     utilized, that only selected tests from

4     the pathway may be ordered?

5          A.     Correct.

6          Q.     How is a nurse to determine

7     which of these selected tests to order on

8     a given patient with chest pain?

9          A.     I don't know that I can

10    answer that.  That varies on their, you

11    know, expertise and general gestalt to

12    the patient.

13         Q.     Well, if the nurse gets to

14    decide which tests to order, then why do

15    we need order sets at all?  Why not just

16    have nurses be allowed to order tests for

17    patients?

18              MS. TERESHKO:  Object to the

19         form.

20              MR. CAMHI:  Go ahead.  We're

21         talking about emergency room care.

22         Go ahead.

23              THE WITNESS:  These are

24         ultimately ordered by the



Page 14

1              physician, but this is implemented

2              to ensure the patients are

3              receiving timely care.

4    BY MR. AUSSPRUNG:

5         Q.    Right.  It's used because

6    sometimes when patients present with

7    chest pain, quick intervention can affect

8    outcome; fair?

9         A.    It's used so that the workup

10   is in process so that the physician and

11   BA team can be more efficient when they

12   are able to receive the patient.

13        Q.    I agree.  It's used to

14   ensure that the patient workup is not

15   delayed because the physician happens to

16   be busy with other patient care issues?

17        A.    Correct.

18        Q.    Do you know how busy you

19   were on the day you took care of Abraham

20   Strimber?

21        A.    I don't recollect the

22   entirety of that day, no.

23        Q.    Do you know how many

24   patients were in your queue ahead of



Page 15

```
 1   Abraham Strimber?

 2          A.     I don't.

 3          Q.     Why does this order set

 4   contain an EKG 12 lead?

 5          A.     So that an EKG 12 lead can

 6   be done.

 7          Q.     On all patients with chest

 8   pain?

 9          A.     EKGs are done on patients

10   that have other complaints as well.

11          Q.     But this order set is only

12   for chest pain patients; right?

13          A.     Correct.

14          Q.     It's not used for abdominal

15   pain; correct?

16          A.     Not --

17                 MR. CAMHI:  This protocol.

18                 THE WITNESS:  Not this

19          particular protocol, no.

20                 MR. AUSSPRUNG:  Off the

21          record.

22                      -   -   -

23                 (Whereupon, a discussion was

24          held off the record.)
```



Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

GARY B. FREEDMAN,       : NO.
ESQUIRE, Administrator: 2:13-CV-3145-CDJ
of the ESTATE OF        :
ABRAHAM STRIMBER,       :
deceased, and           :
BRACHA STRIMBER         :
                        :
        v.              :
                        :
STEVEN FISHER, M.D.,    :
et al.                  :

- - -

February 24, 2014

- - -

Oral deposition of STEVEN
FISHER, M.D., taken pursuant to notice,
was held at Abington Memorial Hospital,
1200 Old York Road, Abington,
Pennsylvania 19001, beginning at 9:14
a.m., on the above date, before Holli
Goldman, a Court Reporter and Notary
Public in and for the Commonwealth of
Pennsylvania.

- - -

MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



Page 98

1  as to why it was ordered?
2      A.   Well, I ordered it, but
3  again, I think it's reasonable to believe
4  that acute coronary syndrome was on the
5  differential.
6      Q.   Okay.  So one of the reasons
7  it was ordered was to evaluate the
8  patient for potentially a cardiac
9  problem, like acute coronary syndrome?
10     A.   Yes.
11     Q.   Okay.  Who interpreted the
12  EKG?
13     A.   I did.
14     Q.   During the patient's stay in
15  the emergency department, did any other
16  physician other than yourself interpret
17  the EKG?
18     A.   I don't know whether
19  Dr. Turner looked at it or not while she
20  was in the emergency department.  I think
21  that would be part of her initial
22  assessment.
23     Q.   Okay.  You didn't discuss
24  the EKG with her, or did you, or you

Page 99

1  don't know?
2      A.   I don't recall specifically.
3      Q.   Do all the EKGs that are
4  done in the emergency department
5  eventually get officially read by a
6  cardiologist?
7      A.   They do.
8      Q.   Was that official reading
9  sometime after your care of Mr. Strimber
10  concluded?
11     A.   Typically, it would be, yes.
12     Q.   Do you know if it was in
13  this case?
14     A.   I don't.  I don't know the
15  timing of its official read by a
16  cardiologist.
17     Q.   Do you know if you had any
18  information of an official read of the
19  EKG by a cardiologist -- you learned of
20  an official read prior to Mr. Strimber
21  being discharged from the emergency
22  department?
23     A.   No.
24     Q.   You don't have any

Page 100

1  recollection of ever discussing the EKG
2  or its results with a cardiologist while
3  the patient was in the emergency
4  department?
5      A.   I'm sorry.  I got
6  distracted.  I apologize.
7      Q.   No problem.
8           Do you have any recollection
9  of ever discussing the EKG with a
10  cardiologist prior to the patient leaving
11  the emergency department?
12     A.   I did not.
13     Q.   Okay.  So the interpretation
14  contained within the emergency room
15  record is your interpretation?
16     A.   It is.
17     Q.   Okay.  Well, let's go to
18  that.
19           Am I correct, that that is
20  on the page that is 9 of 12, or page
21  number 27?
22     A.   I have it on 10 of 12, or
23  page number 28.  I mean, it starts on 27,
24  and then continues.

