# UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF PENNSYLVANIA

GARY B. FREEDMAN, ESQUIRE,
Administrator of the ESTATE OF
ABRAHAM STRIMBER, deceased

and

BRACHA STRIMBER

    Plaintiffs,

  v.

STEVEN FISHER, M.D., *et al.*

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF**
**PENNSYLVANIA**

No.: 2:13-cv-3145

### PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
### PURSUANT TO FED.R.CIV.P. 56

  Plaintiffs Gary B. Freedman, Esquire, Administrator of the Estate of Abraham Strimber,

deceased, and Bracha Strimber, (hereafter "Plaintiffs"), hereby file this *Motion for Partial*

*Summary Judgment Pursuant to Fed.R.Civ.P. 56* and aver the following in support thereof:

I.  FACTS AND BACKGROUND

  This Civil Action was initially a diversity action filed against various defendants on

6/7/2013 in the United States District Court for the Eastern District of Pennsylvania.  (Rec. Doc.

#1).  The gist of the action was that the physicians failed to diagnose Abraham Strimber as

suffering from an aortic dissection on 2/22/2012 when he presented to defendant Abington

Memorial Hospital's ("AMH") Emergency Department.  He died later that evening while in an

outpatient/observation unit at AMH as a result of the aortic dissection/ruptured aneurysm.  The

Plaintiffs are Gary Freedman, Esquire, the Executor of the Estate of Abraham Strimber and

Bracha Strimber, the surviving wife of Abraham Strimber.  Following discovery in this matter,

Plaintiffs' filed a *Motion to Amend* their Civil Action Complaint to add a Count for a violation of

the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §1395dd, ("EMTALA"),

and to add as a defendant another physician, Ritesh Rampure, M.D.  (Rec. Doc. #42).  This

Honorable Court granted Plaintiffs' *Motion to Amend* on 5/6/2014 (Rec. Doc. #46) and on that

same date Plaintiffs' Amended Complaint was filed asserting a claim against Ritesh Rampure,

M.D. and Abington Memorial Hospital for a violation of EMTALA.

     Specifically, Plaintiffs' Amended Complaint averred the following with regard to

EMTALA:

### COUNT XI – VIOLATION OF EMERGENCY MEDICAL TREATMENT AND ACTIVE LABOR ACT, 42 U.S.C. §1395dd GARY B. FREEDMAN, ESQUIRE, ADMINISTRATOR OF THE ESTATE OF ABRAHAM STRIMBER AND BRACHA STRIMBER V. ABINGTON MEMORIAL HOSPITAL

     83.    Paragraphs one (1) through eighty-two (82) above are incorporated by reference hereat as if set forth at length.

     84.    Defendant Abington Memorial Hospital violated § 1395dd(a) of EMTALA on 2/22/2012 in order to determine if Decedent Abraham Strimber was suffering from an "emergency medical condition;" specifically, said Defendants and/or their employees, servants, workmen, agents, and/or ostensible agents:

     a.    failed to conduct a full and complete medical screening examination;

     b.    performed an inadequate triage examination without an appropriate complete medical screening examination;

     c.    treated Abraham Strimber disparately from other similarly situated patients;

     d.    departed from their standard medical screening examination of patients with complaints and symptoms similar to those of Abraham Strimber;

     e..    failed to timely determine whether or not an emergency medical condition existed;

     f.    failed to adhere to their own standard policies, procedures and/or protocols for patients entering the Emergency Department in similar medical circumstances;

     g.    failed to perform a medical screening examination within the capabilities of the defendant hospitals' Emergency Department and ancillary services; and

h.      otherwise departed from appropriate standards of care as described herein.

85.      Had such an appropriate screening examination been performed, his thoracic aortic aneurysm/dissection that was placing his life, health, body and/or organ function in serious jeopardy would have been discovered and appropriately treated.

86.      In the alternative, at the time Abraham Strimber presented to Abington Memorial Hospital's Emergency Department on 2/22/2012, he was suffering from an emergency medical condition, *i.e.,* a thoracic aortic aneurysm/dissection, that put his life and health in jeopardy, placed him at risk for a serious impairment of a body function, placed him at risk for the serious dysfunction of a body organ, to wit, his heart/thoracic aorta.

87.      Dr. Fisher and/or Dr. Turner and/or Dr. Rampure and/or the employees, agents, staff, nurses, or other medical providers who cared for Mr. Strimber during his Emergency Department visit at Abington on 2/22/2012, failed to stabilize Mr. Strimber and/or to transfer him to another hospital for further appropriate treatment.

