# EXHIBIT "K"

ORIGINAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| GARY B. FREEDMAN, ESQUIRE, Administrator of the ESTATE OF ABRAHAM STRIMBER, deceased and BRACHA STRIMBER, | : NO.<br>: 2:13-cv-3145-CDJ<br>:<br>:<br>:<br>:<br>: |
| Plaintiffs, | : |
| v. | : |
| STEVEN FISHER, M.D., et al., | : |
| Defendants. | : |

- - -

Thursday, September 25, 2014

- - -

Videotape deposition of MICHAEL E. CHANSKY, M.D., taken pursuant to notice, was held at the law offices of Christie Pabarue and Young, 1880 JFK Boulevard, 10th Floor, Philadelphia, Pennsylvania, commencing at 2:00 p.m., on the above date, before Amy M. Murphy, a Professional Court Reporter and Notary Public there being present.

- - -

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com

MAGNA LEGAL SERVICES



Page 38

1    Emergency Medicine Transfer and Labor Act
2    no longer applies.
3         So if Dr. Fisher had
4    admitted the patient to Abington Memorial
5    Hospital and Dr. Turner was now taking
6    over and providing an independent
7    evaluation, she no longer is, in that
8    circumstance, held to EMTALA, I believe.
9        Q.   So I want to kind of
10   summarize that and tell me if I got it
11   correct or not.
12        So Dr. Turner, it's your
13   opinion and understanding that Dr. Turner
14   did not perform an EMTALA medical
15   screening examination because of at the
16   point she saw the patient, EMTALA no
17   longer applied?
18        A.   Yes. Assuming that an
19   admission order had been placed and
20   Mr. Strimber was no longer an Abington
21   Memorial Hospital emergency department
22   patient, he was now an Abington Memorial
23   Hospital inpatient.
24        Q.   So do we agree that in
                MAGNA LEGAL SERVICES

Page 39

1    Mr. Strimber's care at Abington Memorial
2    Hospital, the medical screening
3    examination was performed by Dr. Fisher?
4        A.   Yes.
5        Q.   Did Dr. Fisher reach a
6    conclusion from his medical screening
7    examination as to whether or not the
8    patient, Mr. Strimber, had an emergency
9    medical condition?
10       A.   He did not definitively.
11       Q.   So is it your testimony that
12   Mr. Strimber presented to the emergency
13   department at Abington Memorial Hospital,
14   correct?
15       A.   Yes.
16       Q.   With a request for an
17   examination, correct?
18       A.   Yes.
19       Q.   Do you have an understanding
20   as to whether the emergency department at
21   Abington Memorial Hospital is a qualified
22   emergency department as part of the
23   Medicare program?
24       A.   I believe it is.
                MAGNA LEGAL SERVICES

Page 40

1        Q.   So those criteria are all
2    met as far as EMTALA goes, correct?
3        A.   Yes.
4        Q.   So the hospital had an
5    obligation to provide a medical screening
6    exam to determine whether or not an
7    emergency medical condition existed,
8    correct?
9        A.   They did.
10       Q.   And it's your testimony that
11   an emergency medical examination was
12   performed by Dr. Fisher, correct?
13       A.   Yes, by Dr. Fisher and his
14   ancillary staff, yes.
15       Q.   And no conclusion was ever
16   reached as to whether or not the patient
17   had an emergency medical condition?
18       A.   Yes.
19       Q.   But a decision was made to
20   admit the patient to the hospital; that's
21   your understanding, correct?
22       A.   Yes.
23       Q.   And when that occurred,
24   EMTALA no longer applied?
                MAGNA LEGAL SERVICES

Page 41

1        A.   I believe that's the law,
2    but I'm not an attorney, obviously.
3        Q.   I thought -- and maybe I'm
4    wrong, and maybe your understanding is
5    different, that's why I'm asking you --
6    that one of the obligations of the
7    medical screening examination was to
8    reach a conclusion, a yes-or-no
9    conclusion, as to whether an emergency
10   medical condition was present. Is that
11   not your understanding?
12       A.   Yes.
13       Q.   Yes, it's not your
14   understanding?
15       A.   Yes.
16       Q.   Okay. Do you agree that all
17   emergency departments should have a
18   standardized process to ensure that
19   patients presenting for medical care
20   receive an appropriate medical screening
21   examination?
22            MR. YOUNG: Objection to
23       form. You can answer it.
24            THE WITNESS: Yes.
                MAGNA LEGAL SERVICES

### Page 74

1    Q.   And is it also your
2  understanding that Dr. Fisher never
3  arrived at such a conclusion because he
4  never completed his medical screening
5  examination, correct?
6        MR. CAMHI: Object to the
7    form of the question.
8        MR. YOUNG: I object to the
9    form of the question as well when
10   you say he never completed it.
11       THE WITNESS: No. I don't
12   agree with the statement.
13 BY MR. AUSSPRUNG:
14   Q.   Did Dr. Fisher complete his
15 medical screening examination?
16   A.   Dr. Fisher completed his
17 evaluation to the point of where he felt
18 the epigastric pain, and distension, and
19 bloating, and diarrhea, and needed to be
20 further evaluated.
21   Q.   Thank you, but my question
22 was, based upon how a medical screening
23 exam is defined within the law of EMTALA,
24 did Dr. Fisher complete his medical