Page 101

1      Q.   Oh, I see.  Okay.
2           Now, on page 9 of 12, or 27,
3  it starts out with a title that says,
4  "EKG Interpretation," and then it says
5  "12:23 SF," correct?
6      A.   Yes.
7      Q.   SF is you, Steven Fisher,
8  correct?
9      A.   That's correct.
10     Q.   And what does 12:23
11  represent?
12     A.   Time.
13     Q.   The time of what?
14     A.   The time of the
15  interpretation being entered.
16     Q.   For the EKG interpretation,
17  is that something that you type into the
18  computer?
19     A.   Well, yes and no.  The "At,"
20  colon, "12:23 p.m." would be put by me.
21  I believe the 12:23 with my initials
22  would be recorded by the PulseCheck
23  system.
24     Q.   Right.  I'm trying to get

Page 154

1    migration --
2         A.   I believe that's an actual
3    time.
4         Q.   Okay.  So around 14:09, you
5    entered into the computer the patient's
6    final primary diagnosis, correct?
7              THE WITNESS:  Please forgive
8    me.
9              MR. CAMHI:  Do you need to
10   get it?
11             We can go off if you do.
12             THE WITNESS:  No.  I don't
13   need to get it.
14                - - -
15             (Whereupon, a discussion was
16   held off the record.)
17                - - -
18             MR. AUSSPRUNG:  I'm going to
19   ask a fresh question.
20             MR. CAMHI:  New question.
21             Here we go.
22   BY MR. AUSSPRUNG:
23        Q.   Am I correct that at
24   approximately 14:09, you entered into the

Page 155

1    medical record your final primary
2    diagnosis for the patient in the
3    emergency department?
4         A.   Well, I don't consider chest
5    pain or epigastric pain to be a
6    diagnosis.
7         Q.   Who entered the words "chest
8    pain" there under final primary
9    diagnosis?
10        A.   I did.
11        Q.   Okay.  Why did you enter
12   chest pain?
13        A.   Well, I think my primary
14   concern at that point was making sure
15   that there was an indication for the
16   patient to get further telemetry.
17        Q.   I thought you told me the
18   patient never complained to you of chest
19   pain.
20        A.   He did not.
21        Q.   But you were aware that the
22   patient had complained to the nurse of
23   chest pain, correct?
24        A.   Well, the primary nurse

Page 156

1    taking care of the patient said that the
2    patient denies chest pain.
3         Q.   But it's written "chest
4    pain" in multiple spots on the triage and
5    nursing assessment, right?
6         A.   The lack of chest pain is
7    documented on several more important
8    spots on the chart.
9         Q.   So both chest pain and a
10   lack of chest pain are documented in the
11   medical record, correct?
12        A.   Right.  I -- correct.
13        Q.   Why?
14        A.   I can't speculate as to, you
15   know, what someone else heard or was
16   thinking at the triage window.
17        Q.   Was this patient's
18   evaluation partly based upon Abington
19   Memorial Hospital's chest pain protocol?
20        A.   The patient didn't have
21   chest pain.
22        Q.   But the patient got a
23   reflexive EKG, correct?
24        A.   So you're surmising that

Page 157

1    EKGs are limited solely to people that
2    have chest pain.
3         Q.   Do you all patients with
4    abdominal pain in Abington Memorial
5    emergency department get an EKG?
6         A.   Any patient that's 61 that
7    has abdominal pain and is sweaty will get
8    an EKG.
9         Q.   Is that a standing order
10   that the nurses can do without a
11   physician intervention?
12        A.   Well, it obviously is,
13   because it happened.  It was the first
14   thing that happened.
15        Q.   Well, I know it happened,
16   but that doesn't mean there was an order
17   for it.
18        A.   Right.  But the EKG occurred
19   prior to my interactions with the
20   patient.
21        Q.   Does Abington Memorial
22   Hospital emergency department have
23   standing orders that nurses can follow
24   without getting a physician's approval?

Page 158

1     A.   Yes.
2     Q.   Do those standing orders,
3 are they based upon the patient's
4 complaint or complaints?
5     A.   I think it could also be
6 based upon, you know, the nurse's
7 experience or gestalt or --
8     Q.   Are there standing orders
9 for when a patient can receive an EKG
10 prior to being evaluated by a physician?
11     A.   I think there's a standing
12 order that an EKG that, you know, a nurse
13 thinks is necessary would not be
14 declined.
15     Q.   So a nurse at Abington
16 Memorial Hospital can order an EKG
17 whenever she feels it's indicated?
18     A.   I think that would be
19 reasonable.
20     Q.   And that's the policy here
21 at Abington Hospital?
22     A.   I can't speak to the exact
23 narrative of policy.
24     Q.   Can nurses give orders?