88.      In addition, the screening procedure used at Abington Memorial Hospital as of 2/22/2012 for patients complaining of, *inter alia,* chest pain, was not reasonably calculated to identify critical medical conditions.

89.      In the alternative, the screening procedure used at Abington Memorial Hospital as of 2/22/2012 for patients complaining, *inter alia,* of chest pain, was not applied uniformly, *i.e.,* to Mr. Strimber, as to others who present to the Emergency Department with substantially similar complaints/scenarios.

90.      As a result of the foregoing violations of EMTALA by Abington Memorial Hospital, and/or its employees, servants, workmen, agents and/or ostensible agents, Plaintiffs and/or Decedent Abraham Strimber suffered the losses and damages set forth above in detail.

WHEREFORE, Plaintiffs, Gary B. Freedman, Esquire, and Bracha Strimber, respectfully demand judgment in their favor, and against Steven B. Fisher, M.D., Margo Turner, M.D, Manoj R. Muttreja, M.D., Abington Medical Specialists Association, P.C., d/b/a Abington Medical Specialists, and/or d/b/a AMS Cardiology, Abington Emergency Physicians Associates, and/or Abington Memorial Hospital, and/or Ritesh Rampure, M.D., jointly and/or severally, in an amount in excess of $75,000, exclusive of interest and costs.

(Rec. Doc. #47, ¶¶83-90).

Plaintiffs now move for partial summary judgment with regard to the EMTALA claim as

there is no *genuine* dispute as to the material facts surrounding the EMTALA claim.

Specifically, there is no *genuine* dispute as to the following material facts, which show a

violation of EMTALA:

1.     Mr. Strimber had chest pain despite defendants' protestation otherwise, and attempting to deny the same in light of the voluminous evidence to the contrary does not rise a ***"genuine"*** issue of material fact;

2.     Mr. Strimber was required per EMTALA to undergo a "medical screening examination" at Abington Memorial Hospital to determine if he suffered from an "emergency medical condition;

3.     The "medical screening examination" that was required pursuant to EMTALA for patients with complaints of chest pain required his receiving a chest x-ray/chest imaging which did not occur;

4.     Dr. Fisher never made a determination as to whether Mr. Strimber suffered from an "emergency medical condition" before discharging him from the emergency department;

5.     Abraham Strimber was never admitted as an inpatient to the hospital.

## II.    ARGUMENT

### A.    *LEGAL STANDARD*

Fed.R.Civ.P. 56(a) provides that a party is entitled to "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  This well-known standard is summarized succinctly in a recent District Court opinion from this Circuit:

> In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Valhal Corp. v. Sullivan Assocs., Inc.* 44 F.3d 195, 200 (3d Cir.1995). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To properly consider all of the evidence without making credibility determinations or weighing the evidence, a "court should give credence to the

evidence favoring the [non-moving party] as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." " *Id.* at 151, 120 S.Ct. 2097."

Asserted facts are "material" if their resolution could affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hozier v. Midwest Fasteners, Inc. 908 F.2d 1155, 1158 (3d Cir. 1990). "Genuineness" of a factual dispute focuses on the sufficiency of the evidence presented in opposition to the motion and is satisfied if the evidence bearing on the disputed fact is such "that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. Regardless of which party will have the burden of proof at trial, the initial summary judgment burden is on the movant to show an absence of evidence to support the non-moving party's case. Celotex v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party carries its burden, the non-movant must then identify specific facts showing a genuine issue for trial as to those elements essential to the non-moving party's case and on which the non-movant will bear the burden at trial. *Id.* at 322, 324.

When tested against these standards it is clear that Plaintiffs Motion for Partial Summary Judgment on the EMTALA claim should be granted.

B.   *STATEMENT OF UNDISPUTED MATERIAL FACTS*

1.   Plaintiffs' Decedent presented to the AMH Emergency Department on 2/22/2012 at approximately 11:40 a.m. (See Exhibit "A" attached hereto).