### Page 75

1  screening examination?
2    A.   He did, because his
3  conclusion was that the patient needed to
4  be admitted to the hospital for further
5  testing and evaluation.
6    Q.   So am I correct that it's
7  your opinion and testimony that Dr.
8  Fisher completed his medical screening
9  examination but did not reach a
10 conclusion as to whether an emergency
11 medical condition existed?
12   A.   Yes.
13   Q.   Well, if he didn't reach a
14 conclusion as to whether or not an
15 emergency medical exam -- sorry. Strike
16 that. Let me try it again.
17       If Dr. Fisher did not make a
18 conclusion or reach a conclusion as to
19 whether an emergency medical condition
20 existed, how could his screening
21 examination be done?
22   A.   It was done on the basis of
23 his history and physical, a decision that
24 further testing needed to be done based

### Page 76

1  on his initial evaluation. He did
2  consider conditions that would need
3  stabilization such as an acute myocardial
4  infarction and abdominal aortic aneurism,
5  renal colic. I believe he considered
6  some other diagnoses.
7        However, through his
8  appropriate evaluation, history,
9  physical, and the tests he ordered, the
10 imaging studies, he did not have a clear
11 explanation for the patient's epigastric
12 pain. Therefore, he recommended further
13 evaluation in the hospital. He did not
14 discharge the patient from the hospital
15 without finishing his screening exam.
16   Q.   I think you said that based
17 on the imaging and tests that Dr. Fisher
18 did was part of your answer, correct?
19   A.   Correct.
20   Q.   Were the imaging and tests
21 that Dr. Fisher did part of the medical
22 screening examination?
23   A.   Yes.
24   Q.   Okay. You don't say that in

### Page 77

1  your report, do you?
2    A.   They're part of his
3  evaluation.
4    Q.   Well, no. You say, there is
5  no medical screening evaluations for
6  patients with chest pain beyond a
7  thorough history and examination by the
8  emergency room physician. You don't say
9  anything about imaging studies or
10 laboratory tests as being part of the
11 medical screening evaluation, do you?
12       MR. YOUNG: Let me just make
13   this objection. I think that what
14   you read from, which is part of
15   the second report, was not said
16   specifically with regard to Dr.
17   Fisher, at least I didn't read it
18   that way, but we can certainly
19   inquire. All I'm saying is I
20   think you may have just inserted
21   some apples next to the oranges in
22   terms of that particular
23   reference. And I object to it,
24   but certainly the doctor can

MAGNA LEGAL SERVICES

20 (Pages 74 to 77)

Page 82

1  no. The information of -- new
2  information and -- obviously, this
3  is a strong hypothetical, because
4  the triage nurse, Dr. Fisher,
5  Dr. Turner, Mrs. Strimber,
6  Mr. Strimber never complained of
7  chest pain. So it's a complete
8  hypothetical.
9      Had Mr. Strimber complained
10 of chest pain, hypothetically, to
11 the providers, then a further
12 history pertinent to the chest
13 pain would have been elucidated,
14 what were you doing when it came
15 on, what's it associated with,
16 does it radiate, what makes it
17 better, what makes it worse.
18     And then based on those
19 questions, a chest x-ray may be
20 part of the medical screening exam
21 and it may not, but it is
22 certainly not required.
23 BY MR. AUSSPRUNG:
24     Q.   And one of the reasons that
            MAGNA LEGAL SERVICES

Page 83

1  you gave me to say that a chest x-ray is
2  not required as part of the medical
3  screening exam was that Abington Memorial
4  Hospital has no policy or protocol
5  applicable to patients presenting with
6  Mr. Strimber's symptoms?
7      MR. YOUNG: Objection to the
8  form. I don't think that's what
9  he said.
10 BY MR. AUSSPRUNG:
11     Q.   Let me ask it a different
12 way. Let me cure the objection.
13     Do we agree that Abington
14 Memorial Hospital had no written policy
15 or procedure concerning the medical
16 screening examinations for patients
17 presenting with chest pain?
18     A.   Yes.
19     Q.   Do we agree, same question,
20 for patients presenting with abdominal
21 pain?
22     A.   I've not looked through all
23 of their policies and procedures. I
24 don't know if they have a policy
            MAGNA LEGAL SERVICES

Page 84

1  regarding abdominal pain, but I know
2  there was none for chest pain.
3      Q.   You haven't seen a policy
4  for abdominal pain, correct?
5      A.   I have not.
6      Q.   Under EMTALA, when a
7  hospital does not have a written policy
8  or procedure concerning a medical
9  screening exam for a particular category
10 of patients, how is it determined if an
11 appropriate medical screening examination
12 occurred?
13     A.   It is determined that if a
14 qualified provider evaluates the patient,
15 which, as we said before in this case,
16 was met by an emergency physician, and
17 performs a history and physical with the
18 intent to stabilize the patient and rule
19 out an emergency medical condition.
20     Q.   So, Doctor, do you -- are
21 you of the opinion that Mr. Strimber does
22 not have to receive a uniform medical
23 screening exam based upon other patients
24 who presented to the emergency department
            MAGNA LEGAL SERVICES

Page 85

1  at Abington Memorial Hospital with
2  similar symptoms?
3      MR. YOUNG: Could you say
4  that again? I just missed it.
5          - - -
6      (Whereupon, the pertinent
7  portion of the record was read.)
8          - - -
9      MR. YOUNG: Objection to the
10 form of the question. I just
11 don't think it's clear as you've
12 posed it. But you can respond to
13 it, if you understand.
14     THE WITNESS: I am of the
15 opinion -- I am of the opinion
16 that -- let me make sure I'm
17 answering this question right.
18     I'm of the opinion that
19 Mr. Strimber's medical screening
20 evaluation is tailored to him in
21 that you can look at 200 or 300
22 other patients, and every one of
23 those other patients has an
24 independent history and physical
            MAGNA LEGAL SERVICES

22 (Pages 82 to 85)