Page 159

1     A.   Can nurses give orders?  No.
2     Q.   So how is it that a nurse
3 can order an EKG?
4     A.   Well, technically, the nurse
5 didn't order it, but felt that it was
6 indicated in part of the patient's
7 workup.
8     Q.   Right.
9        And it can only be ordered
10 by the nurse if it's part of a standing
11 order or protocol that she's following,
12 correct?
13        MR. CAMHI:  He just said the
14     nurse did not order it, and you
15     included it in your question that
16     the nurse ordered it.
17        MR. AUSSPRUNG:  Oh.
18        MR. CAMHI:  So can you
19     rephrase your question?
20 BY MR. AUSSPRUNG:
21     Q.   Was this EKG ordered by a
22 physician or was it done pursuant to some
23 standing order or protocol?
24     A.   Well, the EKG, if it was

Page 160

1 done at triage and I didn't order it, it
2 can -- you know, we want to make sure
3 that patients are having orders that are
4 commensurate with the care that the
5 physician deems appropriate.
6     Q.   The EKG that was done at
7 11:40:41 on Mr. Strimber, did you order
8 it?
9     A.   I did in retrospect.
10     Q.   Okay.  It was completed
11 before you ordered it, correct?
12     A.   Correct.
13     Q.   So was it done by the nurse
14 based upon some protocol or standing
15 order?
16     A.   I can't answer that, because
17 I don't know exactly what her gestalt was
18 at that time.  I can't tell you that it
19 was to adhere with the chest pain
20 protocol if the patient didn't complain
21 of chest pain.
22     Q.   What nurse made the decision
23 to obtain an EKG at 11:40:41, do you
24 know?

Page 161

1     A.   I don't know if it was Lynne
2 or Lori.
3     Q.   Lori is L-O-R-I?
4        Where is her name on this
5 chart?
6        I've seen Lynne at the
7 primary --
8        MR. CAMHI:  The last page,
9     there's a legend.
10        MR. AUSSPRUNG:  Got it.
11 BY MR. AUSSPRUNG:
12     Q.   Lori Ischinger, correct?
13     A.   Uh-huh.
14        MR. CAMHI:  Yes?
15        THE WITNESS:  Yes.
16 BY MR. AUSSPRUNG:
17     Q.   Does Lori Ischinger still
18 work at Abington Hospital?
19     A.   She does.
20     Q.   Okay.  So your differential
21 diagnosis for the patient before ordering
22 laboratory work and the CT scan was five
23 items that are listed in the chart here,
24 correct?  And then --

# Exhibit I

# UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| GARY B. FREEDMAN, ESQUIRE, Administrator of the ESTATE OF ABRAHAM STRIMBER, deceased | ) ) ) ) **UNITED STATES DISTRICT COURT EASTERN DISTRICT OF PENNSYLVANIA** |
| and | ) No.: 2:13-cv-3145-CDJ |
| BRACHA STRIMBER | ) |
| Plaintiffs, | ) |
| v. | ) |
| STEVEN FISHER, M.D., *et al.* | ) |
| Defendants. | ) |

## PLAINTIFFS' REQUESTS FOR ADMISSIONS ADDRESSED TO ABINGTON MEMORIAL HOSPITAL

Pursuant to the Federal Rules of Civil Procedure, specifically F.R.C.P. 36, Plaintiff Gary B. Freedman, Esquire, Administrator of the Estate of Abraham Strimber and Bracha Strimber hereby propounds the following Requests for Admissions to be answered by Abington Memorial Hospital in accordance with the Federal Rules of Civil Procedure.

1.     It is admitted that the diagnoses on the Outpatient Coding Summary attached hereto as Exhibit "A" were approved by Robert Watson, M.D. for submission to Abraham Strimber's Primary Insurance for payment.

2.      It is admitted that on 2/22/2012 it was the policy of Abington Memorial Hospital that all patients with complaints of chest pain presenting to the Emergency Department receive chest xrays.

3.      It is admitted that Abraham Strimber presented to the Abington Memorial Hospital Emergency Department on 2/22/2012 with a complaint of "chest pain."

4.      It is admitted that no chest xray was performed on Abraham Strimber at any time on 2/22/2012.

5.      It is admitted that the immediate cause of death of Abraham Strimber was a ruptured ascending aortic aneurysm.

Respectfully Submitted,

**LAW OFFICE OF
LEON AUSSPRUNG MD, LLC**

By: _____
    Leon Aussprung, Esquire
    James Hockenberry, Esquire
    One Commerce Square
    2005 Market Street, Suite 2300
    Philadelphia, PA 19107
    (267)-809-8250

Dated:  3/28/14

## CERTIFICATE OF SERVICE

I, Leon Aussprung, M.D., Esquire, and/or James E. Hockenberry, Esquire, hereby certify that on this _28th_ day of March, 2014, I caused a true and correct copy of the foregoing Plaintiffs' Requests for Admissions Addressed to Abington Memorial Hospital to be served upon the following persons via electronic mail and First Class mail, postage prepaid:

Donald Camhi, Esquire
Post & Schell, P.C.
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

James Young, Esquire
Heather Tereshko, Esquire
Christie, Pabarue, Mortensen and Young
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA 19103

John Shusted, Esquire
German, Gallagher & Murtagh
The Bellevue – Suite 500
200 S. Broad Street
Philadelphia, PA 19102

Respectfully Submitted,

**LAW OFFICE OF**
**LEON AUSSPRUNG MD, LLC**

By: _____
Leon Aussprung, Esquire
James Hockenberry, Esquire
One Commerce Square
2005 Market Street, Suite 2300
Philadelphia, PA 19107
(267)-809-8250

Dated: _3/28/14_

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GARY B. FREEDMAN, ESQUIRE,    :
Administrator of the ESTATE OF ABRAHAM    :
STRIMBER, Deceased    :
    and    :    No. 2:13-cv-03145-CDJ
BRACHA STRIMBER    :
    :
    v.    :
    :
STEVEN FISHER, M.D.,    :
MARGO TURNER, M.D.,    :
KRISTINA A. MARTINEZ, CRNP,    :
MANOJ R. MUTTREJA, M.D.,    :
ABINGTON MEDICAL SPECIALISTS    :
ASSOCIATION, P.C., D/B/A ABINGTON    :
MEDICAL SPECIALISTS AND D/B/A AMS    :
CARDIOLOGY,    :
ABINGTON EMERGENCY PHYSICIAN    :
ASSOCIATES AND    :
ABINGTON MEMORIAL HOSPITAL    :

## DEFENDANT, ABINGTON MEMORIAL HOSPITAL'S RESPONSES TO
## PLAINTIFFS' REQUEST FOR ADMISSIONS DATED MARCH 28, 2014

1.    Denied.   To the contrary, the diagnoses on the outpatient coding summary attached as Exhibit A do not require physician approval.

2.    Denied.   To the contrary, Abington Memorial Hospital has no policy which requires that patients with complaints of chest pain who present to the Emergency Department undergo chest x-ray.

3.    Denied.   By way of further response, although "chest pain" is noted as a chief complaint on the medical records, answering defendant cannot admit that this complaint was made by Mr. Strimber because the same medical records document that Mr. Strimber denied

872454.1

chest pain when asked by the health care providers who were providing care to him on February 22, 2012.

     4.     Admitted.

     5.     Denied.  By way of further response, at the time of the submission of these responses, answering defendant cannot admit that the immediate cause of Abraham Strimber's death was a ruptured ascending aortic aneurysm.  There was no post-mortem examination of the decedent performed, at the Plaintiffs' request, which would have likely identified Mr. Strimber's immediate cause of death.

<div align="center">

CHRISTIE, PABARUE & YOUNG,
*A Professional Corporation*

</div>

BY: _____

        HEATHER A. TERESHKO, ESQ.
        Attorney for Defendants, Margo Turner, M.D., Kristina A.
        Martinez, CRNP, and Abington Memorial Hospital

Dated: _____

<div align="center">

2

</div>

# Exhibit J

725605.1

| Abington Memorial Hospital | Department Manual: EMERGENCY TRAUMA CENTER | Policy Number: ETC |
|---|---|---|
| **Title:** Myocardial Infarction – Primary Percutaneous Coronary Intervention for Acute ST Segment Elevation/New Left Bundle Branch Block Myocardial Infarction | **Category:** Patient Care | **Original Date:** 2/98 |
| **Policy Owner: ETC Director** | **Keywords: MI and PCI** | **Last Review Date:** 5/07 |
| **Referenced With:** [Type Here] | **Review Cycle:** Annual | **Last Revision Date:** 5/09 |

I.  **PURPOSE:** To provide guidelines for the identification, evaluation, and management of patients who present with chest discomfort or symptoms suggestive of ischemic coronary artery disease (CAD) and are found to have acute ST segment elevation or new left bundle branch block (LBBB) consistent with acute myocardial infarction (AMI).

II. **PROCEDURE:**
   A. All patients presenting to the Emergency Trauma Center with chest pain or other symptoms suggestive of acute cardiac ischemia will undergo a prompt evaluation.  This evaluation will include the following:

1. A twelve lead electrocardiogram (ECG) will be performed as soon as possible after arrival

2. The nurse or clinical associate who performs the test will present the ECG directly to the responsible emergency physician for interpretation

3. If the emergency physician interprets the ECG as demonstrating an acute ST elevation/new LBBB myocardial infarction, he/she will notify the Interventional Cardiologist (IC) immediately

4. The ETC physician will perform a targeted history and physical to determine:
   - if an AMI is likely
   - if the patient has any contra-indications to PCI
   - whether the patient has a current cardiologist

5. After this evaluation, the ETC physician will then activate a Percutaneous Coronary Intervention (PCI) Alert and notify the patient's primary nurse immediately