2.   Approximately five (5) minutes later, at 11:45 a.m. it was simultaneously noted that his "COMPLAINT" was CHEST PAIN and that he "denied chest pain" but that he had "multiple complaints:"

Patient Data

**Complaint: CHEST PAIN**
**Triage Time:** Wed Feb 22, 2012 11:45
**Urgency:** ESI Level 2
**Bed:** ED ETC5
**Initial Vital Signs:** 2/22/2012 11:42
BP:169/84
P:66
O2 sat:

**ED Attending:** Fisher, MD, Steven
**Primary RN:** Stebulis, RN, Lynne

R:18
T:96.1 (PO )
Pain:

**TRIAGE** (Wed Feb 22, 2012 11:45 LS)
*PATIENT:* NAME: Strimber, Abraham, AGE: 61, GENDER: male, DOB: Tue Nov 14, 1950, TIME
 OF GREET: Wed Feb 22, 2012 11:40, MEDICAL RECORD NUMBER: 0482935, ACCOUNT
 NUMBER: 1205350964, (Wed Feb 22, 2012 11:45 LS)
*ADMISSION:* URGENCY: ESI Level 2, BED: UNASSIGN. (Wed Feb 22, 2012 11:45 LS)
*VITAL SIGNS:* BP 169/84, Pulse 66, Resp 18, Temp 96.1, (PO ), Time 2/22/2012 11:42. (11:42
 LS)
*COMPLAINT:* CHEST PAIN.
*ASSESSMENT:* pt here w/ c/o legs vibrating and abd feels like is going to explode. pt
 denies chest pain. pt states he had 1 episode of loose stools today after eating radishes, tomatoes,
 eggs and locs. pt also had centrum vitamin. pt w/ multiple complaints. (Wed Feb 22, 2012 11:45

(*Id.*).

    3.     According to the chart, in this five-minute window, Mr. Strimber was having his

vital signs taken as they are recorded at 11:42 a.m.  (*Id.*).

    4.     Mr. Strimber's condition was serious enough that his urgency for treatment was

designated an "ESI Level 2" (*Id.*)

    5.     "ESI Level 2" is defined by AMH's own policies as a "high priority" that requires

treatment within 10 minutes because it is a "high risk situation:"

    b.  Decision point B - ESI Level II
        i.  The patient is high priority and requires treatment to be initiated within 10 minutes.
        ii.  The patient presentation is a high risk situation, unless treated promptly, can deteriorate
           rapidly.
        iii.  Patient age, past medical history, and current medications influence the perceived severity of
           the chief complaint.

(See Exhibit "B" attached hereto).

    6.     Defendant Steven Fisher, M.D., was the attending emergency medicine physician

in the emergency department who cared for Mr. Strimber.  (See Exhibits "A" and "C").

7.      Dr. Fisher did not order a chest x-ray as part of the treatment for Mr. Strimber.

(See Exhibit "A" and Exhibit "C", #4).

8.      Dr. Fisher admitted in his response to requests for admissions that he could not

"admit **or deny**" that Mr. Strimber presented to the AMH Emergency Department a complaint of

chest pain.  (See Exhibit "C", #1)(emphasis added).

9.      Dr. Fisher never admitted Abraham Strimber as an inpatient and discharged Ms.

Strimber from the Emergency Department to an ***outpatient*** area as he confirmed in his

deposition[1]:

> Q.      Well, can you tell from the emergency department chart
> what time he left the emergency department?
>
> A.      I can.  Well, he was admitted to the observation unit at 14:09,
> and I don't readily have what time he left the department.
>
> Q.      Okay.  What is the observation unit?
>
> * * *
>
> A.      The observation unit is an area that is utilized to sequester
> patients that are admitted to observations so that they follow
> more of a routine so that their care can be coordinated and
> expedited.
>
> Q.      My question is a little more simplistic than that, what I
> intended.  ***That's an inpatient area?***
>
> A.      ***No.  It's technically an outpatient area.***
>
> Q.      It is part of the emergency department?
>
> A.      It is not.

---

[1]  Plaintiffs anticipate that AMH will cite to 42 C.F.R. §489.24(d)(2) and argue that Ms. Strimber was admitted to the hospital and therefore it cannot be liable for an EMTALA violation.  However, this regulation, on its face, is irrelevant and not applicable for three (3) reasons: First, it requires that the individual be "screened", which Mr. Strimber was not as discussed at length herein; Second, it requires that an "emergency medical condition" be found to exist, which here it was not; and Third, and most importantly, it only applies to **"inpatients"** and Dr. Fisher admits, and other evidence shows, Mr. Strimber was not admitted and was, indeed, an outpatient merely being observed.

> Q.     So it's technically an outpatient area where patients are observed pending being placed on a [*sic*] inpatient floor somewhere?
>
> A.     ***It's an area where they received further <u>care until they may meet criteria, if you will, to be admitted to the hospital</u>***.