6. If the ETC physician is uncertain if the patient is a candidate for PCI, he/she will discuss the management with the IC prior to activating a PCI Alert

   B. Activation of PCI Alert

1. The ETC physician will notify the primary ETC nurse and the ETC Administrative Associate (AA)

2. The ETC AA will contact the IC as follows:
   - Abington Medical Specialists – Cardiology (AMS Cardiology)
     - 8:00 am – 5:00 pm (M - F except holidays) contact the office at x4075

- All other times and when there is no response at x4075, call the IC on call by contacting the AMS Cardiology answering service.
- Pennsylvania Heart and Vascular (PHV)
  - 8:00 am – 5:00 pm (M - F except holidays) and weekday nights, page Dr. Frechie.  If no rapid response, AMS Cardiology should be contacted as above.

3. The ETC AA will activate a PCI Alert.
- During normal catheterization laboratory working hours (M – F except holidays, 7:00 am – 5:00 pm) the AA will call 2437 to activate a PCI Alert
- All other times, the AA will contact the hospital operator at 777 to activate a PCI Alert

4. The hospital operator will contact the members of the PCI Alert team after hours
- Calls will be placed to:
  - Catheterization laboratory on-call team
  - CCU nurse manager (x2140)
  - Hospital Nursing Coordinator (x7103)
  - Bed Coordinator (x7980)
- If no response by the catheterization team, the operator will contact the catheterization laboratory to determine if the team is already present

C. Roles/Responsibilities

1. Interventional Cardiologist
- Will immediately respond to ETC to discuss patient with ETC physician
- During off hours, if the IC is aware that the catheterization team is in the hospital, he should inform the catheterization laboratory to prepare
- Facilitate rapid movement of the patient to the catheterization laboratory

2. ETC Physician
- Interpret all ECG's as soon as possible after patient arrival
- Perform rapid assessment to determine if Primary PCI is indicated
- Initiate PCI Alert as above
- Initiate medical management/stabilization of patient
- Document interventions in the clinical record

3. ETC Primary Nurse
- Ensure that ECG is performed and presented to the ETC physician as soon as possible after patient arrival
- Activate PCI Alert packet
  - PCI Alert Tool
  - Consent Form
  - R2 pads
- Initiate medical management/stabilization in a timely manner.  This may include:
  - Administration of aspirin
  - Administration of beta-blocker
  - Administration of heparin
- Prepare the patient for transfer to the catheterization laboratory with assistance from a secondary ETC nurse and/or CCU nurse:
  - Apply R2 pads if available
  - Bifurcate intravenous lines

- Prepare inguinal area for procedure with use of clippers
- Place patient on transport monitor
- Document times of each communication point on the PCI Alert Tool which will be used for performance assessment purposes only and not part of the permanent record
- Complete documentation of all interventions on the clinical record
- Assist catheterization team in the laboratory with patient preparation and treatment

4. CCU Nurse
   - Respond immediately to PCI Alert with appropriate equipment
   - Assist ETC nurse in stabilization and transport of patient to the catheterization laboratory
   - Assist catheterization team in the laboratory with patient preparation and treatment

5. Catheterization Laboratory Team
   - Immediately prepare room during weekday working hours
   - Repond to PCI Alert immediately and report to catheterization laboratory as soon as possible during on-call hours
   - Contact ETC Primary nurse when first catheterization team member arrives to facilitate patient movement to the laboratory

6. Nursing Coordinator
   - Respond to PCI Alert immediately
   - Open catheterization laboratory and prepare room for incoming cathetherization team members during on-call hours
   - Assist catheterization team, ETC nurse, and CCU nurse in the care of the patient until the full catheterization team arrives

7. Hospital Operator
   - Immediately call PCI Alert as above
   - Contact the ETC AA to inform them that the catheterization laboratory on-call team, nursing coordinator, and CCU have been notified

8. ETC AA
   - Assist ETC physician with the initiation of the PCI Alert and contacting the IC
   - Inform ETC physician and primary nurse that the team has responded
   - Direct the IC to the ETC physician
   - Document times of all calls/pages and response times in ED Pulsecheck and communicate this information to the primary nurse for documentation on the PCI Alert Tool
   - Confirm bed assignment with the bed coordinator/nursing supervisor
   - Contact appropriate resident

9. Bed Coordinator
   - Assign an intensive care unit bed for the patient as soon as possible
   - Communicate this bed assignment to the ETC AA and the catheterization team

PP099.02
Written 2/98

Reviewed March 1999, February 2000

Revised March 2002

Myocardial Infarction.04

Revised 4/04, 11/04

Revised 5/07

Revised 5/09

# Exhibit K

Bracha Strimber

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

    -   -   -

GARY B. FREEDMAN, ESQUIRE  :
Administrator of the ESTATE:
OF ABRAHAM STRIMBER,       :
Deceased and BRACHA        :
STRIMBER                   :
                             :
      v.                :
                             :
STEVEN FISHER, M.D., et al.:NO. 13-03145

          -   -   -

FEBRUARY 17, 2014

          -   -   -

        Oral deposition of BRACHA
STRIMBER, taken pursuant to notice, was
held at the LAW OFFICE OF LEON AUSSPRUNG
M.D., LLC, One Commerce Square, 2005
Market Street, Suite 2300, Philadelphia,
Pennsylvania, commencing at 2:30 p.m., on
the above date, before LISA MARIE
CAPALDO, RPR, a Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Pennsylvania.