(<u>See</u> Deposition Transcript of Steven Fisher, M.D., pg. 41, line 20 through pg. 43, line 11, attached hereto as Exhibit "D") (emphasis added).

10.    Thus, Abraham Strimber was <u>never</u> admitted as an "inpatient" to the hospital.

11.    Indeed, AMH's Coding Summary is titled "**<u>OUTPATIENT</u>** Coding Summary:"



**Abington Memorial Hospital**
**1200 Old York Road**
**Abington, PA 19001**

**Outpatient Coding Summary**

| Facility Abington Memorial Hospital | | | | | | | |
|---|---|---|---|---|---|---|---|
| Patient Name STRIMBER, ABRAHAM | | | Sex Male | Birth Date 11/14/1950 | Age 61 | MR Number A0482935 | Account Number 1205350964 |
| Admit Date 02/22/12 12:35 PM | Discharge Date 02/22/12 10:49 PM | | LOS 1 | Primary Insurance BLUE CROSS PERSONAL CHOICE [809] | | Disposition EXPIRED [20] | |

(<u>See</u> Exhibit "E" attached hereto).

12.    Prior to Mr. Strimber's discharge to the Emergency Department, Dr. Fisher noted that his ***primary*** final diagnosis was "**Chest pain [NOS]**" and an additional diagnosis of "Epigastric pain:"

**DIAGNOSIS** (14:09 SE)
*FINAL:* PRIMARY: **Chest pain [NOS]**, ADDITIONAL: **Epigastric pain.**

(<u>See</u> Exhibit "A", pg. 11 of 12).

13.     Dr. Fisher requested at 2:27 p.m. that Mr. Strimber be placed into observation status because of chest pain, and, importantly, the record of the same actually requires the reason therefore to be typed in:"

| Adm, Obs, Discharge, Transfer | Date | Status | Requested By |
|---|---|---|---|
| Place Patient In Observation Status | 02/22/2012 14:27 | Performed | *Fisher, Steven MD* |
| 001LJMKQC | | | |
| ...  Observation started: 22-Feb-2012, 14:27  Additional Instructions: Reason for Observation (type-in) chest pain;Under the Care of hosp green | | | |

(See Exhibit "H" attached hereto).

14.     In addition, at the time of defendant Margo Turner, M.D.'s History & Physical, she noted a "CHIEF COMPLAINT" of "**chest**/epigastric/back pain, n/v/d" *and* that the history source for the same was the "patient, spouse:"



CHIEF COMPLAINT:

Chief Complaint: chest / epigastric / back pain , n/v/d
History Source: patient, spouse

(See Exhibit "F").

15.     Further, under her "PLAN COMMENTS" Dr. Turner noted the following:

PLAN COMMENTS:

Comments (Assessment and Plan): 1) chest / epigastric / back pain - rc cl  abd done, telemetry, trend co, ekg , anti emetics and analgesics
2) history of valve replacement surgery - inr 2.0, coumadin on hold as pt is npo - await further recommendations
3) n/v/d - npo, ivf, stool culture & stool for c. diff
Meds and plans as per orders.

(See Exhibit "F").

16.     Dr. Fisher's employer, Abington Emergency Physicians' *"Statement of Account"* also lists Mr. Strimber's first diagnosis as "CHEST PAIN:"

```
         ABINGTON EMERGENCY PHYSICIANS
                  PO BOX 9012
             WILMINGTON DE 19804

                 8884566062

            Tax ID: 232624943

           Statement of Account


Account No:D0X0HJ
   Patient :STRIMBER, ABRAHAM          Resp Party:STRIMBER, ABRAHAM
   Address  ████████  ██          Address  ██  ██ ████ ██ █
   Develop :                           Develop :
   City    :PHILA                      City    :PHILA
   State   :PA      Zip:19115          State   :PA      Zip:19115
   Phone   :215-698-7511               Phone   :215-698-7511
   Birth dt ██ ██                      Birth dt ██ ██

   Prim Dr:924 STEVEN F. FISHER, M
Iag: 786.50 CHEST PAIN
Iag: 789.06 EPIGASTRIC ABD PAIN
```

(See Exhibit "G" attached hereto).