       GOLKOW TECHNOLOGIES, INC.
   877.370.3377 ph|917.591.5672 fax
         deps@golkow.com

Bracha Strimber

Page 46

1    twice. I don't know the timespan.
2        Q.   How did he do it the first
3    time?
4        A.   I don't know which came
5    first or second, whether it was the
6    baseball one or the other one where he
7    slipped on the grass and he broke it.
8            He slipped on the grass in
9    front of our house, and I don't remember
10   which was first and which was second. I
11   just know it was the same leg. I'm
12   guessing.
13       Q.   Do you believe for both of
14   those broken bone events he went to
15   Abington's ER?
16       A.   I'm not certain. I believe
17   so, but I'm not certain.
18       Q.   Did you go with him to those
19   ER visits?
20       A.   Of course, yes.
21       Q.   How many other ER visits did
22   he have before February of 2012 at
23   Abington?
24       A.   I don't know.

Page 47

1        Q.   Do you know if there were
2    any?
3        A.   I don't know.
4        Q.   What did he say, if
5    anything, in the car on the way over to
6    the hospital?
7        A.   He was strangely silent.
8        Q.   Were his eyes open or
9    closed?
10       A.   Open.
11       Q.   Was he talking at all?
12       A.   No.
13       Q.   Any moaning or groaning?
14       A.   No, he was silent, strangely
15   silent.
16       Q.   Had you considered calling
17   an ambulance before you put him in the
18   car?
19       A.   No, an ambulance would take
20   you to the closest hospital.
21       Q.   Did you drive directly to
22   the emergency department at Abington?
23       A.   Yes.
24       Q.   What happened when you got

Page 48

1    there?
2        A.   We got out of the car and
3    walked in together. Instead of waiting
4    in line to be checked in, he pushed right
5    through the doors and went to the back
6    himself, which he never would have done.
7    That frightened me. I knew something was
8    very wrong.
9        Q.   When you walk in through
10   those doors, there's a desk where people
11   sit behind and ask questions.
12       A.   That's where I went, but he
13   walked through the doors.
14       Q.   When you first walked in,
15   are you saying you went to that desk with
16   the glass wall and spoke to the lady
17   sitting behind the desk and he walked in
18   through the doors?
19       A.   I don't remember if I spoke
20   to anyone. I remember him walking
21   through the doors.
22       Q.   What time did you get there?
23       A.   I don't know.
24       Q.   Did you also walk through

Page 49

1    those doors at some point?
2        A.   At some point I did, when I
3    was asked to walk through.
4        Q.   Do you remember any of the
5    names of the nurses that cared for him
6    that day?
7        A.   No.
8        Q.   Do you remember the names of
9    any of the doctors that saw him in the
10   emergency department?
11       A.   Yes.
12       Q.   What name do you remember?
13       A.   I remember a Dr. Fisher and
14   I remember an admitting doctor, a Dr.
15   Turner.
16       Q.   Had you ever met Dr. Fisher
17   before?
18       A.   Not to my knowledge.
19       Q.   Do you know if your husband
20   ever met Dr. Fisher before?
21       A.   I don't know.
22       Q.   Are you able to estimate how
23   long it was after you arrived at the
24   emergency room that Dr. Fisher first saw

Bracha Strimber

## Page 50

1  your husband?
2     A.   No.
3     Q.   Was it more or less than an
4  hour?
5     A.   I don't know.
6     Q.   Were you present when the
7  nurse asked your husband what was
8  bothering him?
9     A.   Yes.
10     Q.   What was his answer?
11     A.   He was very nauseous.  He
12  had terrible back pain.  He kept talking
13  about this metallic taste rising to his
14  mouth, shoulder and neck pain.  His arm
15  was bothering him.  He kept vomiting, all
16  the time.
17     Q.   In the emergency room?
18     A.   Projectile vomiting.
19     Q.   Which arm was bothering him?
20     A.   I don't know.  He had so
21  much back pain, there was no position
22  where he could get comfortable.
23     Q.   Do you know if the back pain
24  was high, mid or low back?