17.    The *Outpatient Coding Summary*, attached hereto as Exhibit "E" (*supra*), also

notes that Mr. Strimber's "admit diagnosis" was "Unspecified chest pain:"

### Outpatient Coding Summary

| Facility Abington Memorial Hospital | | | | | | |
|---|---|---|---|---|---|---|
| Patient Name STRIMBER, ABRAHAM | | Sex Male | Birth Date ██ ██ ██ | Age 61 | MR Number A0482935 | Account Number ██ ██ █ |
| Admit Date 02/22/12 12:35 PM | Discharge Date 02/22/12 10:49 PM | LOS 1 | Primary Insurance BLUE CROSS PERSONAL CHOICE [809] | | Disposition EXPIRED [20] | |
| Attending Physician WATSON, ROBERT | | Patient Type Observation | | | Chart Status Record has been sent to billing | |

Admit Diagnosis
78650 Unspecified chest pain

Primary Diagnosis
4411 Thoracic aneurysm, ruptured

Secondary Diagnosis
42789 Cardiac dysrhythmia
4589 Hypotension, unspecified
42611 First degree atrioventricular block
V433 Heart valve replacement status

(<u>See</u> Exhibit "E").

18.     Mr. Strimber had a total of three (3) EKG's at AMH, and the initial EKG at 12:28

p.m. was indicated because of "abdominal pain", however, a second EKG was ordered at 4:02

p.m. and the indication was *changed* to "Chest pain:"



(<u>See</u> Exhibit "I" attached hereto).

19.     At 4:01 p.m. Dr. Turner requested a cardiology consult because of Mr. Strimber's

history of having had a valve replacement **and** because of "chest pain:"



(<u>See</u> Exhibit "J" attached hereto).

20.     Consistent with her history and physical, request for cardiac consultation, and her

indication for an EKG, Dr. Turner herself acknowledged at her testimony that she believed Mr.

Strimber had chest pain:

Q.     Do you believe that the patient never had chest pain?

A.     **<u>I believe he reported he had chest pain to the triage</u>**
        **<u>nurse</u>**.

Q.      Do you believe that the patient **never** had any chest pain?

A.      Do I believe the patient never had any –

Q.      Never actually had chest pain.

A.      **I believe the patient had chest pain**.

Q.      And why do you believe that?

A.      I don't have any reason to doubt what he spoke to the triage nurse about.

Q.      And in fact, you now know today that he had a thoracic aortic aneurysm; correct?

A.      I do.

Q.      And that would be consistent with chest pain; correct?

A.      That would be.

(See Deposition Transcript of Margo Turner, M.D., attached hereto as Exhibit "J", pg. 54, line 9 through pg. 55, line 7) (emphasis added).

    21.    Thus, it is clear from the above, and there is no ***genuine*** dispute, that Abraham Strimber had chest pain and that he was discharged from the emergency department to an outpatient area.

    22.    Defendant AMH's EMTALA expert, Michael Chansky, M.D., admitted in his deposition that Mr. Strimber presented to the AMH emergency department and that AMH had an obligation to perform a "medical screening exam" to determine whether an "emergency medical condition" existed in Mr. Strimber, but that Dr. Fisher never concluded whether an emergency medical condition existed **before discharging him**.  (See Deposition Transcript of Michael Chansky, M.D., pg. 40, lines 4-18; pg. 75, lines 6-12 attached hereto as Exhibit K").

23.     As for the "medical screening examination" required by EMTALA, during discovery *Plaintiffs' Request for Admission Dated March 28, 2014* was sent to AMH in which AMH admitted that it had no explicit/written policy that requires patients with complaints of chest pain to undergo a chest x-ray.  (See Exhibit "L" attached hereto).

24.     Dr. Chansky, AMH's EMTALA expert, agrees that there was no "written" policy concerning the medical screening examination for patients who complains of chest pain at AMH's emergency department.  (See Exhibit "K", pg 83, lines 13-18).

25.     When asked how a proper "medical screening examination" is determined under EMTALA when there is no "written" policy/procedure, Dr. Chansky responded at length, but essentially that it is "unique" to every patient and that there is no "uniform screening" beyond a history and physical which is required of <u>every</u> patient who comes to the emergency department. (<u>See</u> Exhibit "K", pg. 84, line 6 through pg. 91, line 18).