## Page 51

1     A.   I don't know.
2     Q.   I asked you, what did he
3  tell the nurse when she asked him what
4  was bothering him and you told me that,
5  right?
6     A.   Right.
7     Q.   At some point, were you
8  present when Dr. Fisher asked the same
9  question, what's going on?
10     A.   I was present, but I don't
11  remember Dr. Fisher asking too many
12  questions.  All of the talking was done
13  and all of the decision-making seemed to
14  be done by Dr. Turner.  And Dr. Fisher
15  mostly stood on the side.
16     Q.   Was there ever a moment that
17  your husband was in the emergency
18  department, before he got admitted
19  upstairs, was there ever a moment where
20  you were not with him?
21     A.   Yes.
22     Q.   When?
23     A.   There were a few moments
24  when I went out into the hallway to call

## Page 52

1  his friends.
2     Q.   How many separate times was
3  that?
4     A.   I don't know the count.
5     Q.   Any other times other than
6  to call friends?
7     A.   I went to the bathroom,
8  nothing prolonged.
9     Q.   Do you know if he was taken
10  to any place for any kind of testing and
11  then returned back to the emergency
12  department?
13     A.   The CAT scan of his abdomen.
14     Q.   How did you learn that he
15  was going to have a CAT scan of the
16  abdomen?
17     A.   I don't remember which
18  physician, but one of them told me they
19  were going to do that.
20     Q.   Did whoever that physician
21  was tell you why they were going to do a
22  CAT scan of the abdomen?
23     A.   Because of his abdominal
24  pain.

## Page 53

1     Q.   Do you remember a physician
2  touching your husband's abdomen and him
3  complaining about pain from that
4  touching?
5     A.   I'm not certain.
6     Q.   What is your knowledge of
7  your husband being allergic to
8  intervenous dye or contrast?
9     A.   I do know he was allergic to
10  that.
11     Q.   How do you know that?
12     A.   I believe it was when he was
13  at Temple Hospital and he had a procedure
14  done that they discovered that.
15     Q.   Do you remember what his
16  reaction to that was?
17     A.   No.  I wasn't present in the
18  room.
19     Q.   Did you or your husband
20  bring that allergy to someone's
21  attention?
22     A.   Absolutely, every time we
23  went.
24     Q.   Was there a discussion about

14  (Pages 50 to 53)

# Exhibit L

COPY

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

—  —  —

GARY B. FREEDMAN,          : NO.
ESQUIRE, Administrator   : 2:13-cv-3145-CDJ
of the ESTATE OF         :
ABRAHAM STRIMBER,        :
deceased                 :
and                      :
BRACHA STRIMBER,         :
                         :
      Plaintiffs,   :
                         :
        v.         :
                         :
STEVEN FISHER, M.D.,     :
et al.,                  :
                         :
     Defendants. :

—  —  —

Thursday, April 10, 2014

—  —  —

      Oral deposition of LORI
ISCHINGER, taken pursuant to notice, was
held at Abington Hospital, 1200 Old York
Road, Abington, Pennsylvania, commencing
at 10:10 a.m., on the above date, before
Amy M. Murphy, a Professional Court
Reporter and Notary Public there being
present.

—  —  —

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com
MAGNA LEGAL SERVICES



Page 17

```
 1        Q.      Because they were kind of an

 2   unusual --

 3        A.      Yes.

 4        Q.      Diet.

 5                And again, it feels like a

 6   conversation.  Try not to talk when I'm

 7   talking and I'll try to do the same.  We

 8   both fall into it.

 9        A.      Okay.

10        Q.      You said you remembered he

11   was in distress, you said.  What do you

12   remember about that?

13        A.      I remember him being in a

14   lot of pain.

15        Q.      Do you remember where his

16   pain was?

17        A.      He told me it was abdominal.

18        Q.      Do you remember anything

19   else -- and we're going to look at what

20   you wrote down in a moment, but do you

21   remember anything else from that

22   interaction other than he had some

23   unusual things he had eaten recently and

24   that he was in significant distress?
```



Page 23

1          form.   You can answer.   Go ahead.

2                  THE WITNESS:   Not

3          necessarily.

4     BY MR. AUSSPRUNG:

5          Q.     Who else would be entering

6     something that would be documented by a

7     time and the initials "LS"?

8          A.     Can you tell me specifically

9     where you're --

10         Q.     Well, one of the things that

11    you did not mention to me was the

12    complaint.   See where it says

13    "complaint"?

14         A.     Yes.

15         Q.     And then after that it says

16    "chest pain", and then it says in

17    parenthesis, Wednesday, February 22nd,

18    2012, 11:45, LS.   Do you see where it

19    says that?

20         A.     Yes.

21         Q.     Is that you or is that

22    somebody else?

23         A.     I did not document that.

24         Q.     Who documented that?



Page 24

1      A.      That would have been
2  documented when he initially came in at
3  the time of greet by someone other than
4  me.
5      Q.      Do you know who that person
6  was?
7      A.      I don't know who the person
8  was.
9      Q.      If you go to the end of the
10  last page of this chart, there's a key
11  that lists a variety of people and their
12  initials.  Do you see that?
13      A.      Yes.
14      Q.      Is it someone on that list
15  who documented that complaint?
16      A.      I don't believe so.
17      Q.      Do you have any
18  understanding as to how the computer
19  knows what initials to place after an
20  entry?
21      A.      I don't know how the systems
22  work.
23      Q.      Do you sign into the system
24  using a specific code that identifies



1    you?