26.     Such a position and testimony is simply and unequivocally erroneous, as this Court itself has recognized the axiomatic black-letter law of EMTALA in its June 11, 2014 *Memorandum and Order* when granting Plaintiffs' discovery requests to obtain other similarly-situated patients' charts to determine what a "uniform screening" is at AMH for patients with chest pain.  (Rec. Doc. #63).  The "essence of [EMTALA's] screening requirement is that there be some screening procedure, and that it be administered even-handedly" necessitates a comparison to the care received by *other* patients. <u>Guadelupe et al. v. Agosto et al.</u>, 299 F.3d 15, 19 (1st Cir. 2002) *(citation omitted); <u>see</u> also <u>Davis et al. v. Township of Paulsboro</u>, 424 F.Supp.2d 773, 779 -780 and n.16 (D.N.J. 2006) (holding that hospitals must perform screening in a uniform manner to all similarly situated patients).

27.     Thus, in order to determine what AMH's uniform screening examination is for patients who present with a complaint of chest pain, Plaintiffs obtained a total of 222 emergency department charts spanning a four (4) week period surrounding Mr. Strimber's care on 2/22/2012 for all patients who presented with an initial complaint of "chest pain" in the Emergency Department[2].

28.     The 222 produced charts consisted of thousands of pages, and as such a summary was prepared pursuant to F.R.E. 1006 summarizing the relevant information for the issue at hand.  (See Summary attached hereto as Exhibit "M")

29.     It is clear, and AMH does not appear even attempt to refute, that **96%  (or 212/221)** of patients with ***ANY*** complaint of chest pain, even when it was not the initial or even complaint, received some form of chest imaging.  (See Expert Report of Keith A. Marill, M.D., attached hereto as Exhibit "N" and Exhibit "M").

30.     Dr. Marill, Plaintiffs' emergency medicine expert and EMTALA expert, correctly concludes that, without an explicit written policy determining what a uniform screening for a patient who complaints of chest pain consists of, " it is clear that the standard screening evaluation for patients with chest pain is to receive a chest x-ray or other chest imaging.  (See Exhibit "N").

31.     AMH's EMTALA expert, Dr. Chansky, simply states in a conclusory fashion that a chest xray is not part of the screening examination for patients with chest pain, **having made no reference to, or review of, the 222 medical charts from AMH**.  (See Exhibit "O").  While this may be his *opinion* regarding the standard of care, it is simply irrelevant for the EMTALA

---

[2]  One of these charts was Abraham Strimber, so there are a total of 221 charts of *other* patients.  It is factually important that the hospital itself included Abraham Strimber's chart in a request for patients who complained of chest pain.

analysis; the question is what uniform screening examination existed for similarly-situated patients at AMH; that uniform screening examination, beyond doubt, includes a chest xray.

32.     Amazingly, Dr. Chansky testified at his deposition that he did not even review all of the 222 charts turned over in the EMTALA discovery request.  (See Exhibit "K", pg. 133, lines 15-19).

33.     Dr. Chansky further admitted in his deposition that no decision was made while Mr. Strimber was in the emergency department as to whether had an emergency medical condition *before* he was discharged to the *outpatient* area to be observed.  (See Exhibit "K", pg. 40, lines 15-18)[3].

33.     In summary, the undisputed material facts to which AMH cannot *genuinely* dispute show (1) Mr. Strimber had chest pain; (2) the uniform screening examination at AMH for patients with chest pain included a chest xray or other chest imaging; (3) Ms. Strimber did not receive a chest xray; (4) Mr. Strimber was discharged from the emergency department as an *outpatient* to be observed without a determination ever being made if he suffered from an "emergency medical condition" as required by EMTALA.

### C.     *Application of Facts to the Law*

The Emergency Medical Treatment and Active Labor Act (EMTALA, 42 U.S.C. 1395dd) sets forth two (2) requirements for hospitals treating patients such as Abraham Strimber, a screening requirement and stabilization requirement:

---

[3]  Dr. Chansky immediately testifies that because the patient was "admitted" EMTALA no longer applied, and therefore, apparently, no making a determination as required by the statute if Mr. Strimber had an emergency medical condition was moot.  (See Exhibit "K", pg. 40, line 19 though pg. 41, line 2).  As Dr. Fisher testified however, Mr. Strimber was discharged and merely observed in an *outpatient* unit.  Thus, it is clear that Mr. Strimber was discharged before a determination was made as to whether he suffered from an "emergency medical condition.'  This is a clear violation of EMTALA that the defendants essentially admit.

**(a)** Medical screening requirement

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

**(b)** Necessary stabilizing treatment for emergency medical conditions and labor

**(1)** In general

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

> **(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
> **(B)** for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

EMTALA expressly extends eligibility to "**to any and all patients.**" Broughton v. St. John Health Sys., 246 F. Supp. 2d 764, 767 ( E.D. Mich. 2003)(emphasis Added).  The Act itself draws no distinction between persons with and without insurance.  Rather, the Act's plain language unambiguously extends its protections to "any individual" who seeks emergency room assistance. Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991).