2           A.      I do.

3           Q.      So, does somebody else at

4    Abington Hospital have the authority to

5    sign in under your code?

6           A.      No.

7           Q.      So, can you explain to me

8    how it is that your initials appear next

9    to something that you didn't document?

10          A.      The initial complaint gets

11   documented in Star, which is a different

12   system, and then it repopulates into

13   pulse check, and that's how my initials

14   got attached to it.

15          Q.      Do you repopulate it?

16          A.      No.  It does it

17   automatically.

18          Q.      Well then why doesn't it put

19   the initials of the person that created

20   that field?  Why does it put your

21   initials?

22          A.      At that time, it put the

23   initials of, I'm assuming, the registered

24   nurse that does the triage.



Page 26

```
 1          Q.     Do you know who the
 2    registered -- that was you that day;
 3    correct?
 4          A.     Yes.
 5          Q.     The person who it's your
 6    understanding who wrote the words "chest
 7    pain," what was -- you don't know who
 8    that person was, the person's name;
 9    correct?
10          A.     Correct.
11          Q.     Tell me again what job that
12    patient had.
13          A.     It would be -- well, a
14    clinical assistant is the person that
15    Stars the patient.
16          Q.     What does Stars the patient
17    mean?
18          A.     Star is another system where
19    when the patient comes in, they either
20    use their Social Security number or their
21    first name and last name, and they put it
22    into the Star system and it will pick out
23    if the patient was here before.  They
24    confirm that that patient's correct, they
```



Page 27

1    enter the complaint, they press "enter"

2    and then that gets repopulated somehow

3    into pulse check.

4         Q.     That person is not a nurse

5    or a physician; correct?

6         A.     Correct.

7         Q.     That person is like a clerk

8    or a nurse's aid?

9         A.     A nurse's aid, clinical

10   associate.

11        Q.     That's the name for a

12   nurse's aid, clinical associate?

13        A.     Yes.

14        Q.     This clinical associate, are

15   they, like, sitting at the front desk,

16   are they the person that greets the

17   patient when they walk into the emergency

18   department?

19        A.     At the time when

20   Mr. Strimber came in, yes, they were.

21        Q.     And how does that clinical

22   associate know what to place as the

23   complaint?

24              MS. TERESHKO:  I'm going to



Page 32

1        in with multiple complaints.

2  BY MR. AUSSPRUNG:

3        Q.    I mean, is the instruction

4  to put down everything the patient

5  complains of in the complaint spot?

6        A.    The chief complaint is

7  supposed to be one or two words as to why

8  the patient's here.  It's something very

9  brief just to get them through the door.

10  The actual assessment that I performed is

11  why the patient is telling me that he's

12  here.

13        Q.    So, would it be fair to say

14  that the patient said I stubbed my toe

15  and I now have chest pain, that chest

16  pain would be placed in that block?

17        MS. TERESHKO:  Well,

18        objection.  Calls for speculation.

19  BY MR. AUSSPRUNG:

20        Q.    You can answer if you

21  understand.

22        A.    I don't know.  It would

23  depend on the situation.

24        Q.    Well, I think I just gave



Page 52

1          Q.     Could you list all the

2     clinical factors that went into that

3     determination of his ESI level that you

4     used?

5          A.     The patient stated to me

6     that he felt like his abdomen was going

7     to explode, he had multiple complaints.

8     I can recall that he was in a lot of pain

9     and very uncomfortable at triage.  So,

10    that would influence my decision making.

11         Q.     Okay.  In the HPI, that's

12    something that's written by the

13    physician; correct?  SF is Dr. Fisher?

14         A.     Yes.

15         Q.     There's a description that

16    pain began in his epigastrium and then

17    slammed up into his jaw.  Did you ever

18    get any kind of description as the pain

19    moving up his body?

20         A.     I can only tell you what I

21    wrote in my assessment.  I don't recall.

22    I mean, I wrote that he had complaint,

23    legs vibrating and he felt like his

24    abdomen was going to explode, and he



MAGNA ❯
LEGAL SERVICES

Page 53

1    specifically denied chest pain to me.

2            Q.      But he did have, as you

3    describe, epigastric pain?

4                    MS. TERESHKO:  She didn't

5            use the word epigastric.

6    BY MR. AUSSPRUNG:

7            Q.      Where was the location of

8    Mr. Strimber's pain based upon everything

9    you know and the medical record that you

10   documented?

11                   MR. GOEBEL:  At the time of

12           her assessment?

13                   MR. AUSSPRUNG:  Correct.

14                   THE WITNESS:  In his

15           abdomen.

16   BY MR. AUSSPRUNG:

17           Q.      Okay.  That's a fairly

18   diffuse area.  Can you be more specific?

19           A.      I can't be more specific

20   other than what I wrote, that it was in

21   his abdomen and that he said it was not

22   in his chest.

23           Q.      Do you have any knowledge or

24   information as to whether or not the pain