At issue here, to establish an EMTALA violation, a plaintiff must show that a "hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away,

discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition." Correa v. Hospital San Francisco, 69 F.3d 1184, 1190 (1st Cir. 1995). See also Miller v. Medical Ctr. of S.W. La., 22 F.3d 626, 628 (5th Cir. 1994); Stevison v. Enid Health Sys., Inc., 920 F.2d 710, 712 (10th Cir. 1990).    In this case, AMH violated the EMTALA requirement to give Mr. Strimber an appropriate medical screening examination in two (2) ways: (1) they failed to perform a chest xray/chest imaging as they had for other similarly-situated patients and (2) they failed to determine whether Mr. Strimber suffered from an "emergency medical condition" prior to discharging him.   AMH also violated EMTALA in that they failed to stabilize his medical condition prior to discharging him.

### 1.    Abraham Strimber Was Not Afforded an Appropriate Medical Screening to Determine If He Had an Emergency Medical Condition

As just noted, this EMTALA requirement was violated in two (2) ways.   EMTALA requires a hospital to even-handedly administer an appropriate screening procedure to all emergency room patients." Cruz-Queipo v. Hosp. Espanol Auxilio Mutuo De P.R., 417 F.3d 67, 71 (1st Cir. P.R. 2005).   Essentially, it requires that patient not be treated disparately.   The question under EMTALA's screening obligation is **not** whether a patient has been given negligent or non-negligent treatment.   Instead, the question presented by an EMTALA claim is whether the patient has been treated as other similarly situated patients are treated.   *Id.*   Thus, in the instant case, defendants were required to appropriately screen Abraham Strimber "even-handedly" for his initial and ongoing medical complaint of, *inter alia*, chest pain and to provide him with a level of screening uniform to all those who present with substantially similar complaints.   Defendant AMH failed to do so as evidenced by their own medical records and policies, as well as by their own expert, Dr. Chansky.

Cour have achieved a consensus on a method of assessing the appropriateness of a medical examination in the EMTALA context:

> A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that **level of screening uniformly to all those who present substantially similar complaints**.

See Baber v. Hosp. Corp. of Am. 977 F.2d 872, 879 (4h Cir. 1992); Gatewood v. Washington Healthcare Corp., at, 1041. "The essence of this requirement is that there be *some* screening procedure, and that it be administered even-handedly." Correa v. Hospital San Francisco, 69 F.3d at 1193. In making this assessment, Courts obtain guidance from the hospital's own policies and procedures. A hospital's failure to conform to its own standard screening procedures constitutes inadequate screening in violation of EMTALA. Moore v. John F. Kennedy Memorial Hospital, 1994 U.S. Dist. Lexis 8, *7 (E.D. Pa.., January 5, 1994); Gatewood v. Washington Healthcare Corp. at 1041.Here, as set forth above, hospital personnel, including Drs. Fisher and Turner, had actual knowledge of Mr. Strimber's complaint of chest pain. AMH did not have a written policy of procedure that provided for a "uniform screening" for patients with complaints of chest pain as detailed *supra*, thus, the question is how AMH screened other patients with complaints of chest pain, which revealed that in practice the policy of AMH in its uniform screening of patients with chest pain includes a chest xray or other chest imaging. It bears repeating that as detailed above, AMH does not dispute that their own uniform screening exam as evidenced by the 221 charts requires a chest xray/chest imaging on patients who complaint of chest pain; their own expert does not deny the same either but merely parrots the line that the Mr. Strimber did not have chest pain. Thus, there is not genuine dispute of material fact that AMH failed to perform its own uniform screening examination on Mr. Strimber, which constitutes a violation of EMTALA as a matter of

law. That failure in itself constitutes a violation of EMTALA as recognized in Moore and Gatewood.

Correa v. Hospital San Francisco, *supra,* is instructive for the instant case. Ms. Gonzalez awoke feeling unwell and experiencing "chills, cold sweat, dizziness [and] chest pains." She requested that her family take her to the hospital. The evidence as to what Ms. Gonzalez reported about her condition was contested. The family related Ms. Gonzalez was having chest pain; the hospital maintained that Ms. Gonzalez only reported dizziness and nausea. However, in our case, it is copiously documented that Mr. Strimber had complained of chest pain. Ms. Gonzalez and her daughter were told to sit and bide their time. Weary of waiting, the two women left and went to the office of Dr. Rojas. Her condition deteriorated and Dr. Rojas arranged transport to a hospital. Mrs. Gonzalez died at 4:30 p.m. that same day as a result of hypovolemic shock.   Correa v. Hospital San Francisco at 69 F.3d at 1188-89.

The Court found that the delay in attending to the patient amounted to an effective denial of a screening examination. The Court looked specifically to the hospital's violation of its own policies and internal procedures for screening evaluations (which required vital signs, documentation, treatment of patients with chest pain). Finding that the "Hospital did not measure up to the parameters it had established" and customarily offered to its patients *with chest pain*, the Court concluded that the decedent had been denied screening. The Court found an EMTALA violation, holding that "the same screening examination must be made available to all similarly situated patients." *Id.* at 1193. Here, as in Correa, there is no doubt that the hospital failed to conform to its own policies and procedures for the uniform medical screening that must be afforded Mr. Strimber. Thus, summary judgment is clearly appropriate.

Here, just like in <u>Correa v. Hospital San Francisco</u>, Abraham Strimber was denied a uniform screening examination of his medical condition concerning an initial *and* subsequent complaints of chest pain that was made available to other similarly situated patients. AMH ignored its own *de facto* policies and procedures for patients with ***any*** complaint of chest pain.  The hospital, moreover, had actual knowledge of the potential emergency medical condition as is clearly documented.   There is simply no evidence that AMH admits, *via* Dr. Fisher and its *Outpatient Coding Summary* that Mr. Strimber was never admitted and admits that Mr. Strimber did not receive a chest xray/chest imaging required by its own uniform screening examination for patients with chest pain.  Thus, no reasonable jury could conclude that EMTALA was not violated and summary judgment is appropriate.

The second manner in which this EMTALA requirement was violated occurred when Mr. Strimber was discharged from the emergency department to an ***outpatient*** unit for mere observation **before the medical screening examination was completed and a determination made if an "emergency medical condition" existed**.  As set forth above in detail above and at length, Dr. Fisher admits Mr. Strimber was not admitted.  Further, Dr. Chanksy, AMH's EMTALA expert, admits that no determination of whether an emergency medical condition existed was ever made before that discharge.  (<u>See</u> Exhibit "K", pg. 40, lines 15-18) (<u>also</u> <u>see</u> fn. 3, *supra*). This is a violation of EMTALA on its face and warrants summary judgment.

## 2.      **Abraham Strimber Was Not Stabilized Prior to Discharge in Violation of the EMTALA.**

Under EMTALA, when any individual comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide medical examination and such treatment as may be required to stabilize the medical condition.

EMTALA defines the term "to stabilize" as to provide such medical treatment of the condition as may be necessary to assure within reasonable medical probability that no material deterioration of the condition is likely to result from discharge. 42 U.S. C. § 1395dd(e).

In Cruz-Queipo v. Hosp. Espanol Auxilio Mutuo, 417 F.3d 67 (1st Cir. 2005), the Court recognized that the plaintiff's assertion that he did in fact report chest pain had to be credited at the summary judgment stage, and in this case it is indisputable that the records are replete with reference to Mr. Strimber's chest pain imputing actual knowledge of the same to AMH and making any dispute as to whether he had chest pain not "genuine." Because the complaint of chest pain had to be credited, the hospital had a duty to stabilize the heart condition (*i.e.*, the "emergency medical condition") that culminated in a heart attack. *Id.* 417 F.3d at 71. Again, AMH cannot deny that it had actual knowledge of the complaint of chest pain and that it did not perform a complete uniform screening examination in accordance with its own policies before discharging Mr. Strimber to an outpatient unit for mere observation.

III.    CONCLUSION

In conclusion, there is overwhelming evidence that cannot be ***genuinely*** disputed that Mr. Strimber presented to the AMH emergency department with a complaint of chest pain and that he did not receive the same uniform screening examination as other similarly-situated patients as per AMH's own practice. In addition, Mr. Strimber was discharged as an ***outpatient*** before it was determined if he was suffering from an emergency medical condition. These facts show a clear violation of EMTALA and Plaintiffs are entitled to summary judgment on this issue.                          Respectfully submitted,

By:    */s/ H. Leon Aussprung, M.D./James E. Hockenberry*
       H. Leon Aussprung, III, M.D., Esquire
       James E. Hockenberry, Esquire
       *Counsel for Plaintiffs*