# EXHIBIT C

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

        -   -   -

GARY B. FREEDMAN,            :
ESQUIRE, Administrator       :  NO.
of the ESTATE OF             :  2:13-cv-3145-CDJ
ABRAHAM STRIMBER,            :
deceased                     :
and                          :
BRACHA STRIMBER,             :
                             :
          Plaintiffs,        :
                             :
     v.                      :
                             :
STEVEN FISHER, M.D.,         :
et al.,                      :
                             :
          Defendants.        :

        -   -   -

Tuesday, March 18, 2014

        -   -   -

        Videotape deposition of
MARGO E. TURNER, M.D., taken pursuant to
notice, was held at the law offices of
Christie, Pabarue & Young, 1880 JFK
Boulevard, 10th Floor, Philadelphia,
Pennsylvania, commencing at 10:40 a.m.,
on the above date, before Amy M. Murphy,
a Professional Court Reporter and Notary
Public there being present.

        -   -   -

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com

MAGNA LEGAL SERVICES



Page 2

```
1   APPEARANCES:
2
    LAW OFFICE OF LEON AUSSPRUNG, MD, LLC
3   BY: LEON AUSSPRUNG, M.D., J.D., LL.M.,
    ESQUIRE
4   One Commerce Square
    2005 Market Street, Suite 2300
5   Philadelphia, Pennsylvania 19103
    267-809-8250
6   Representing the Plaintiffs
7
    LAW OFFICE OF LEON AUSSPRUNG, MD, LLC
8   BY: JAMES HOCKENBERRY, ESQUIRE
    One Commerce Square
9   2005 Market Street, Suite 2300
    Philadelphia, Pennsylvania 19103
10  267-809-8250
    Representing the Plaintiffs
11
12  CHRISTIE PABARUE AND YOUNG
    BY: JAMES A. YOUNG, ESQUIRE
13  1880 JFK Boulevard, 10th Floor
    Philadelphia, Pennsylvania 19103
14  215-587-1625
    Representing the Defendant,
15  Kristina Martinez, Dr. Turner, Abington
    Hospital
16
17  POST & SCHELL, PC
    BY: DONALD N. CAMHI, ESQUIRE
18  Four Penn Center
    1600 JFK Boulevard
19  Philadelphia, Pennsylvania 19103
    215-587-1015
20  Representing the Defendant, Steven
    Fisher, M.D., Abington Emergency
21  Physician Associates
22
23
24
```

Page 4

```
1          - - -
2        INDEX
3          - - -
    Testimony of: MARGO E. TURNER, M.D. PAGE
4
5
6   By Mr. Aussprung        7
7
          - - -
8
       EXHIBITS
9
          - - -
10
    NO.    DESCRIPTION        PAGE
11
12  Turner-1  Curriculum Vitae      11
13  Turner-2  Physician Employment
              Agreement         19
14
    Turner-3  Delineation of
15            Privileges        22
16  Turner-4  Emergency Department
              Record            41
17
18  Turner-5  Emergency Department
              Record            51
19  Turner-6  Department of Radiology
              Record            71
20
    Turner-7  History & Physical    79
21
22  Turner-8  Consultation Report   98
23  Turner-9  Nursing Note      101
24  Turner-10 Nursing Note      107
```

Page 3

```
1      APPEARANCES CONTINUED....
2
3   GERMAN, GALLAGHER & MURTAGH, PC
    BY: CHILTON G. GOEBEL, III, ESQUIRE
4   The Bellevue
    200 S. Broad Street, Suite 500
5   Philadelphia, Pennsylvania 19102
    215-875-4023
6   Representing the Defendant, Dr. Muttreja
7
8
9
10
11
12
13
14
15
16  ALSO PRESENT:
17  MATT MERIN - VIDEOGRAPHER
18        - - -
19
20
21
22
23
24
```

Page 5

```
1          - - -
2   DEPOSITION SUPPORT INDEX
3          - - -
4
5   Direction to Witness Not to Answer
6   Page Line   Page Line   Page Line
7   None
8
9
10  Request for Production of Documents
11  Page Line   Page Line   Page Line
12  None
13
14
15  Stipulations
16  Page Line   Page Line   Page Line
17  None
18
19
20  Question Marked
21  Page Line   Page Line   Page Line
22  None
23
24
```



Page 6

```
 1          THE VIDEOGRAPHER:  We are
 2   now on the record.  My name is
 3   Matt Merin.  I'm a videographer
 4   for Magna Legal Services.  This is
 5   a video deposition for the United
 6   States District Court for the
 7   Eastern District of Pennsylvania.
 8          Today's date is March 18th,
 9   2014 and the time is 10:40 a.m.
10   This deposition is being held at
11   1880 JFK Boulevard in
12   Philadelphia, Pennsylvania in the
13   matter of Gary B. Freedman,
14   Esquire and Bracha Strimber versus
15   Steven Fisher, M.D., et al.  The
16   deponent is Margo Turner, M.D.
17   This deposition is being taken on
18   behalf of the plaintiff.
19          Will all Counsel please
20   identify themselves?
21          MR. AUSSPRUNG:  Leon
22   Aussprung on behalf of the
23   Plaintiffs.
24          MR. YOUNG:  Jim Young.  I'm
```

Page 7

```
 1   here on behalf of Dr. Turner,
 2   nurse practitioner Martinez, and
 3   Abington Memorial Hospital.
 4          MR. CAMHI:  Don Camhi for
 5   Dr. Fisher and Abington Emergency
 6   Medicine Associates.
 7          MR. GOEBEL:  And Chad Goebel
 8   on behalf of Dr. Muttreja.
 9          MR. AUSSPRUNG:  Also present
10   is James Hockenberry on behalf of
11   the Plaintiff.
12          THE VIDEOGRAPHER:  The court
13   reporter is Amy Murphy who will
14   now swear in the witness.
15              -  -  -
16          MARGO E. TURNER, M.D., after
17   having been duly sworn, was
18   examined and testified as follows:
19              -  -  -
20            EXAMINATION
21              -  -  -
22   BY MR. AUSSPRUNG:
23      Q.  Good morning.
24      A.  Good morning.
```

Page 8

```
 1      Q.  My name is Leon Aussprung.
 2   We were just introduced and I represent
 3   the Strimber family that's brought a
 4   lawsuit against yourself and some others.
 5          Have you ever been deposed
 6   before like this?
 7      A.  No.
 8      Q.  Could you state your full
 9   name for the record?
10      A.  Margo Eleanor Turner.
11      Q.  And what is your profession?
12      A.  I'm a physician.
13      Q.  What kind of physician?
14      A.  Internal medicine.
15      Q.  Are you board certified?
16      A.  I am not.
17      Q.  Let me first give you a few
18   instructions.  I know you're represented
19   by Counsel here and you had an
20   opportunity to talk with him beforehand,
21   but I want to make sure we're on the same
22   page.
23      A.  Um-hum.
24      Q.  Everything that's being
```

Page 9

```
 1   spoken is being taken down by our court
 2   reporter.  She can only take down words.
 3   So, you may nod your head and say
 4   "uh-huh" like you just did a moment ago.
 5      A.  Yes.
 6      Q.  We'll all be very clear that
 7   you mean "yes."  But later, when we read
 8   the written transcript, it may not be
 9   clear.
10      A.  Okay.
11      Q.  And it's very important
12   today when I try and get some answers to
13   questions, whatever your testimony might
14   be, it's very important to all the
15   lawyers that whatever that testimony is,
16   it be clear on the record and that it
17   can't somehow be misinterpreted by a
18   lawyer at trial or at some other stage of
19   the proceedings.  So, we will remind you.
20   We'll say, "did you mean yes?"
21          Sometimes we might ask a
22   question in the form of a negative and
23   you may say "no" and it will be a little
24   unclear as we listen to it.  And so we'll
```

Page 10

1 say, "would you agree that" and we'll
2 repeat it. We're not trying to harass
3 you in any sort of way. We want to be
4 absolutely certain that whatever your
5 testimony is, it's very clear on the
6 written record; okay?
7      A.   I understand.
8      Q.   Sometimes I ask questions
9 that are less than clear. Sometimes
10 they're poorly-phrased questions, you
11 might be confused about something I ask.
12 Perhaps you're looking at a medical
13 record and your mind drifts off for a
14 moment and you don't hear my entire
15 question. If for any reason you don't
16 understand my question, please, let me
17 know; all right?
18      A.   I will.
19      Q.   To the extent you do provide
20 us with answers today, we're going to
21 assume you understood my question; okay?
22      A.   I do.
23      Q.   If you need to take a break,
24 there's no rules about that. I

Page 11

1 understand you have some medical
2 problems. Whatever you need to make this
3 as comfortable for you as possible, if
4 you need water, we can take breaks every
5 five minutes. There's no rules about
6 that. We're happy to accommodate you in
7 any way that we need to.
8      A.   Those issues will not
9 interfere with what we have to do today.
10      Q.   I'm sure they won't. But I
11 just want to let you know that if you're
12 uncomfortable or you want to talk to your
13 lawyer or you just want some air because
14 you're upset --
15      A.   Yes.
16      Q.   -- that's fine. Just let us
17 know and we'll take a break; okay?
18      A.   Okay.
19           - - -
20           (Whereupon, Exhibit Turner-1
21      was marked for identification.)
22           - - -
23 BY MR. AUSSPRUNG:
24      Q.   Prior to today's deposition,

Page 12

1 I was given a copy of your curriculum
2 vitae which I've marked as Exhibit-1.
3           Is this CV something that
4 was prepared for this litigation or is
5 this a CV that you had prepared
6 previously?
7      A.   Previously prepared.
8      Q.   Is there anything on this CV
9 which is no longer accurate?
10      A.   This CV is up to date in
11 terms of my current employment, yes.
12      Q.   Where are you currently
13 employed?
14      A.   Jeanes Hospital.
15      Q.   And what is your job there?
16      A.   I work as a house physician
17 there.
18      Q.   What does that mean?
19      A.   I'm responsible for the
20 admission of patients to the medical
21 service and response to patients who are
22 in the hospital who have acute problems
23 that require a physician to respond to
24 them immediately.

Page 13

1      Q.   Are you an attending
2 physician at Jeanes Hospital?
3      A.   I'm an attending but I don't
4 have a service there. I don't admit
5 patients through a service. I'm hired by
6 the hospital to admit to the medical
7 service and to do that response that I
8 just mentioned to you.
9      Q.   But you have attending
10 privileges?
11      A.   I do.
12      Q.   Just getting back to your
13 education and training, you did, it looks
14 like, a year internship and then two
15 years of residency in internal medicine
16 at Albert Einstein.
17      A.   That is correct.
18      Q.   Did you ever sit for the
19 boards in internal medicine?
20      A.   I did not.
21      Q.   Is there a reason why you've
22 chosen never to sit for the boards of
23 internal medicine?
24      A.   At the time that those



Page 14

1  boards were going on, I had a problem in
2  my family with my mother and I elected to
3  pay attention to that and I did not sit
4  for the boards. As the years went by, I
5  had my work and my employment and I --
6  it's not something that I pursued.
7      Q.  Has not being board
8  certified in internal medicine ever
9  affected your ability to obtain any sort
10  of privileges or credentials at a
11  hospital?
12      A.  It has not.
13      Q.  We're going to be dealing
14  with some events that happened back in
15  February of 2012. I'm just looking at
16  your curriculum vitae here.
17          Who was your employer in
18  February of 2012?
19      A.  I was employed by Abington
20  Memorial Hospital.
21      Q.  And they are the people that
22  actually sent you a paycheck every couple
23  weeks?
24      A.  Yes.

Page 15

1      Q.  Have you ever published
2  anything in any peer review literature?
3      A.  I have not.
4      Q.  Do you receive any
5  publications regularly?
6      A.  I receive New England
7  Journal of Medicine weekly and I also
8  subscribe to the Clinical Problems in
9  Emergency Medicine series that's
10  published once a month.
11      Q.  Anything else?
12      A.  No.
13      Q.  Are there any journals or
14  literature that you would consider to be
15  authoritative?
16      A.  No.
17      Q.  Do you own any textbooks in
18  internal medicine?
19      A.  I do.
20      Q.  What textbooks do you own?
21      A.  Harrison's Principles of
22  Internal Medicine.
23      Q.  Would you consider that
24  textbook to be a reliable authority of

Page 16

1  internal medicine?
2      A.  I would say that's a
3  reference that I refer to.
4      Q.  Would you consider it to be
5  a reliable authority or you're not sure?
6      A.  No.
7      Q.  Have your privileges to work
8  at any hospital or credentials with any
9  insurance company ever been disciplined
10  or restricted?
11          MR. YOUNG:  Objection to the
12      form.  Credentials with an
13      insurance company?
14          MR. AUSSPRUNG:  Let me ask
15      it a better way.
16  BY MR. AUSSPRUNG:
17      Q.  Has there ever been any
18  action taken on your license to practice
19  medicine?
20      A.  Yes.
21      Q.  Can you tell me what action
22  was taken?
23      A.  My license was suspended for
24  a period of about six months.

Page 17

1      Q.  When was that?
2      A.  The period of 2004 to 2005.
3      Q.  What were the circumstances
4  surrounding that suspension?
5      A.  I was not able to
6  financially keep up with the payments of
7  my tail coverage, so that I arranged with
8  the State a payback plan for the tail
9  coverage.  But until that happened, I was
10  suspended for the six months.  To me,
11  that it was a malpractice insurance tail
12  coverage issue only.
13      Q.  So it had to do with the
14  Pennsylvania legal requirement for
15  insurance?
16      A.  Exactly.
17      Q.  It didn't have any -- the
18  action on your medical license didn't
19  have anything to do with patient quality
20  of care?
21      A.  It did not.
22      Q.  Any other actions ever taken
23  against your medical license?
24      A.  None.

Page 18

1    Q.   Has any hospital ever
2  disciplined you?
3    A.   No.
4    Q.   Has any hospital ever
5  limited or suspended your privileges to
6  practice?
7    A.   No.
8    Q.   Has any insurance company
9  ever suspended your ability to submit
10  claims to them or anything of that
11  nature?
12    A.   No.
13    Q.   Have you ever been a
14  defendant in a medical malpractice
15  lawsuit other than this one?
16    A.   I have not.
17    Q.   I think you said this is the
18  first time you've ever given a
19  deposition; correct?
20    A.   Yes.
21    Q.   Have you ever been a
22  plaintiff in any lawsuits?
23    A.   I have not.
24    Q.   I'm going to mark as

Page 19

1  Exhibit-2 a copy of a Physician
2  Employment Agreement that was provided to
3  me previously.
4       - - -
5       (Whereupon, Exhibit Turner-2
6    was marked for identification.)
7       - - -
8  BY MR. AUSSPRUNG:
9    Q.   Doctor, I'd like to start at
10  the end on page 12.
11    A.   Yes.
12    Q.   Is this your signature on
13  the last page?
14    A.   It is.
15    Q.   And this is the employment
16  agreement that you had with Abington
17  Memorial Hospital; correct?
18    A.   It is, yes.
19    Q.   I'd like you to go to page
20  4. There's a section 3.2.4 and it's
21  titled "Quality." Do you see that?
22    A.   3.2.4, yes.
23    Q.   Can you just read that to
24  yourself? I want to ask you a couple

Page 20

1  questions about it.
2       - - -
3       (Whereupon, the witness
4    complies with request.)
5       - - -
6       THE WITNESS: Yes. I've
7    read it.
8  BY MR. AUSSPRUNG:
9    Q.   On the fourth line down it
10  talks about how you, as the contracting
11  physician, shall promote hospital
12  policies designed to maintain appropriate
13  standards of professional practice in the
14  care of patients, including the
15  hospital's quality assurance program.
16       Do you see that?
17    A.   I do.
18    Q.   Where it says "appropriate
19  standards of professional practice,"
20  where are those -- where do you draw
21  those standards from?
22    A.   Could you rephrase that
23  question?
24    Q.   Well, it says that you are

Page 21

1  to maintain appropriate standards of
2  professional practice. How do you, as a
3  practicing physician, know what are the
4  appropriate standards of professional
5  practice?
6    A.   I think that that applies to
7  my ability to function to follow the
8  training that I received and to respond
9  to the problems that are presented to me
10  in a fashion that is reflective of my
11  ability to care for patients and how I
12  should perform my duties in that regard.
13    Q.   Are there any written
14  standards of professional practice that
15  you're aware of?
16    A.   I am not.
17    Q.   Are you aware of any
18  protocols or guidelines concerning the
19  evaluation of chest pain?
20       MR. YOUNG: You're talking
21    about written?
22       MR. AUSSPRUNG: Written,
23    yes.
24       THE WITNESS: I am not.



Page 22

BY MR. AUSSPRUNG:
    Q.   Are you aware of any written or published guidelines or standards concerning the evaluation of a potential aortic aneurysm?
    A.   I am not.
    Q.   This then goes onto say, quote, physician acknowledges that hospital is fully responsible and accountable for physician's performance of his or her clinical and other services.
         Is that your understanding?
    A.   It is.
                - - -
         (Whereupon, Exhibit Turner-3 was marked for identification.)
                - - -
BY MR. AUSSPRUNG:
    Q.   I have here what I'm marking as Exhibit-3 a two-page Delineation of Privileges for Initial Appointment.
         Now, my somewhat imperfect understanding is that when you obtain

Page 23

privileges at a hospital, there is paperwork filled out that basically says what you can and can't do; correct?
    A.   Correct.
    Q.   Based on your training and experience and your --
    A.   That is correct.
    Q.   -- job.
         So, this looks like -- if I go to the second page, it's, again, signed by you in June of 2011; correct?
    A.   Yes.
    Q.   And so is this your what they call the delineation of privileges for your practice?
    A.   That is correct.
    Q.   Okay.  On the first page, the one that's checked off is Category 2: MCU-Admitting Privileges when in the Field of Expertise; correct?
    A.   Yes.
    Q.   What does that mean?
    A.   That means to me that I have my privileges limited to those things

Page 24

which I am expert at performing.
    Q.   Which things are those?
    A.   And that is -- the main thing is that it excludes the other lists of things that are on that sheet, and those things are history and physical examination, order writing, laboratory, ordering and interpretation of studies that are ordered.
    Q.   You just said it excludes things that are on that sheet.  Are you talking about --
    A.   These other things are not checked off.  My privilege is checked off.  The other things that are there are not checked off means those are the things that I would not do.
    Q.   Okay.  So above where it says "Request" and there's some blanks next to lumbar puncture, thoracentesis, those are things that are not within your field of expertise?
    A.   That is correct.
    Q.   So, it looks like the only

Page 25

request that you have for your privileges was arterial puncture on the second page; correct?
    A.   That is correct.
    Q.   So that -- above arterial puncture it says EKG including Pacemaker Interpretation.  What does that mean?
    A.   Above -- you said --
         MR. YOUNG:  Second page.
         THE WITNESS:  Second page, okay.
BY MR. AUSSPRUNG:
    Q.   Sorry.
    A.   Above that, EKG, that would mean that I would be a person that would interpret EKGs and my interpretation would be then taken as the official interpretation of the EKG.
    Q.   Would you routinely interpret EKGs within the scope of your practice?
    A.   I would.
    Q.   But that's different because that is the official interpretation for

**MAGNA** ◗
LEGAL SERVICES

Page 26

1  the hospital?
2      A.   That is correct, and that's
3  done by cardiologists.
4      Q.   But you did routinely look
5  at and interpret EKGs --
6      A.   Yes, I did.
7      Q.   -- and use that information?
8      A.   Yes.
9      Q.   Your --
10         MR. YOUNG:  And I was going
11  to do the same.
12         Let him finish his question.
13         THE WITNESS:  I'm sorry.
14         MR. YOUNG:  That's okay.
15  And he'll wait for your answer.
16         THE WITNESS:  Okay.
17         MR. YOUNG:  Just so the
18  record is clear.  The space that
19  you directed the doctor's
20  attention to, EKG including
21  pacemaker interpretation, was not
22  checked.  It just wasn't quite
23  clear on the record.
24         MR. AUSSPRUNG:  Thank you.

Page 27

1  BY MR. AUSSPRUNG:
2      Q.   As we do this deposition, it
3  feels like you and I are having a
4  conversation, but it's really not a
5  conversation.  It's my question followed
6  by your answer.  And that's kind of
7  artificial.  And it almost feels rude to
8  wait all the way to the end and then give
9  your answer, but that's what we need to
10  do here.  Otherwise, it looks funny on
11  the transcript and we speak over each
12  other and it's very hard for the court
13  reporter.
14         So, it's kind of rude and it
15  feels like you're slowing it down, but
16  actually, in the end, it speeds it up
17  because you may answer some question that
18  isn't really what I'm asking, so.
19  Sometimes you're slowing it down and
20  making sure I'm done is the best way to
21  go; okay?
22         As you sit here today, do
23  you have any memory of Abraham Strimber?
24      A.   I do.

Page 28

1      Q.   You remember the patient?
2      A.   Yes.
3      Q.   Let's first talk about your
4  memory and then we'll get into the
5  records.
6         What documents, pieces of
7  paper, did you review in preparation of
8  today?
9      A.   The medical record from
10  Abington.
11      Q.   Did you review the ER
12  record?
13      A.   I did.
14      Q.   Did you review the -- and
15  the hospitalization up until he died?
16      A.   Yes.
17      Q.   Did you review any other
18  documents?
19      A.   I did not.
20      Q.   There have been other
21  depositions like this taken, for
22  instance, of Dr. Fisher, the emergency
23  room doctor.  Did you review that?
24      A.   I did not.

Page 29

1      Q.   So you haven't seen any
2  depositions?
3      A.   I have not.
4         MR. YOUNG:  Keep your voice
5  up just a little bit.
6         THE WITNESS:  Okay.
7  BY MR. AUSSPRUNG:
8      Q.   You're doing fine.
9         I recognize that memories
10  are a funny thing, and sometimes we
11  remember an event but we can't place it
12  within a timeline.  I'm going to try and
13  go through your memory chronologically,
14  but to the extent you're not sure when a
15  memory is from, if it's from 4 o'clock or
16  6 o'clock, that's fine.  What is the --
17  just let me know.
18         What is the first thing you
19  remember about Abraham Strimber?  Is it
20  in the emergency room or up on the floor?
21      A.   In the emergency room.
22      Q.   What do you remember?  Do
23  you remember getting called to see the
24  patient?



Page 30

1    A.   Yes.
2    Q.   Who called you?  How were
3  you contacted?
4    A.   The emergency room clerk.
5    Q.   Was it like a page or phone
6  call?
7    A.   Phone call, page.
8    Q.   Were you given some
9  information on the phone?
10    A.   Yes.
11    Q.   What were you told?
12    A.   There's an admission for you
13  and the name of the patient.
14    Q.   Okay.  Just that there was
15  an admission?
16    A.   Um-hum.
17    Q.   Yes?
18    A.   Yes.
19    Q.   It's one of those times --
20    A.   Yes.
21    Q.   -- "um-hum" and nod.
22    A.   Yes.
23    Q.   Happens all the time.
24         All right.  And do you know

Page 31

1  what time that phone call came at?
2    A.   I do not recall the time.
3    Q.   What did you do?
4    A.   I went down to the ER.
5    Q.   Do you know approximately
6  what time you arrived in the emergency
7  department?
8    A.   I might be able to get a
9  time from the medical record, but I don't
10  recall the time.
11    Q.   Okay.  We'll look at that.
12  And there are some times written down
13  there.
14         I'll represent to you the
15  medical record, the first times I could
16  see in there were around 3:58 p.m.,
17  almost 4 o'clock.  Is that about the time
18  that you remember?
19    A.   That feels later to me.
20    Q.   You may have been there
21  before, doing things before there was
22  anything documented.
23    A.   Yes.
24    Q.   So, you went down to the

Page 32

1  emergency department.  What did you do?
2  Did you see the patient?  Did you talk to
3  one of the nurses or doctors?
4    A.   Um --
5    Q.   And you may not remember.
6    A.   I do remember.
7         Dr. Fisher spoke with me
8  about Mr. Strimber.
9    Q.   So you spoke to Dr. Fisher
10  before seeing the patient?
11    A.   Yes.
12    Q.   And what do you recall of
13  that conversation?
14    A.   That conversation usually
15  involves --
16    Q.   No.  That's not my question
17  though.
18    A.   Okay.
19    Q.   I understand there's, like,
20  a general practice and you have a way of
21  doing things and you know your routine is
22  to always do things a certain way.
23    A.   Okay.
24    Q.   This is different.  This is

Page 33

1  an actual memory.
2    A.   Okay.
3    Q.   So, I know you have a
4  general practice, and I'm not suggesting
5  you didn't do it that way, but I just
6  want to find out what you remember as you
7  sit here today.
8         So, do you remember anything
9  about that conversation?
10    A.   I do.  I remember him
11  mentioning Mr. Strimber to me and just
12  saying I have a patient who needs to be
13  admitted to medical service, and a brief
14  summary of he presented with the
15  following findings.  He said, these are
16  the things that I did, I think he needs
17  to be admitted, would you take care of
18  that part of things.
19    Q.   Do you remember any of the
20  findings that Dr. Fisher specifically
21  told you?
22    A.   We talked about the fact
23  that Mr. Strimber had abdominal pain, the
24  nausea, the vomiting, the foods that he

Page 34

1  had eaten in the hours prior to that,
2  what evaluation had been done in the ER
3  to evaluate those symptoms and what the
4  reason for admission would be.
5      Q.  Did Dr. Fisher, in that
6  initial conversation, mention to you that
7  Mr. Strimber had an artificial heart
8  valve?
9      A.  He did.
10     Q.  Did he mention -- did Dr.
11 Fisher mention to you anything about pain
12 in the chest?
13     A.  He did not.
14     Q.  Did Dr. Fisher mention to
15 you anything about pain that went through
16 to the patient's back?
17     A.  We talked about his
18 abdominal pain, nausea, vomiting, and
19 diarrhea.  That's what I recall.
20     Q.  Do you have any recollection
21 of how the abdominal pain was described
22 to you?
23     A.  I do not.
24     Q.  So you don't know whether it

Page 35

1  was described as going through to the
2  back or not?
3      A.  I don't.
4      Q.  Did you discuss Mr.
5  Strimber's EKG in that initial
6  conversation?
7      A.  Yes.
8      Q.  So it had been done by then?
9      A.  Yes.
10     Q.  Had Mr. Strimber's -- did
11 you discuss Mr. Strimber's CAT scan
12 results?
13     A.  We did.
14     Q.  So you believe the CAT scan
15 was completed before you first came to
16 the emergency department?
17     A.  Yes.
18     Q.  That helps give us a little
19 bit of a timeline.
20         It looks like the CAT scan
21 report is at least timed around 1:30 or
22 so.
23         Anything else about that
24 conversation with Dr. Fisher that you

Page 36

1  remember?
2      A.  No.
3      Q.  Was the next thing you did
4  go and see the patient?
5      A.  Yes.
6      Q.  Where was the patient
7  located?
8      A.  In one of the holding areas,
9  one of the rooms in the ER.
10     Q.  Was it a room?
11     A.  They're like partitioned
12 cubicles.
13     Q.  And what do you recall from
14 that initial interaction with Abraham
15 Strimber?
16     A.  I remember Mr. Strimber was
17 sitting there.  I interviewed Mr.
18 Strimber initially to just evaluate what
19 symptoms presented him to the hospital
20 for admission.  I conducted a physical
21 examination.  I left, reviewed the data
22 then that I had, and I returned back to
23 him to describe to him the plan of action
24 of what was going to happen subsequent to

Page 37

1  the admission.
2      Q.  One of the things you did
3  was you took -- you did a history and
4  physical?
5      A.  That's correct.
6      Q.  You did it in the emergency
7  department?
8      A.  Yes.
9      Q.  So as part of that history,
10 you, again, confirmed that he had an
11 artificial heart valve?
12     A.  Yes.
13     Q.  And as part of the history,
14 did you get a description of his pain?
15     A.  Yes.
16     Q.  And what do you recall --
17 and we'll look at the note in a minute,
18 but what do you recall of that
19 description?
20     A.  I remember there was
21 abdominal pain, feeling like something
22 exploded in his abdomen and just went up
23 to the top of his head, and that he had
24 eaten a series of things that are listed

**MAGNA**
LEGAL SERVICES

10  (Pages 34 to 37)

Page 38

1   in the medical record earlier that day.
2   He had one episode of diarrhea earlier
3   and had an episode of vomiting in the ER.
4   When I saw him, the abdominal pain had
5   subsided.
6       Q.   So, the abdominal pain was
7   no longer present when you saw him?
8       A.   That's correct.
9       Q.   You said something in his
10  abdomen that went up, and I think you
11  just said to the top of his head?
12      A.   He -- in the medical record,
13  my description in the history of present
14  illness will be a description of how he
15  described that abdominal pain to me.  If
16  we can refer to that, the details of it,
17  I'd be more clear about it.
18      Q.   Did you understand that his
19  pain was limited to his abdomen or that
20  it went up through his chest to his head?
21      A.   My understanding was that he
22  felt something like -- I think he
23  described it as a vibrating sensation in
24  his abdomen.  Again, if I could refer to

Page 39

1   that I could tell you exactly.  What I
2   wrote in that history of present illness
3   will reflect what his words were which is
4   then how I interpreted those things.
5       Q.   I'm just trying to figure
6   out what you recall from your memory.
7       A.   I understand.
8       Q.   All right.  Do you remember
9   anything else in the history that he told
10  you?
11      A.   I noted that there had been
12  a complaint of chest pain given to the
13  triage nurse.  So, I asked if he was
14  experiencing chest pain at the time that
15  I saw him.
16      Q.   And was he?
17      A.   He was not.
18      Q.   And in fact, he wasn't even
19  experiencing abdominal pain when you saw
20  him?
21      A.   That's correct.
22      Q.   Had he received any
23  analgesics in the emergency department
24  before you saw him?

Page 40

1       A.   I believe he had received
2   morphine before I saw him.
3       Q.   What do you remember of your
4   physical examination, if anything?
5       A.   I remember my physical
6   examination to reveal to be within normal
7   limits and not to reveal any
8   abnormalities on the examination.
9       Q.   Did you palpate his abdomen?
10      A.   I did.
11      Q.   Did you specifically feel
12  for aortic pulsations?
13      A.   I did.
14      Q.   Did you detect them?
15      A.   I did not.
16      Q.   Are you aware that there was
17  a note in the emergency department record
18  that they found he did have unusual
19  aortic pulsations?
20      A.   I saw that note.
21      Q.   What did you understand that
22  to mean?
23      A.   I thought that that was
24  probably directing attention to whether

Page 41

1   there was an aneurism present.
2       Q.   But on your exam you did not
3   have that same finding?
4       A.   I did not.
5           MR. AUSSPRUNG:  I'm going to
6   mark as Exhibit-4 a big packet of
7   papers, I think it's 12 pages
8   long, which is the emergency
9   department record, because I
10  believe Dr. Turner has some orders
11  and things in it.
12          THE WITNESS:  Yes.
13              - - -
14          (Whereupon, Exhibit Turner-4
15  was marked for identification.)
16              - - -
17  BY MR. AUSSPRUNG:
18      Q.   Now, Dr. Turner, the first
19  place -- which might not be totally
20  accurate -- that I saw anything was on
21  the third page of this document under the
22  orders.
23      A.   Yes.
24      Q.   I want to start in the

**MAGNA** ❯
**LEGAL SERVICES**

Page 42

1  middle of the page where it first says
2  "Physician Consult-Other."
3      A.  Yes.
4      Q.  Do you see that?
5          And then it says for Fisher,
6  MD.  Do you know who this physician
7  consult -- who was being consulted for
8  that?
9      A.  Let me find that area.
10     Q.  I can point to it.
11     A.  I see it.
12     Q.  There's two physician
13  consults in a row.  The first one, it's
14  timed 13:59, and then it looks like
15  completed at 14:00.
16     A.  Yes.
17     Q.  Physician Consult-Other.
18  And I believe -- well, who is Majeski, do
19  you know, M-A-J-E-S-K-I?  Do you know who
20  that is?
21     A.  I don't know who it is.
22     Q.  It's not an attending or
23  anybody you're familiar with?
24     A.  It might have been the

Page 43

1  admitting resident who would be the first
2  person that would be -- the ER would call
3  about an admission.
4      Q.  And it says it was placed
5  for Dr. Fisher who we know is the ER
6  attending.
7      A.  Yes.
8      Q.  Do you know who was being
9  consulted, what physician was being
10  consulted?
11     A.  I think that's a way of
12  noting.  That's the physician asking that
13  the admitting resident be called so that
14  we could discuss the admission of the
15  patient to a service.
16     Q.  So there was a call to the
17  admitting resident around 14:00?
18     A.  Okay.
19     Q.  You would agree?
20     A.  Yes.
21     Q.  Now --
22         MR. YOUNG:  Hang on.  I
23  think she said she thought it
24  might be.  I'm not sure she said

Page 44

1  it was.
2  BY MR. AUSSPRUNG:
3      Q.  Was there a resident, an
4  admitting resident, at that time period
5  named Dr. Singer?
6      A.  I don't know.
7      Q.  Okay.  You said you got a
8  phone call directly from a clerk in the
9  emergency department.
10     A.  Yes.
11     Q.  Did you get any calls from
12  any admitting residents or other people?
13     A.  No.
14     Q.  Was that the normal way you
15  would be notified about an admission from
16  the ER was a call from the ER?
17     A.  Yes.
18     Q.  So, I'll just kind of ask it
19  in an open-ended way.
20         Do you know who was being
21  called in this first physician consult
22  order around 14:00?
23     A.  I think that was probably to
24  the admitting resident.

Page 45

1      Q.  But we don't know who that
2  person was?
3      A.  We don't know who that was.
4      Q.  The second consult says
5  "Unreferred."  Do you know what this
6  physician consult means?
7      A.  I don't know what that means
8  but I know what "unreferred" means.
9      Q.  What does "unreferred" mean?
10     A.  The first call to the
11  resident discusses whether or not the
12  resident team has a spot open for this
13  patient to be admitted to the resident
14  service.  If the answer is "no" and the
15  services are filled, then the patient
16  goes to unreferred and then a call comes
17  to me to admit to what's called the
18  non-teaching service.
19     Q.  Well, that makes perfect
20  sense then.
21         So, that second call,
22  unreferred, which looks like it was done
23  around 14:08, it's your understanding
24  that was most likely a call to you?

**MAGNA ▶**
LEGAL SERVICES

Page 46

1    A. The call to me -- I thought
2 I saw a note that specifically talks
3 about the call to me in another part of
4 the chart. There's a point at which my
5 name is mentioned as a person called.
6    Q. Okay. Can you identify that
7 for me? Take your time, if you can find
8 it.
9    A. Okay.
10    MR. YOUNG: Can we go off
11 the tape just for a moment,
12 please?
13    MR. AUSSPRUNG: Sure.
14    THE VIDEOGRAPHER: The time
15 is 11:12 a.m. We are off the
16 record.
17    (Off video record.)
18    MR. YOUNG: On the paper
19 record, Dr. Aussprung, you asked
20 me for a copy of the order
21 protocol for chest pain, and I
22 have been given what I believe is
23 that order protocol. I'm not able
24 to tell you when this work

Page 47

1 protocol was in force. I believe
2 it is the one that you and I
3 talked about and I'm happy to give
4 you a copy. And we'll follow up
5 just to confirm by letter that we
6 provided it.
7    Does anybody else want this?
8    MR. CAMHI: Thanks.
9    MR. YOUNG: As you can see,
10 just by way of formatted, it
11 appears as presented to be almost
12 right off the computer set of
13 orders, if you will.
14    So, that's all we have, I
15 think, that is representative of
16 the protocol you asked for, but
17 we'll certainly double check.
18    THE WITNESS: I see.
19    MR. YOUNG: Hang on. Have
20 you found what you were looking
21 for?
22    THE WITNESS: Yes.
23    MR. AUSSPRUNG: Let's go
24 back on the video.

Page 48

1    (On video record.)
2    THE VIDEOGRAPHER: The time
3 is 11:14 a.m. We are back on the
4 record.
5 BY MR. AUSSPRUNG:
6    Q. Doctor, you just had a
7 chance to look through the ER record.
8 Did you find when you were contacted?
9    A. I didn't find what I was
10 looking for in reviewing it. I did not
11 find.
12    Q. Did you find anything?
13    A. I find notes that begin to
14 say orders that I placed.
15    Q. And it looks like, would you
16 agree, that the first order that's placed
17 by you is the Physician Group Consult
18 Routine NSO by Turner, MD, at 15:57?
19    A. Yes.
20    Q. Do you have a sense of how
21 long it took you between when you were
22 called by the emergency department and
23 when you actually came down to the
24 emergency department? Was it 5 minutes,

Page 49

1 30 minutes, an hour?
2    A. On that day I was able to
3 come down immediately.
4    Q. So you believe, based upon
5 this record, that you arrived sometime
6 shortly after 14:08 p.m.?
7    MR. CAMHI: Sometime after
8 what?
9    MR. AUSSPRUNG: 14:08, when
10 the call was entered on the chart.
11    THE WITNESS: Can we go off
12 the record for a minute again?
13 BY MR. AUSSPRUNG:
14    Q. Sure.
15    THE VIDEOGRAPHER: The time
16 is 11:15 a.m. We are off the
17 record.
18    (Off video record.)
19      - - -
20    (Whereupon, a brief recess
21 was taken.)
22      - - -
23    THE VIDEOGRAPHER: The time
24 is 11:17 a.m. We're back on the

1  record.
2      THE WITNESS:  I found an
3  entry in the emergency document
4  notes on page 26.  The second line
5  says Dr. Green, Department of
6  Medicine, is this an AO admission,
7  meaning is this a resident service
8  admission, not an AO admission.
9      So, that time will probably
10  give me an idea of when it was
11  determined that the patient was
12  going to be admitted to the
13  non-teaching medical service.
14  BY MR. AUSSPRUNG:
15      Q.  Okay.  I don't know what
16  you're referring to because I don't
17  believe it's been marked.
18      A.  Yes.
19      Q.  Is this part of that
20  inpatient medical record?
21      A.  It's part of the emergency
22  department record.  It's that last --
23  it's the last page of that.  Let me just
24  find it in the packet you gave me.  I'm

1  referring to this portion right there.
2      MR. YOUNG:  Can we go off
3  the tape just for a second so I'm
4  not testifying?
5      THE VIDEOGRAPHER:  The time
6  is 11:18 a.m.  We are off the
7  record.
8      (Off video record.)
9      MR. YOUNG:  Let me copy
10  this.
11          - - -
12      (Whereupon, a brief recess
13  was taken.)
14          - - -
15      (Whereupon, Exhibit Turner-5
16  was marked for identification.)
17          - - -
18      (On video record.)
19      THE VIDEOGRAPHER:  The time
20  is 11:24 a.m.  We are back on the
21  record.
22  BY MR. AUSSPRUNG:
23      Q.  Okay, Doctor.  I've marked
24  as Exhibit-5 what's been Bates stamped

1  AMH 0026, which is part of the emergency
2  room record.  I'll hand that to you.
3      Doctor, can you tell from
4  this document approximately what time you
5  came down to the emergency department?
6      A.  I can't tell that, no.
7      Q.  What can you tell from this
8  document?
9      A.  There's an entry that talks
10  about the admitting resident being
11  notified, and then it says not an AO
12  admission.  The next line is patient
13  being admitted to observation status.
14  That's like an admission order.  And the
15  next note is about the nurses calling
16  report to the floor.
17      It doesn't shed any light on
18  the time that I came down to see the
19  patient, this document.
20      Q.  Do you believe that second
21  order that's February 22nd at 14:29 --
22      A.  Yes.
23      Q.  -- it reads, Diagnosis:
24  Chest pain; correct?

1      A.  NOS, yes.
2      Q.  What does "NOS" mean?
3      A.  Nonspecific.
4      Q.  It means not otherwise
5  specified; correct?
6      A.  Um-hum.
7      Q.  And what is Diagnosis 2?
8      A.  Epigastric pain.
9      Q.  So, when you were notified
10  of the admission, was that your working
11  diagnosis, what you were initially told
12  was chest pain?
13      A.  No.  I was told I had an
14  admission to the ER.
15      Q.  Do you have any
16  understanding as to why it says
17  diagnosis, chest pain here?
18      A.  The triage nurse's note
19  notes that that's the complaint that Mr.
20  Strimber had when he came into the triage
21  booth.
22      Q.  And he had received morphine
23  prior to your seeing him; correct?
24      A.  For the abdominal pain.

**MAGNA** ▶
**LEGAL SERVICES**

Page 54

```
1        Q.   Well, does morphine only
2   treat pain in the abdomen?
3        A.   It does not.
4        Q.   Okay.
5        A.   But the indication for the
6   pain was not for chest pain. The
7   indication for the morphine was abdominal
8   pain in the ER.
9        Q.   Do you believe that the
10  patient never had any chest pain?
11       A.   I believe he reported he had
12  chest pain to the triage nurse.
13       Q.   Do you believe the patient
14  never had any chest pain?
15       A.   Do I believe the patient
16  never had any --
17       Q.   Never actually had chest
18  pain.
19       A.   I believe the patient had
20  chest pain.
21       Q.   And why do you believe that?
22       A.   I don't have any reason to
23  doubt what he spoke to the triage nurse
24  about.
```

Page 55

```
1        Q.   And in fact, you now know
2   today that he had a thoracic aortic
3   aneurysm; correct?
4        A.   I do.
5        Q.   And that would be consistent
6   with chest pain; correct?
7        A.   That would be.
8        Q.   And then this had some other
9   things in it. So after it has the two
10  diagnoses it says, IP Area Request:
11  Observation, dash, Telemetry.
12            What does that mean?
13       A.   IP probably means inpatient
14  area requested. Observation status is
15  the status the patients are admitted to
16  for the evaluation of symptoms that are
17  felt to require a less than 24-hour
18  evaluation, observation.
19       Q.   So he went to an inpatient
20  observation area?
21       A.   That is correct.
22       Q.   He didn't go to, like, a
23  medical floor though?
24       A.   He went to a medical floor.
```

Page 56

```
1   He went to a medical floor. He went to
2   telemetry, but he went in under
3   observation status.
4        Q.   Meaning the expectation was
5   he would be less than 24 hours?
6        A.   Correct.
7        Q.   Then it says, not an AO
8   admission. What does that mean?
9        A.   Not an admitting resident
10  service, not a resident service
11  admission.
12       Q.   Okay. Meaning that it was
13  being covered by you as the unreferred
14  service?
15       A.   That's correct.
16       Q.   Then the next order, you
17  said that's a call to the floor, to the
18  nurse about him coming up?
19       A.   The next -- the next request
20  time of 14:29?
21       Q.   Right.
22       A.   Observation, telemetry,
23  admit.
24       Q.   And there's an admitting bed
```

Page 57

```
1   assigned, 3H02?
2        A.   Yes. That's an admission.
3        Q.   So, that's a call to an
4   administrative person about finding a
5   bed?
6        A.   To the bed, to the board,
7   yes.
8        Q.   Do you have any
9   understanding as to whether or not you
10  saw the patient before or after there was
11  a decision to admit the patient to the
12  observation area?
13       A.   Yes.
14       Q.   What's your understanding?
15       A.   The decision to admit is
16  made and then I'm called.
17       Q.   So you believe that the
18  decision to admit to the observation
19  telemetry unit was made by whom?
20       A.   It's usually made by the
21  emergency unit physician.
22       Q.   You did not make that
23  decision for Mr. Strimber?
24       A.   No.
```

**MAGNA** ◆
LEGAL SERVICES

Page 58

1    Q.   You were informed of the
2  decision?
3    A.   Yes.
4    Q.   By the emergency room
5  attending?
6    A.   Yes.
7    Q.   Let me go back to those
8  orders I was talking about on the third
9  page of the one I marked.
10   A.   Yes. Page 3, yes.
11   Q.   Okay. I'm going through
12  some of these orders. We got down to --
13  we talked about the physician consult,
14  dash, unreferred. And then it says,
15  patient placed in observation status, and
16  I see that is an order by Dr. Fisher who
17  is the ER attending; right?
18   A.   Yes.
19   Q.   And it looks like the next
20  order, at least on this list, is the
21  first order I see by you.
22   A.   Yes.
23   Q.   And it's a nutrition order
24  timed at 15:56; correct?

Page 59

1    A.   Yes.
2    Q.   So, do you believe that by
3  15:56 you had already seen the patient
4  and done your H&P?
5    A.   Yes.
6    Q.   You did your whole H&P
7  before you wrote any orders?
8    A.   I performed it. Writing it
9  on the chart is a different time.
10   Q.   Sometimes people write
11  orders before they finish their whole
12  history and physical?
13   A.   Exactly.
14   Q.   So I'm just trying to figure
15  out, did you do your entire history and
16  physical and then did you dictate it or
17  did you write orders? What did you do
18  after your history and physical?
19   A.   I put orders in so that -- I
20  put orders in.
21   Q.   So, you believe that 13:56
22  was shortly after you finished your
23  history and physical?
24   A.   I think, yes.

Page 60

1    MR. YOUNG: Did you say
2  13:56 or 15:56?
3    MR. AUSSPRUNG: I meant
4  15:56. I may have misspoke. I
5  apologize if I did.
6    MR. YOUNG: No problem.
7  BY MR. AUSSPRUNG:
8    Q.   I think we're all in
9  agreement it was slightly before 4 p.m.
10  when you put your orders in; right?
11   A.   Yes.
12   Q.   And then the next order you
13  wrote is Physician Group Consult. What
14  is that?
15   A.   I think that entry might
16  refer to the patient being admitted to
17  the medical service. I don't think
18  that's a consult, per se. I think that's
19  a note that talks about him being
20  admitted to the medical service. There's
21  not a name of a doctor right after that
22  so I don't think that's a consult to a
23  particular physician. I think that's the
24  terminology for admitting to the medical

Page 61

1  service, the hospital of service.
2    Q.   In February of 2012 when you
3  saw Mr. Strimber, were you an attending
4  physician?
5    A.   Yes.
6    Q.   Would you refer to yourself
7  as a hospitalist?
8    A.   I refer to my -- the term at
9  Abington is daylighter. It's a house
10  physician.
11   Q.   I saw that in the contract.
12   A.   Yes.
13   Q.   Would you call yourself a
14  hospitalist though?
15   A.   I would not.
16   Q.   Now, did you have privileges
17  at Abington in February of 2012 to admit
18  a patient to your service if you so
19  desired?
20   A.   No.
21   Q.   Your privileges were for
22  admitting patients who were always under
23  some other attending physician?
24   A.   That is correct.



Page 62

1       Q.   And in the case of Mr.
2  Strimber, that was whoever was attending
3  on the Green team that day?
4       A.   That's correct.
5       Q.   Because they were the ones
6  taking admissions?
7       A.   That's correct.
8       Q.   And my understanding, from
9  conversations among Counsel, is that that
10  attending was a Dr. Rampure that day?
11       A.   That's correct.
12       Q.   Is that your recollection?
13       A.   Yes.
14       Q.   Just going down the list,
15  there's an order that you wrote that says
16  "Doc to Nurse."  What is that?
17       A.   It doesn't say what that
18  order is, so.
19       Q.   Do you have an understanding
20  of what it is?
21       A.   I would have to see the
22  order that I gave to interpret that.  It
23  doesn't say it.  If we match that time to
24  orders, we might be able to discern what

Page 63

1  happened at 16:01.
2       Q.   Is there somewhere else that
3  there are orders written concerning these
4  things other than here?
5       A.   I see medication orders
6  follow.  And if I can match something to
7  that time I could perhaps -- that says
8  16:01.  I see a 16:04 order entered for
9  Zofran.  And it could be that the nurse
10  asked me a question, told me it was --
11  you know, he was feeling nauseated, and I
12  said, okay, I'm going to put an order in
13  for Zofran, and that order appeared three
14  minutes later.
15       Q.   So, it could be the doc to
16  nurses kind of a way that they chart a
17  normal order?
18       A.   Yes.
19       Q.   We're not sure, but I
20  understand what you're saying.
21            All right.  Going onto the
22  next page, the first one I have on my
23  page is 02 therapy by cannula?
24       A.   Yes.

Page 64

1       Q.   You placed the patient on
2  oxygen?
3       A.   Yes.
4       Q.   Why?
5       A.   I don't recall.
6       Q.   What was the patient's
7  oxygen saturation in the emergency
8  department; did you know?
9       A.   I would have to look at it
10  to see that number.
11       Q.   You can look.
12       A.   I do not see an O2 set
13  recorded in the place where vital signs
14  where that normally would appear.
15            MR. CAMHI:  There's a whole
16  list of them.
17            THE WITNESS:  Which page?
18            MR. YOUNG:  On the second
19  page.
20            MR. CAMHI:  Yeah.
21            THE WITNESS:  Second page of
22  this?
23  BY MR. AUSSPRUNG:
24       Q.   Yes.

Page 65

1            MR. CAMHI:  Under the
2  heading of "vital signs."
3            THE WITNESS:  I have it,
4       okay.  02 set, okay.  I see those,
5       yes.
6  BY MR. AUSSPRUNG:
7       Q.   So, I see that there are at
8  least four 02 stats reported at range
9  between 94 percent and 97 percent;
10  correct?
11       A.   Yes.
12       Q.   Is it your understanding
13  that those oxygen saturation levels were
14  done on room air?
15       A.   It says "room air" beside
16  it.
17       Q.   Okay.  So, did the patient
18  have an abnormal AA gradient?
19       A.   No.
20       Q.   So the patient had normal
21  oxygen saturations on room air; correct?
22       A.   Yes.
23       Q.   So why did you order oxygen?
24       A.   I do not recall.

**MAGNA**
LEGAL SERVICES

Page 66

1    Q.   Was that an order that you
2  standardly gave to certain types of
3  patients?
4    A.   No.
5    Q.   One of the things that you
6  were doing when you admitted the patient
7  was that you were going to continue
8  getting additional serial cardiac
9  enzymes; correct?
10   A.   That's correct.
11   Q.   Because you had not
12 completely ruled out some myocardial
13 ischemia; correct?
14   A.   Correct.
15   Q.   You had one set of enzymes
16 when you saw the patient that were
17 negative; right?
18   A.   That's correct.
19   Q.   But you need three sets to
20 send the patient home; correct?
21   A.   May I elaborate a little on
22 the question?
23   Q.   Sure.  If it's not a "yes"
24 or "no," then feel free.

Page 67

1    A.   Because of the complaint he
2  gave to the triage nurse of chest pain, I
3  felt the need to consider -- further that
4  evaluation during his admission.  So, I
5  ordered those to not ignore a complaint
6  he had when he came in.  Even though he
7  didn't have it when I spoke to him, I
8  thought it was imperative of me to do the
9  appropriate evaluation to evaluate that
10 further, and I did that through
11 telemetry, cardiac enzymes, EKG, and a
12 cariology consult.
13   Q.   Did you place him on oxygen
14 because of the ongoing cardiology workup?
15   A.   No.
16   Q.   Did you place him on oxygen
17 because of his abdominal pain?
18   A.   No.
19   Q.   Well, oxygen is a drug;
20 correct?
21   A.   It is.
22   Q.   Why did you give this drug?
23   A.   I had the feeling that it's
24 one of those things that on the grid of

Page 68

1  orders that I'm doing for admission, that
2  just -- it doesn't require you to choose
3  it or not.  It comes up.
4    Q.   Well, when you have patients
5  that are being evaluated for chest pain
6  with serial cardiac enzymes, do you
7  routinely place those patients on some
8  amount of supplemental oxygen?
9    A.   I don't always do that.
10   Q.   Why did you place -- I guess
11 it wasn't you.  You didn't make the
12 decision to place him on telemetry;
13 correct?
14   A.   I did not.
15   Q.   What was your understanding
16 as to why Mr. Strimber was placed on a
17 telemetry unit?
18   A.   My understanding was that
19 was because he complained of chest pain
20 when he came in.
21   Q.   And as I go down now to the
22 telemetry order, the two orders after
23 that both deal with cardiac troponins.
24 Those are cardiac enzymes; correct?

Page 69

1    A.   That's correct.
2    Q.   And that's to finish out the
3  serial cardiac enzymes?
4    A.   That's correct.
5    Q.   And that would be for a --
6  ruling out a heart attack; correct?
7    A.   Correct.
8    Q.   Now, you told me that when
9  you saw the patient he was no longer
10 complaining of any pain; correct?
11   A.   That is correct.
12   Q.   So, if you go to page 23 of
13 the packet I handed you.
14   A.   Yes.
15   Q.   This is in orders now.  If
16 you look at this, there's one order for
17 morphine sulfate at the top and then
18 there's a second order for morphine
19 sulfate which looks like it's your order;
20 correct?
21   A.   Yes.
22   Q.   So, this looks like at
23 around 15:59 you ordered morphine every
24 four hours as needed; correct?



Page 70

1    A.   Correct.
2    Q.   Now, if you go to the page
3  before that, there's a little chart, the
4  Medication Administration Summary in the
5  ER?
6    A.   Yes.
7    Q.   And it looks like three --
8  well, there's three doses of morphine, it
9  looks like.  One of them is held at
10  16:04, and the other two doses are given
11  at 15:38 and 15:40.  Do you see that?
12    A.   I see it.
13    Q.   So, why did the patient get
14  morphine at 15:38; do you know?
15    A.   I would think that the
16  morphine would be in response to having
17  pain.
18    Q.   Do you know where that pain
19  was?
20    A.   I would think it would be
21  abdominal pain.
22    Q.   And you knew when you saw
23  the patient in the emergency department
24  that the one cardiac troponin that had

Page 71

1  been ordered was negative; correct?
2    A.   I knew that.
3    Q.   And you knew that a CAT scan
4  had been done of the abdomen only;
5  correct?
6    A.   Correct.
7    Q.   And what was your
8  understanding as to why the CAT scan was
9  ordered?
10    A.   It was done to evaluate the
11  abdominal pain.  And also, Dr. Fisher's
12  note indicated, I believe, that he felt a
13  pulsation.  So, it was done to exclude an
14  abdominal aortic aneurysm.
15    Q.   And in fact, if you look on
16  the report, which I'll go ahead and mark
17  as Exhibit-6 of the CAT scan, you had the
18  CAT scan report available to you at the
19  time?
20    A.   Yes, I did.
21              - - -
22          (Whereupon, Exhibit Turner-6
23       was marked for identification.)
24              - - -

Page 72

1  BY MR. AUSSPRUNG:
2    Q.   If you look on that report,
3  it actually says, reason for study,
4  aortic aneurysm without rupture?
5        MR. YOUNG:  May I have it,
6      please?
7  BY MR. AUSSPRUNG:
8    Q.   That's what it says;
9  correct?
10    A.   That's placed by the ER,
11  yes.
12    Q.   But that was the reason
13  given for the study; correct?
14    A.   Yes, yes.
15    Q.   Now, did you know that you
16  could have aortic aneurysms in the
17  abdomen, but you could also have them in
18  the thorax?
19    A.   Yes.
20    Q.   Why was it that -- did you
21  have an -- did you have a differential
22  diagnosis which included a thoracic
23  aortic aneurysm?
24        MR. YOUNG:  Did you say did

Page 73

1  she or did you say why was it she
2  did?
3        MR. AUSSPRUNG:  No.
4  BY MR. AUSSPRUNG:
5    Q.   Did you, at the time you
6  were caring for Mr. Strimber, have a
7  differential diagnosis that included
8  thoracic aortic aneurysm?
9    A.   I did not.
10    Q.   You knew that they had
11  looked for an abdominal aortic aneurysm;
12  correct?
13    A.   Yes.
14    Q.   You knew he had an
15  artificial valve?
16    A.   Yes.
17    Q.   Did you have an
18  understanding as to whether or not the
19  artificial valve placed the patient at
20  increased risk of developing a thoracic
21  aortic aneurysm?
22    A.   It does and I knew that.
23    Q.   You know that it does create
24  increased risks and you were aware of it

Page 74

1 at the time?
2    A.   Yes.
3    Q.   Why did you not consider
4 obtaining additional studies to rule out
5 a thoracic aortic aneurysm?
6    A.   The absence of the patient's
7 chest pain at the time, and I also made
8 plans for further evaluation by obtaining
9 the cardiology consult and doing the
10 enzymes and EKGs that I mentioned.
11    Q.   When you saw the patient,
12 had he had a chest x-ray?
13    A.   No.
14    Q.   Why not?
15    MR. YOUNG:   Why -- are you
16 asking her why somebody else
17 hadn't ordered one before she saw
18 the patient?
19    MR. AUSSPRUNG:   Yes.
20    MR. YOUNG:   If she knows.
21 Thank you.
22    THE WITNESS:   I don't know
23 why, but I would say that the
24 absence of shortness of breath and

Page 75

1 chest pain at my time might have
2 been why.  And also, the CT of the
3 abdomen viewed part of the thorax.
4 And perhaps that amount of
5 information was sufficient not to
6 require him to be subjected to the
7 radiation of a chest x-ray.
8 BY MR. AUSSPRUNG:
9    Q.   Well, the kind of thoracic
10 aneurysm that a valve places a patient at
11 risk for is an ascending thoracic
12 aneurysm; correct?
13    A.   I'm aware.  And the CAT scan
14 of the abdomen did not view that area.
15    Q.   So, a chest x-ray sometimes
16 has findings when you have aortic
17 aneurysms or aortic dissections that can
18 be worrisome for thoracic aneurysms;
19 correct?
20    A.   That is correct.
21    Q.   He can have a widened
22 mediastinum; correct?
23    A.   Correct.
24    Q.   So, a chest x-ray might have

Page 76

1 provided additional information as to
2 whether there was a concern in the
3 thoracic aorta; correct?
4    A.   It might have.
5    Q.   Okay.  Was it your
6 understanding that the patient in the
7 emergency department was following the
8 chest pain orders protocol?
9    MR. CAMHI:   Can you repeat
10 that, please?  You said the
11 patient was following a protocol?
12    MR. AUSSPRUNG:   Yes.  I'm
13 sorry.
14 BY MR. AUSSPRUNG:
15    Q.   Memorial Hospital has, I'm
16 sure, a lot of policies and procedures.
17 One of them is titled Protocol Orders.
18    Are you familiar with the
19 protocol orders established by the
20 hospital?
21    A.   No.
22    Q.   There's a set of protocol
23 orders on chest pain.  Are you familiar
24 with that at all?

Page 77

1    A.   Yes.
2    Q.   Was it your understanding
3 that all patients complaining of chest
4 pain would get chest x-rays?
5    A.   No.
6    Q.   Why not?
7    A.   I think it's an individual
8 decision about whether or not that study
9 is indicated.
10    Q.   Was it indicated in Mr.
11 Strimber?
12    A.   At the time that I saw him,
13 I didn't feel so, no.
14    Q.   So, you were concerned
15 enough about his cardiac status to ensure
16 that he was on telemetry; correct?
17    A.   Correct.
18    Q.   To ensure additional cardiac
19 enzymes would be ordered; correct?
20    A.   Correct.
21    Q.   But you didn't feel a chest
22 x-ray was needed?
23    A.   Correct.
24    Q.   You did get a PT.  Why did



MAGNA
LEGAL SERVICES

Page 78

1  you order a PT?
2      A.   A PT is part of standard
3  admission orders.
4      Q.   Well, Mr. Strimber had an
5  artificial valve; correct?
6      A.   Correct.
7      Q.   Was he on Coumadin?
8      A.   That was another reason.  He
9  was on Coumadin, yes.
10     Q.   He was on Coumadin, okay.
11     A.   Yes.
12     Q.   So, what effect does that
13 have on the danger that Mr. Strimber
14 would face if he was in fact bleeding?
15     A.   It would increase his
16 danger.  We measure prothrombin level,
17 which was in the therapeutic range for
18 someone with an aortic valve and on
19 Coumadin.  I think it was 2.8.
20     Q.   But his INR was appropriate
21 for somebody on Coumadin?
22     A.   That's correct.
23     Q.   He was anticoagulated?
24     A.   Therapeutically, yes.

Page 79

1      Q.   And that meant that if he
2  did bleed, his blood would not clot as
3  quickly or as well as somebody not on any
4  coagulation therapy?
5      A.   That is correct.
6      Q.   Are EKG abnormalities common
7  in thoracic aortic aneurysms?
8      A.   They could be present.
9      Q.   Were any present on his EKG?
10     A.   His initial EKG in the ER
11 did not show evidence of an acute
12 process.
13     Q.   That brings us to your
14 history and physical.
15     A.   Okay.
16              - - -
17         (Whereupon, Exhibit Turner-7
18         was marked for identification.)
19              - - -
20 BY MR. AUSSPRUNG:
21     Q.   I'm marking your history and
22 physical as Exhibit-7.
23         Now, the document that I've
24 marked here is seven pages long.  Flip

Page 80

1  through it.  Is the whole seven pages
2  your history and physical or have I
3  over-included something?
4      A.   That was -- it looks like it
5  was repeated.  I updated some information
6  at the end.  I went back to put some
7  additional data in so it made it repeat
8  some of the things.  CAT scan is in there
9  twice.
10     Q.   And it's your memory and
11 general practice that you would first do
12 orders and then -- I don't know -- did
13 you enter your H&P into the computer?
14     A.   Yes.
15     Q.   So, you do your orders and
16 then do your history and physical?
17     A.   Yes.
18     Q.   So it looks like this
19 history and physical on page 1 created
20 initially at 14:09, which is --
21         MR. CAMHI:  4:09.
22 BY MR. AUSSPRUNG:
23     Q.   I'm sorry, 4:09 p.m., you
24 believe that time to be about accurate?

Page 81

1      A.   Yes.
2      Q.   Do you have any reason to
3  think it's not?
4      A.   No.
5      Q.   And as the chief complaint,
6  what did you write?
7      A.   Chest, epigastric, back
8  pain, nausea, vomiting, diarrhea.
9      Q.   So you were under the
10 understanding the patient's chief
11 complaint included chest pain; correct?
12     A.   I obtained that from the ER
13 triage information, yes.
14     Q.   Well, this was your chief
15 complaint, right, or was this somebody
16 else's chief complaint?
17     A.   That's written in my chief
18 complaint.
19     Q.   The back pain, was that pain
20 from the chest and/or epigastric that
21 went through to the back or was the back
22 pain separate?
23     A.   I would refer to history of
24 present illness to see if I described

Page 82

1 that further in that part of things.
2 Q. Okay. Please, do.
3 A. Patient is 61-year-old --
4 I'm going to read that.
5 Q. Okay.
6 A. 61-year-old male who is
7 status post valve replacement surgery --
8 there seems to be a question at the time
9 that I talked to him whether it was
10 aortic valve and questionably also the
11 mitral valve -- who presents to the ER
12 for evaluation of legs vibrating and
13 abdomen feeling like it is going to
14 explode. Patient reports that abdominal
15 pain is mid epigastric. He had one
16 episode of diarrhea yesterday and has
17 vomited once in the ER. He describes
18 eating radishes, tomatoes, eggs, and lox
19 today and feeling these symptoms after
20 that. Patient had non-contrast CT of the
21 abdomen in the ER and is admitted for
22 further evaluation of management.
23 I didn't mention back pain
24 in that development of my HPI.

Page 83

1 Q. So, do you have an
2 understanding as to whether the back pain
3 was something that came through from the
4 front or was separate?
5 A. You're asking whether I
6 thought it was a separate issue than what
7 I reported here or whether -- where did
8 it come from when I mentioned it up at
9 the top in the chief complaint?
10 Q. A lot of people complain of
11 back pain; correct? It's a common
12 complaint, especially in the emergency
13 department; right?
14 A. Yes.
15 Q. Okay. So, my question is,
16 did you believe that the back pain was
17 related to the epigastric pain or did you
18 believe it was not related to the
19 epigastric pain?
20 A. I couldn't tell.
21 Q. Now, I see there's a lot of
22 lab results and CAT scan results. Do you
23 cut and paste those into your H&P?
24 A. Yes.

Page 84

1 Q. So then let's go to the
2 fourth page, which is page 13, at the
3 bottom where it says "Plan Comments."
4 Is this your, like,
5 assessment?
6 A. That is, yes.
7 Q. Your assessment was that the
8 patient had chest, epigastric, and back
9 pain; correct?
10 A. Correct.
11 Q. What does "NC CL" mean?
12 A. Noncontrast CT.
13 Q. Oh, noncontrast CT of the
14 abdomen done.
15 A. Uh-huh. Telemetry, trend
16 cardiac enzymes, EKG, anti emetics and
17 analgesics.
18 Q. Okay. And number 2, you
19 wrote history of the valve replacement
20 surgery. Why did you list that as number
21 2 in your plan comments?
22 A. I thought it was an
23 important thing to keep as a priority.
24 Q. What was important about it?

Page 85

1 A. That certainly a patient
2 whose had that kind of surgery is someone
3 who requires attention -- that the
4 presence of that surgery in his past is
5 something that should be part of what
6 we're considering or keeping in mind with
7 him.
8 Q. Did you, at the time, have
9 any suspicion that his history of valve
10 replacement was in any way related to the
11 pain he was having?
12 A. I didn't at that time.
13 Q. Now, down at the bottom of
14 this page it says "Edit History."
15 A. Yes.
16 Q. Can you explain to me why it
17 says "edit"?
18 A. I was reading that to see if
19 anything else was written there that was
20 different than mine, than what I said.
21 That entire statement is the same, but I
22 wondered -- but I think the issue is when
23 you go to the next page. The computer
24 updates it every time you add something



MAGNA
LEGAL SERVICES

Page 86

1  to it. And what I noticed to be
2  different about that was that when you
3  look at my assessment plan, there's a
4  point in my -- yeah, when you go back to
5  the last page, page 16, on Comments, I
6  adjusted my plans for him and I added
7  some things. And that was mainly the
8  cardiology consult I added for the
9  evaluation of problem number 1. And I
10 think with the valve replacement I also
11 put cardiology there, that I would await
12 their recommendation concerning his
13 Coumadin with the INR of 2.8.
14       So, whenever you make a new
15 -- whenever you add something different,
16 the computer updates the whole thing.
17 So, I added cardiology to my notes to
18 indicate that I placed that consultation,
19 so the computer updated the whole thing.
20 So, that's why it was edited.
21       Q.   I want to go back to page
22 13.
23       A.   Okay.
24       Q.   If I look over to where it

Page 87

1  says "Edit History," I look over to the
2  right-hand column. The first four lines,
3  it looks like, are edited by you at
4  4:28:30 p.m.; correct?
5        A.   Yes.
6        Q.   And then the last -- from
7  there down, it's edited by you at 8:20:12
8  p.m.
9        A.   That's when I got back to
10 finishing up -- back to my chart to
11 finish up the things that I had done
12 earlier. That doesn't mean the time that
13 it was done. It means when I got back to
14 the computer.
15       Q.   By 8:20 p.m., had the
16 patient already had a medical emergency?
17       A.   He had. I think that
18 happened around 8:10.
19       Q.   So after the patient had a
20 medical emergency and started being
21 evaluated by the cardiac cath lab, you
22 went back and edited your note?
23       A.   I think while I was on the
24 floor attending to him and waiting for

Page 88

1  things to get going, I went back to the
2  computer to finish up my history and
3  physical.
4        Q.   So you hadn't finished it
5  when you entered it the first time?
6        A.   Correct.
7        Q.   What else did you add?
8        A.   That's the only thing that I
9  see different that I added.
10       Q.   Let's go to page 16. It's
11 the last page of that document where you,
12 again, have your comments, your
13 assessment, and plan?
14       A.   Yes.
15       Q.   All right. Again, you wrote
16 chest, epigastric, and back pain;
17 correct?
18       A.   Correct.
19       Q.   And it looks like the first
20 four things were entered by you at
21 4:15:46 p.m.; correct?
22       A.   Yes.
23       Q.   And then you went back and
24 you edited those four things at 8:20

Page 89

1  p.m.; correct?
2        A.   Just to add -- well, to add
3  the cardiology consult. I wanted to
4  place that.
5            MR. YOUNG: Let me object to
6        the word "edit." I think what
7        she's testified to is that she's
8        adding information.
9            MR. AUSSPRUNG: Fair enough.
10 BY MR. AUSSPRUNG:
11       Q.   So, what information is
12 present at 8:20 that's not at 4:15 in
13 that note?
14       A.   It looks -- when I read
15 through, it just seems the only thing
16 that's different is the cardiology
17 consult.
18       Q.   Right. And it looks to me
19 like the consult cardiology was actually
20 removed from the note.
21       A.   It was.
22       Q.   Not added; correct?
23       A.   Well, both happened. First
24 of all, if you note the time of the

Page 90

1  cardiology consult, you'll see that it
2  happened long before I wrote this in my
3  note about adding it -- I mean, about it
4  being done. So, it was done hours
5  before. I ordered a cardiology consult
6  on admission. When I talked to
7  Dr. Rampure about it and presented Mr.
8  Strimber's case to him, he told me he
9  didn't think we needed a cardiology
10  consult and asked me to take it out,
11  which I did. But I'm thankful that the
12  cardiology consult was done before I took
13  it out. So when I went to Mr. Strimber
14  when he got into trouble and I looked at
15  the chart, the cardiology consult was
16  there. So, it was done.
17      Q.  So, at 4:15 when you
18  initially wrote your comments,
19  assessment, and plan, you included
20  consult cardiology?
21      A.  Yes.
22      Q.  Then you spoke to
23  Dr. Rampure and he asked you to take that
24  out of your order set?

Page 91

1      A.  Yes.
2      Q.  And so then when you edited
3  it at 8:20 p.m., you removed that?
4      A.  Perhaps that's the
5  difference in things then.
6      Q.  Okay.
7      A.  But it had been done.
8      Q.  We received an affidavit
9  from Dr. Rampure basically just saying he
10  doesn't have any memory of the events.
11      How many conversations do
12  you recall having with Dr. Rampure about
13  Mr. Strimber and his care?
14      A.  Two.
15      Q.  Let's talk about the first
16  conversation.
17      THE VIDEOGRAPHER: The time
18  is 12:01 p.m. We are off the
19  record.
20      (Off video record.)
21      THE VIDEOGRAPHER: The time
22  is 12:02 p.m. We are back on the
23  record.
24      THE WITNESS: I was

Page 92

1  answering my two conversations
2  with Dr. Rampure.
3  BY MR. AUSSPRUNG:
4      Q.  Correct. So, what can you
5  tell me about the first conversation you
6  had with Dr. Rampure?
7      A.  The first conversation was
8  after seeing Mr. Strimber, doing his
9  history and physical, formulating his
10  orders and my plan, I then called the
11  attending physician whose services he's
12  being admitted to say, and I present this
13  patient, this is what I have, his
14  symptoms, my exam, the laboratory
15  studies, and my plan.
16      Q.  Is that your general routine
17  or is that your actual memory?
18      A.  No. That's a routine that
19  has to be done at every admission at
20  Abington.
21      Q.  What do you actually
22  remember about your conversation with
23  Dr. Rampure that first time?
24      A.  I remember all of it. I

Page 93

1  remember it.
2      Q.  You remember doing --
3      A.  I remember doing it. I
4  remember it, yes.
5      Q.  And did Dr. Rampure ask you
6  any specific questions on that first
7  phone call?
8      A.  I don't recall specific
9  questions.
10      Q.  Was that initial interaction
11  with Dr. Rampure on the phone?
12      A.  It was on the phone.
13      Q.  Do you remember any
14  instructions or orders he gave you to
15  carry out?
16      A.  Yes. He agreed with the
17  plan but he just said I don't think we
18  need a cardiology consult so do you mind
19  taking that out. And I said I would
20  remove it.
21      Q.  Anything else you recall
22  about that first telephone call?
23      A.  We were -- everything was
24  routine. We were all right. I don't


MAGNA
LEGAL SERVICES

Page 94

1  recall anything specific about that. It
2  was our regular way of communicating
3  about new admissions.
4       Q.   Do you have any sense as to
5  what time that phone call occurred at?
6       A.   I don't. I could estimate
7  that it was a little bit after the orders
8  were entered cause I usually -- but the
9  orders have different times and that kind
10  of thing. It's hard to tell. But
11  sometime after I admitted Mr. Strimber
12  before 7 o'clock. Sometime after I put
13  the initial things in.
14       Q.   Would it have been after you
15  entered your history and physical into
16  the computer?
17       A.   It didn't have to be. It
18  might have been before.
19       Q.   So you don't really know
20  what time between 4 p.m. and 7 p.m. that
21  conversation occurred?
22       A.   I don't recall that time.
23       Q.   Okay. You said there was a
24  second conversation with Dr. Rampure?

Page 95

1       A.   Yes.
2       MR. AUSSPRUNG: Rampure is
3  R-A-M-P-U-R-E.
4       THE WITNESS: And that was
5       --
6  BY MR. AUSSPRUNG:
7       Q.   Tell me about the second
8  conversation.
9       A.   The second conversation was
10  to inform him that a patient admitted to
11  his service, Mr. Strimber, had had a
12  change in status and had changed from a
13  person who was stable with abdominal
14  symptoms, now had a change in status.
15       Q.   Do you know what time that
16  phone call occurred at?
17       A.   I'm going to say it must
18  have happened sometime after 8:10 because
19  that's the time I see in the chart that I
20  recall to be clear to me that the nurse
21  calls that there's a problem with Mr.
22  Strimber.
23       Q.   If it was sometime after
24  8:10 when you had the second conversation

Page 96

1  with Dr. Rampure, why is it that you
2  didn't make your change and remove the
3  cardiology consult until 8:20 p.m.?
4       A.   I had other things that I
5  was involved in, other things, others
6  orders of patients.
7       Q.   What do you recall informing
8  Dr. Rampure during the second phone call?
9  Do you recall what you told him?
10       A.   I recall that I told him
11  that he had an EKG which looked acute,
12  like he was having acute MI, that I was
13  going to activate the cardiac cath lab,
14  and we would get back to him in a little
15  bit to tell him what the outcome of those
16  things were.
17       Q.   Anything else you remember
18  telling him in that second call?
19       A.   No.
20       Q.   Did he instruct you to do
21  anything in that second call?
22       A.   He did not. I did tell him
23  that the cardiology consult was done, you
24  asked me to take it out but it was done.

Page 97

1  We talked about the cardiologist's
2  recommendations and we left it there.
3  But I did inform him of that.
4       Q.   When did you first learn the
5  cardiology consult had been completed?
6       A.   When I went to see Mr.
7  Strimber when he developed an acute
8  change.
9       Q.   So that was sometime around
10  8:10, I think you said?
11       A.   Or after.
12       Q.   Did you ever speak to the
13  cardiologist who did the cardiology
14  consult?
15       A.   I did not.
16       Q.   Did you have an
17  understanding as to what the
18  cardiologist's recommendations were after
19  he did the consult?
20       A.   When I read it, yes, I did.
21       Q.   And that was sometime after
22  18:10?
23       A.   Yes.
24       Q.   I'm sorry, 8:10 p.m.

**MAGNA** ▶
LEGAL SERVICES

Page 98

```
 1      A.   Yes.
 2      Q.   What was your understanding
 3  as to what the cardiologist wanted?
 4      A.   May I take a look at the
 5  cardiology consult?
 6      Q.   Yes.  I'll mark it for us
 7  and we can all look at it together.
 8           - - -
 9           (Whereupon, Exhibit Turner-8
10       was marked for identification.)
11           - - -
12           MR. AUSSPRUNG:  I'm marking
13       it as Exhibit-8.
14           THE WITNESS:  I remember
15       that evening quickly focusing my
16       eye on the assessment, plan, and
17       recommendations when I went over.
18           MR. AUSSPRUNG:  I'm sorry.
19       Could you just read back that
20       answer?  I didn't hear.
21           - - -
22           (Whereupon, the pertinent
23       portion of the record was read.)
24           - - -
```

Page 99

```
 1  BY MR. AUSSPRUNG:
 2      Q.   Okay.  What was your
 3  understanding as to what the
 4  cardiologist's assessment, plan, and
 5  recommendations were?
 6      A.   That he did not identify any
 7  acute cardiovascular issues.  He wrote
 8  doubt ACS by enzymes and EKG.  Some of
 9  the writing is difficult to read the next
10  line, but he recommended checking an
11  echocardiogram or stress test.  And I
12  think that might say either for the
13  patient or for the a.m. I can't read that
14  last word.  And it says INR, in range.
15           So, my impression of reading
16  his consult was he did not identify any
17  acute cardiovascular issues and was
18  agreeing with the plan to check serial
19  EKGs and enzymes.
20      Q.   I want to focus on that
21  third line.
22      A.   Yes.
23      Q.   What's that first word?
24      A.   I think that says sent
```

Page 100

```
 1  enzymes and EKG.  I think that says
 2  "sent."  That orders have been placed for
 3  the enzymes and the EKG.  I think that's
 4  what that says.
 5      Q.   I'm sorry.  So go two lines
 6  below that.
 7      A.   You're going to -- oh,
 8  you're at the bottom; right?
 9      Q.   Right.  The second to the
10  last line.
11      A.   Second to the last line.
12      Q.   What is the first word
13  there?
14      A.   I don't know.
15      Q.   What is the second word
16  there?
17      A.   Need to check echo or stress
18  for, and I don't know what that last word
19  is.  I don't know what that first letter
20  is.
21      Q.   So you weren't sure what
22  that recommendation was?
23      A.   I could read echo or stress
24  test.  So, I would take from that that he
```

Page 101

```
 1  was suggesting we order an echo or stress
 2  test.
 3      Q.   An echo would have revealed
 4  a thoracic aortic aneurysm; correct?
 5      A.   It would have.  Now, he
 6  didn't call me to tell me that.  This was
 7  placed on the chart -- left on the chart
 8  for us to read when we saw him.  So, no
 9  one called to say, Dr. Turner, get that
10  echo right now.  And if the cardiologist
11  wanted that, he would have ordered it
12  right then anyway, so.  He wrote that in
13  recommendation for us to look at when he
14  was -- the next person was going to see
15  him, if things were going per usual,
16  would have been Dr. Rampure the next day
17  when he came to evaluate him.  He would
18  have seen this and ordered the echo.
19           If he wanted it immediately,
20  he would have called me to say he wanted
21  the echo, and either I or he would have
22  ordered it.  We can ask him what that
23  first letter might say right there.
24      Q.   I'll mark this document as
```

**MAGNA** ▶
LEGAL SERVICES

Page 102

1    Exhibit-9 and give it to you.
2              - - -
3              (Whereupon, Exhibit Turner-9
4    was marked for identification.)
5              - - -
6    BY MR. AUSSPRUNG:
7         Q.   I believe it's a nursing
8    note.
9         A.   Yes.
10        Q.   There's a bunch of stuff at
11   the bottom two-thirds of the page that's
12   crossed out. I assume that was some kind
13   of mistake in entry. But at the top of
14   the page there's something called "Human
15   Response." Do you see that?
16        A.   Okay, but this is crossed
17   out when somebody updates something. So,
18   there must be a place where this is
19   updated. It crosses out what was done
20   before and the computer updates it to
21   what a new entry is. But, okay.
22        Q.   Okay. That's fine. Up at
23   the top, I want to focus up under the
24   "Human Response" heading.

Page 103

1         A.   Yes.
2         Q.   And it looks like if I go
3    just above that, that this was recorded
4    at around 15:30 by Amber Freese. Do you
5    know nurse Freese, F-R-E-E-S-E?
6         A.   Not specifically, but she's
7    a nurse.
8         Q.   Do you know if she's an ER
9    nurse?
10        A.   No. She's a nurse on the
11   floor, I believe. I think.
12        Q.   She noted here that the
13   patient felt a bubble-like sensation
14   creeping up his throat which also causes
15   metallic taste in his mouth. Do you see
16   that?
17        A.   I see that.
18        Q.   Is that consistent with the
19   history you took?
20        A.   No. And she didn't
21   communicate this to me. This is her
22   assessment when he gets to the floor,
23   but.
24        Q.   Was this note on the chart

Page 104

1    at 15:30 when you saw the patient?
2         A.   I saw him in the ER, and no,
3    this note was not on our chart. This is
4    a note entered when he gets -- I believe
5    when he gets up to the floor.
6         Q.   Was your history and
7    physical -- well, your very first order
8    is timed at 13:58, and your history and
9    physical says it was created at 14:09 --
10   I'm sorry, at 16:09. So, can we agree
11   that by 15:30 this was entered?
12        A.   I don't know.
13        Q.   Was it available to you?
14        A.   I don't know. I didn't see
15   this note. I wouldn't have a reason to
16   look at this kind of note again unless it
17   was brought to my attention.
18        Q.   Do you routinely review the
19   nursing notes?
20        A.   I do.
21        Q.   But you don't believe you
22   saw that one?
23        A.   I don't believe I saw that
24   one. I usually review the nursing notes

Page 105

1    prior to admission. Once the admission
2    is done, the nurse has the patient up on
3    the floor and she's entering her
4    assessment. If there's something she
5    wants me to know or if I'm called back to
6    the patient to do something, I can refer
7    to that. But there's not a reason I
8    should know that specifically because I
9    have seen them and done the things that I
10   wanted to do.
11        Q.   When you reviewed the
12   medical records in preparation for
13   today's deposition, did you see that
14   note?
15        A.   I read -- yes. I read that
16   note, yes.
17        Q.   Okay. Do you place any
18   significance on that note?
19             MR. YOUNG: You're asking
20   her --
21             MR. AUSSPRUNG: Let me ask
22   it a different way.
23             MR. YOUNG: Yeah, try.
24   BY MR. AUSSPRUNG:

Page 106

1    Q.   Now that you see that
2    complaint that Mr. Strimber apparently
3    told at least a nurse around 15:30, does
4    that complaint have any significance to
5    his clinical presentation?
6        MR. YOUNG:  Objection.
7        She's told you that she didn't see
8        this before.  It seems to me that
9        you're now asking for a
10       backward-looking opinion, which I
11       object to you inquiring about in
12       terms of any expertise by her.
13       Since we're in federal court, I'm
14       not going to instruct her not to
15       respond, but I don't think it's an
16       appropriate question.
17   BY MR. AUSSPRUNG:
18       Q.   Let me ask it a little
19   different way, Doctor.
20           Have you ever had patients
21   complain of a metallic taste in their
22   mouth?
23       A.   Yes.
24       Q.   Is that characteristic of

Page 107

1    any conditions?
2        A.   No.
3        Q.   A complaint of a bubble-like
4    sensation creeping up in the throat, is
5    that complaint consistent with a thoracic
6    aortic aneurysm?
7        MR. YOUNG:  Same objection.
8    BY MR. AUSSPRUNG:
9        Q.   You can answer.
10       A.   Not specifically.
11       Q.   And I'm going to mark as
12   Exhibit-10 another one-page document from
13   your chart.
14           - - -
15           (Whereupon, Exhibit
16       Turner-10 was marked for
17       identification.)
18           - - -
19   BY MR. AUSSPRUNG:
20       Q.   Under 4, KBC Adult
21   Goal/Outcome Evaluation, it appears that,
22   again, at 19:45, the nurse again notes
23   the same complaint as prior of abdominal
24   bubble with metallic taste in mouth.  Do

Page 108

1    you see that?
2        A.   I see it.
3        Q.   You, again, did not garner
4    that complaint prior to Mr. Strimber's
5    death?
6        A.   That is correct.
7        Q.   And then the second part at
8    the bottom of this page is an Observation
9    Patient Notification, and it appears this
10   documents that a moonlighter, nurse
11   practitioner Martinez, was notified at
12   20:31; correct?
13       A.   Yes.
14       Q.   She testified that her
15   memory was that you were together when
16   she got that notification.  Is that your
17   memory as well?
18       A.   Yes, it is.
19       Q.   Tell me what you remember
20   about that call to nurse practitioner
21   Martinez.
22       A.   Well, the nurse called that
23   telemetry had reported that Mr.
24   Strimber's EKG and heart rate had taken a

Page 109

1    change.
2        Q.   And did you go with
3    Ms. Martinez to see the patient?
4        A.   Yes, I did.
5        Q.   You were signing out at that
6    point; correct?
7        A.   I was finishing up the day.
8    My shift ended at 7 o'clock.  I was
9    finishing up notes on charge and things.
10       Q.   It was 8:30, so you were
11   already there late?
12       A.   Yes.  Every night.
13       Q.   Okay.
14           THE VIDEOGRAPHER:  The time
15       is 12:18 p.m.  We are off the
16       record.
17           (Off video record.)
18           THE VIDEOGRAPHER:  The time
19       is 12:18 p.m.  We are back on the
20       record.
21   BY MR. AUSSPRUNG:
22       Q.   So you went with
23   Ms. Martinez to see Mr. Strimber;
24   correct?



Page 110

1    A.   Yes.
2    Q.   What do you remember about
3  that interaction?
4    A.   Us with the patient.
5    Q.   Do you remember having any
6  conversations with Ms. Martinez about Mr.
7  Strimber?
8    A.   I remember, yes.
9    Q.   What did you tell her?
10    A.   I said from what they're
11  reporting, I think I should go with you
12  to see him.
13    Q.   Okay.
14    A.   I said I met him earlier in
15  the day, I know his history, I know his
16  story, I'm going to go with you.
17    Q.   Did you tell her anything
18  about his history and story?
19    A.   I'm sure as we walked along,
20  yes, I'm sure I told her his history.
21    Q.   I'm sure you did.
22    A.   Okay.
23    Q.   But do you remember?
24    A.   That I admitted him earlier

Page 111

1  with abdominal discomfort, nausea,
2  vomiting. I thought it was an abdominal
3  issue. Now with what they're reporting
4  to me, there's a cardiac issue going on,
5  we need to go and see him right away.
6    Q.   Did you tell her that the
7  patient had an artificial heart valve?
8    A.   Yes.
9    Q.   Did you tell her the patient
10  was on Coumadin?
11    A.   Yes.
12    Q.   Do you remember anything
13  else you specifically told her?
14    A.   I mentioned that we had
15  requested cardiology consult but that I
16  had been asked to take it out so I'm not
17  -- we probably didn't have it. At that
18  point I hadn't seen the chart.
19    Q.   So as of when this phone
20  call came in at 20:31, you had not yet
21  seen the cardiology consult?
22    A.   I had not.
23    Q.   It was when you got over to
24  the patient's bedside that you realized

Page 112

1  the consult had been done?
2    A.   That's correct.
3    Q.   Now, did nurse practitioner
4  Martinez say anything to you that you
5  recall?
6    A.   No, no.
7    Q.   Did she say anything along
8  the lines of today's my first day, please
9  come?
10    A.   We were together. It was
11  her first day. We were signing out. I
12  was giving her instructions, so I was
13  staying behind a bit to work with her. I
14  didn't go with her because it was her
15  first day, I went with her because I knew
16  Mr. Strimber's history and felt that I
17  could facilitate evaluation of what was
18  going on in a faster fashion. She knew I
19  knew it was her first day. I mean,
20  that's not something we had to talk
21  about.
22    Q.   Now, when you cared for Mr.
23  Strimber, you believed that he was
24  predominantly having an abdominal

Page 113

1  complaint; correct?
2    A.   That is correct.
3    Q.   And you ordered a cardiology
4  consult that you then tried to cancel;
5  correct?
6    A.   Yes.
7    Q.   Did you order a
8  gastroenterology consult?
9    A.   I did not.
10    Q.   Why not?
11    A.   His abdominal exam didn't
12  require it at that point in my opinion.
13    Q.   Did you order any type of --
14  I know he had had a CAT scan; correct?
15    A.   Yes.
16    Q.   Did you order any plain
17  films of his abdomen?
18    A.   No.
19    Q.   Did you order upper GI or a
20  lower GI?
21    A.   I did not.
22    Q.   And request endoscopy?
23    A.   No.
24    Q.   What were you doing to

Page 114

1  evaluate his abdominal pain?
2      A.    Kept him nothing by mouth, I
3  ordered IV fluids for hydration, I
4  ordered pain medication.  We would
5  normally do serial abdominal exams to
6  evaluate his abdomen in response to his
7  complaints.
8      Q.    Did you do an abdominal exam
9  between 4 p.m. and 8 p.m.?
10     A.    I did not.
11     Q.    Did anybody that you're
12 aware of do an abdominal exam between 4
13 p.m. and 8 p.m.?
14     A.    Cardiology saw the patient.
15 They might have done that since that's a
16 standard part of what every physician
17 does.  And on his consult, in fact, it
18 says, abdomen, it says soft.
19     Q.    If the patient had no pain
20 and was cardiovascularly stable -- he was
21 when you saw him; correct?
22     A.    Correct.
23     Q.    Why was he admitted at all?
24     A.    61-year-old man with a

Page 115

1  history of aortic valve surgery
2  complaining of chest pain in triage and
3  having abdominal pain is someone who
4  warrants admission for further
5  evaluation.
6      Q.    The two critical things you
7  mentioned there were that he had a valve
8  replacement and he presented with chest
9  pain; correct?
10     A.    Correct.
11     Q.    Did you do a physical
12 examination of Mr. Strimber when you saw
13 him again sometime after 8:10 p.m.?
14     A.    Yes.
15     Q.    What do you recall of that
16 physical examination?
17     A.    I recall that it was
18 probably limited to his heart and lungs,
19 a brief exam of his abdomen, and I
20 checked his extremities, something that
21 happens really quickly because he was in
22 distress, and that that remained the
23 same.
24     Q.    Do you remember if there

Page 116

1  were any findings or anything had
2  changed?
3      A.    His physical exam hadn't
4  changed but he was diaphoretic, he was
5  having pain, his blood pressure was low,
6  he looked extremely uncomfortable.  A
7  major change from how he appeared in the
8  ER.
9      Q.    He was hypotensive when you
10 came to see him; correct?
11     A.    Yes.
12     Q.    Did he have diminished
13 pulses in his legs?
14     A.    I do not recall.
15     Q.    Did you check his pulses in
16 his legs?
17     A.    I'm sure I did.
18     Q.    Was it your impression when
19 you saw him sometime after 8:10 p.m. that
20 he was having a myocardial infarction?
21     A.    He was having an acute
22 cardiac event of some scope.  I didn't
23 know exactly what it was.  It appeared to
24 be an acute MI, but.

Page 117

1      Q.    And you, along with nurse
2  practitioner Martinez, initiated a
3  cardiology evaluation and notified the
4  cath lab; is that correct?
5      A.    I did.  At that point I was
6  the most senior person there.  She was my
7  nurse practitioner.  I took over the care
8  of Mr. Strimber and I made the steps
9  necessary to get him to where I thought
10 he should be.
11     Q.    Was all the care provided
12 your responsibility and not nurse
13 practitioner Martinez's?
14     A.    I would say that, yes.
15     Q.    Thank you.
16         So, nurse Martinez didn't
17 make any independent decisions concerning
18 Mr. Strimber that you're aware of?
19     A.    No.
20     Q.    You were the one making all
21 the decisions?
22     A.    Yes.  And we called a MET
23 team, the medical emergency team response
24 on him, and other doctors arrived and we

MAGNA
LEGAL SERVICES

Page 118

1  together collectively worked on him.
2      Q.   In between when you first
3  saw the patient in the ER sometime just
4  before 4 p.m. and when Mr. Strimber left
5  to go to the cath lab, you were the
6  physician responsible for his care?
7      A.   That's correct.
8      Q.   And you made all the
9  decisions during that time period?
10     A.   Yes.
11     Q.   Okay.  Did you stay with the
12 patient until the patient left the room,
13 his floor bed, to go to the cath lab?
14     A.   I did.
15     Q.   Who came to take him?  Did
16 another physician come, a cardiologist
17 come?
18     A.   A cardiologist arrived in
19 the cath lab.  And once he's in the cath
20 lab, we can then transport the patient
21 from his place to the cath lab.
22     Q.   Did you go with the patient
23 to the cath lab?
24     A.   I did not.

Page 119

1      Q.   Some kind of critical care
2  team took him?
3      A.   Um-hum.
4      Q.   Yes?
5      A.   Yes, yes.  I'm sorry.  Yes.
6      Q.   At some point, did you learn
7  what happened to Mr. Strimber?
8      A.   Yes.
9      Q.   What did you learn?
10     A.   I learned that he had
11 expired in the cath lab.
12     Q.   Who told you that?
13     A.   Christina Martinez.
14     Q.   Did you ask what his
15 diagnosis was?
16     A.   I did.
17     Q.   And what did you learn?
18     A.   She said that he had a
19 dissecting thoracic aneurysm.
20     Q.   At that point did you go
21 back and look at anything in Mr.
22 Strimber's medical record?
23     A.   I don't recall specifically,
24 but I might have.

Page 120

1          MR. AUSSPRUNG:  Let's take a
2  short break.
3          THE VIDEOGRAPHER:  The time
4  is 12:27 p.m.  We are off the
5  record.
6          (Off video record.)
7            - - -
8          (Whereupon, a brief recess
9  was taken.)
10         (On video record.)
11           - - -
12         THE VIDEOGRAPHER:  The time
13 is 12:34 p.m.  We are back on the
14 record.
15 BY MR. AUSSPRUNG:
16     Q.   Doctor, one of the things
17 you said is that when you saw the patient
18 sometime after 8:10 p.m. was that he was
19 having some type of cardiac event;
20 correct?
21     A.   Correct.
22     Q.   What was your differential
23 diagnosis as to the type of cardiac event
24 he was having at that point?·

Page 121

1      A.   My impression was that he
2  was having an acute MI.
3      Q.   Was there any other
4  possibility that you considered he was
5  having at that point?  Let me ask those
6  questions again.  This thing is causing
7  me problems.
8          Doctor, when you saw the
9  patient shortly after 8:10 p.m., you
10 understood he had a cardiac event;
11 correct?
12     A.   Correct.
13     Q.   What was your differential
14 diagnosis of that cardiac event?
15     A.   My impression was that he
16 was having an acute MI, but other causes
17 of acute onset of chest pain, hypotension
18 on the list, included a pulmonary
19 embolism, pericarditis, pericardial
20 tamponade, and an aneurysm, a thoracic
21 aneurysm, was in the differential as
22 well.
23     Q.   Why was it that a thoracic
24 aneurysm was on your differential

Page 122

1  diagnosis list after 8:10 p.m. but not
2  four hours earlier when you saw him in
3  the emergency department?
4      A.  When I saw him after 8:10 he
5  had EKG changes consistent with an acute
6  cardiac process. He was hypotensive, he
7  was bradycardic, diaphoretic, in
8  distress, obviously having a cardiac
9  event.
10     Q.  I believe you told me
11 earlier that one of the reasons that Mr.
12 Strimber was admitted was so that someone
13 could do serial abdominal examinations;
14 correct?
15     A.  Correct.
16     Q.  I saw in the medical record
17 where serial cardiac enzymes were
18 ordered; correct?
19     A.  Yes.
20     Q.  Was there anywhere in the
21 chart where you documented that part of
22 the plan for this patient was further
23 abdominal examinations?
24     A.  I didn't document that.

Page 123

1      Q.  Why?
2      A.  That would be something that
3  if the patient had abdominal pain, again,
4  the nurse would call with it and he would
5  be examined at that time. So, that's not
6  an order. That's a clinical response.
7      Q.  When you were doing sign-out
8  to nurse practitioner Martinez, did you
9  instruct her to do abdominal examinations
10 with some certain frequency?
11     A.  I wasn't signing out to
12 Martinez on any individual patient. We
13 didn't sign out that way.
14     Q.  So, who was going to perform
15 these serial abdominal examinations after
16 you left?
17     A.  Martinez was on call that
18 night. If a nurse called her with a
19 problem, she'd respond to it. But we
20 signed out patients who have things --
21 that were having problems that we needed
22 to follow on with, carry on with. That
23 would not be the kind of thing I would
24 sign out to her as he was admitted and

Page 124

1  stable at the time that we were signing
2  out. So, we weren't discussing Mr.
3  Strimber at our sign-out.
4      Q.  Was it your understanding
5  that your desire for serial abdominal
6  examinations would be satisfied by
7  waiting and doing an exam in the morning?
8          MR. YOUNG:  Objection to the
9      form of the question. You can
10     respond.
11         THE WITNESS:  My impression
12     was that if the patient felt
13     abdominal symptoms, the nurse
14     would call the personal call and
15     he would be examined at that time
16     when it occurred.
17 BY MR. AUSSPRUNG:
18     Q.  Well, that's different than
19 performing serial examinations as a
20 matter of routine; correct? That would
21 be responding to a problem. Was it your
22 intention to do examinations as a matter
23 of routine during this less-than-24-hour
24 admission?

Page 125

1      A.  Not necessarily. My plan
2  was to respond to him within a
3  re-examination should he report
4  reoccurrence of symptoms.
5      Q.  Doctor, I noticed in the
6  chart in multiple places there are blood
7  pressures recorded; correct?
8      A.  Correct.
9      Q.  Throughout his admission.
10         Did you ever take his blood
11 pressure in one arm and compare it to his
12 blood pressure in his other arm?
13     A.  I did not.
14     Q.  Did you ever ask any nurse
15 to do that?
16     A.  I don't recall.
17     Q.  Did you see any
18 documentation in the chart of that having
19 been done?
20     A.  I didn't see that.
21     Q.  Are you aware of any time
22 that blood pressures in both arms were
23 taken and compared?
24     A.  Well, I don't specifically



Page 126

1 recall.  It would not be unusual to ask
2 for that when we were at his bedside and
3 he was having problems after 8:10.
4    Q.   Do you have any evidence
5 that that in fact occurred for Mr.
6 Strimber?
7    A.   Not recorded in the chart.
8    Q.   Do you have a memory of it
9 happening?
10    A.   My memory is that it
11 happened and numbers were reported to me
12 verbally at the bedside.
13    Q.   When was that?
14    A.   Sometime after 8:10 when I
15 was attending to him when he was having
16 his emergency.
17    Q.   So after he became
18 hypotensive, then blood pressures were
19 obtained in the right arm versus the left
20 arm?
21    A.   Yes.
22    Q.   Before that when you were
23 evaluating his problem before he had his
24 change in status, I think as you referred

Page 127

1 to it, before he had his change in
2 status, did anyone check his blood
3 pressure in his right arm versus his left
4 arm?
5    A.   No.
6    Q.   I asked you about order
7 sets.  There are protocol orders for
8 chest pain.  Are you aware of any
9 protocol orders sets for chest pain in
10 the computer at Abington Hospital?
11    A.   No.
12    Q.   Are you aware of any such
13 order sets for abdominal pain in the
14 computer at Abington Hospital?
15    A.   No.
16    Q.   Doctor, do you ever have any
17 memories of any conversations with Mr.
18 Strimber?
19    A.   Yes.
20    Q.   What do you remember of
21 those conversations?
22    A.   I remember a conversation of
23 our admission in the ER talking about his
24 reason for coming, his admission.

Page 128

1    Q.   Other than taking your
2 history, do you remember conversations?
3    A.   I remember the conversation
4 we had when I returned and he was in
5 trouble that evening.
6    Q.   What do you remember about
7 that?
8    A.   I remember trying to
9 reassure him that we're going to do
10 everything to take care of him, outlined
11 to him what was going to go on.  He was
12 sick and he could tell it and he wanted
13 to speak to his family.
14    Q.   Was he frightened?
15    A.   Yes.
16    Q.   Who did he ask to speak to?
17    A.   Mrs. Strimber was present,
18 his son was present, he wanted to speak
19 to his daughter on the phone.
20    Q.   Did you have any
21 conversations that you can recall with
22 any of Mr. Strimber's family members, his
23 wife, his children?
24    A.   We -- I mean, I was

Page 129

1 informing them what was going on and what
2 the plan was and trying to reassure.
3    Q.   Any separate conversations
4 you can recall?
5    A.   With Mr. -- not in his
6 presence.  I mean, Mrs. Strimber went
7 into the hallway when things were going
8 really well and I went out to her and I
9 had to obtain her consent for the
10 catheterization.  So, I spent a moment
11 explaining to her what that was.  I spent
12 a few minutes with her but I was hurrying
13 to return to him and do what had to be
14 done so I --
15    Q.   What did you tell her as to
16 why --
17       MR. YOUNG:  Hang on a
18    second.  I think you now
19    interrupted her answer.  She just
20    wasn't finished.
21 BY MR. AUSSPRUNG:
22    Q.   I'm sorry.
23       MR. YOUNG:  Could you read
24    back where the answer was?  And

Page 130

1  you can decide whether you were
2  finished or not.
3          - - -
4          (Whereupon, the pertinent
5  portion of the record was read.)
6          - - -
7          THE WITNESS:  Your question
8  is?
9  BY MR. AUSSPRUNG:
10         Q.   Do you recall anything that
11 you specifically told her were the
12 reasons for the cardiac catheterization?
13         A.   I told her -- I'm sure I
14 said he looked like he might be having a
15 heart attack in the cath lab and the
16 cardiac catheterization was the best way
17 to determine exactly what was going on
18 and to get him the treatment that he
19 needed.
20         Q.   Did you ever mention the
21 possibility of a thoracic aneurysm to Ms.
22 Strimber?
23         A.   I did not.
24         Q.   Did you ever mention it to

Page 131

1  nurse practitioner Martinez?
2          A.   Probably not.
3          Q.   Did you ever speak to any of
4  the cardiologists?
5          A.   From his room, I spoke to
6  the cardiologist on call requesting
7  emergent cardiac catheterization.
8          Q.   Do you remember anything
9  else about that conversation?
10         A.   He said he'd be right in.
11         Q.   Did you talk about anything
12 in a differential diagnosis for him with
13 the cardiologist during that
14 conversation?
15         A.   Our conversation was limited
16 to these are the things I'm doing to try
17 to stabilize him now, he needs to go to
18 the cath lab, I'm on my way.
19         Q.   In retrospect, he needed to
20 go to the operating room; correct?
21         MR. YOUNG:  Objection with
22 regard to asking her for a
23 retrospective opinion.  I don't
24 think it's an appropriate

Page 132

1  question.
2  BY MR. AUSSPRUNG:
3          Q.   After Mr. Strimber went to
4  the cath lab, did you go home for the
5  night?
6          A.   Yes.
7          Q.   Did you ever have any
8  conversations with the Strimber's family
9  after Mr. Strimber went to the cath lab?
10         A.   No.
11         Q.   Were you present when Mr.
12 Strimber's family were informed that he
13 had passed?
14         A.   No.
15         Q.   No further questions.
16         MR. CAMHI:  I have no
17 questions.
18         MR. GOEBEL:  Nor do I.
19         MR. YOUNG:  Nor do I.
20         MR. AUSSPRUNG:  I'll just
21 remind everyone that one of the
22 reasons we videotaped this was
23 that I know the doctor's health
24 status is somewhat tenuous, and I

Page 133

1  want to ensure that everyone has
2  the opportunity to ask her
3  questions now as this might be --
4          MR. YOUNG:  Appreciate it.
5          MR. AUSSPRUNG:  -- if the
6  doctor is unavailable, just remind
7  everyone.
8          THE VIDEOGRAPHER:  The time
9  is 12:44 p.m.  This concludes
10 today's deposition.  We are off
11 the record.
12
13         - - -
14         (Whereupon, the witness was
15 excused.)
16         - - -
17         (Whereupon, the videotape
18 deposition concluded at
19 approximately 12:44 p.m.)
20         - - -
21
22
23
24



Page 134

```
 1          CERTIFICATE
 2
 3
 4          I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
 5   deposition is a true record of the
     testimony given by the witness.
 6
            It was requested before
 7   completion of the deposition that the
     witness, MARGO E. TURNER, M.D., have the
 8   opportunity to read and sign the
     deposition transcript.
 9
10
            _____
11          Amy M. Murphy, a
            Professional Court Reporter and
12          Notary Public
            Dated:  March 26, 2014
13
14
15
16
17          (The foregoing certification
18   of this transcript does not apply to any
19   reproduction of the same by any means,
20   unless under the direct control and/or
21   supervision of the certifying reporter.)
22
23
24
```

Page 135

```
 1      INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition
 4   over carefully and make any necessary
 5   corrections.  You should state the reason
 6   in the appropriate space on the errata
 7   sheet for any corrections that are made.
 8          After doing so, please sign
 9   the errata sheet and date it.
10          You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14          It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24
```

Page 136

```
 1          - - - - - -
            E R R A T A
 2          - - - - - -
 3   PAGE  LINE  CHANGE
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

Page 137

```
 1      ACKNOWLEDGMENT OF DEPONENT
 2
 3          I,_____, do
 4   hereby certify that I have read the
 5   foregoing pages,  1 - 134, and that the
 6   same is a correct transcription of the
 7   answers given by me to the questions
 8   therein propounded, except for the
 9   corrections or changes in form or
10   substance, if any, noted in the attached
11   Errata Sheet.
12
13
14          _____
15   MARGO E. TURNER, M.D.       DATE
16
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22
            _____
23   Notary Public
24
```



35  (Pages 134 to 137)

Page 138

```
 1            LAWYER'S NOTES
 2   PAGE LINE
 3   ____ ____  _____
 4   ____ ____  _____
 5   ____ ____  _____
 6   ____ ____  _____
 7   ____ ____  _____
 8   ____ ____  _____
 9   ____ ____  _____
10   ____ ____  _____
11   ____ ____  _____
12   ____ ____  _____
13   ____ ____  _____
14   ____ ____  _____
15   ____ ____  _____
16   ____ ____  _____
17   ____ ____  _____
18   ____ ____  _____
19   ____ ____  _____
20   ____ ____  _____
21   ____ ____  _____
22   ____ ____  _____
23   ____ ____  _____
24   ____ ____  _____
```



MAGNA
LEGAL SERVICES

Page 138

**LAWYER'S NOTES**

PAGE LINE

1
2
3
4
5
6
7
8
9
0
1
2
3
4
5
6
7
8
9
0
1
2
3
4



**A**

aa 65:18
abdomen 37:22
  38:10,19,24
  40:9 54:2 71:4
  72:17 75:3,14
  82:13,21 84:14
  113:17 114:6
  114:18 115:19
abdominal 33:23
  34:18,21 37:21
  38:4,6,15 39:19
  53:24 54:7
  67:17 70:21
  71:11,14 73:11
  82:14 95:13
  107:23 111:1,2
  112:24 113:11
  114:1,5,8,12
  115:3 122:13
  122:23 123:3,9
  123:15 124:5
  124:13 127:13
ability 14:9 18:9
  21:7,11
abington 2:15,20
  7:3,5 14:19
  19:16 28:10
  61:9,17 92:20
  127:10,14
able 17:5 31:8
  46:23 49:2
  62:24
abnormal 65:18
abnormalities
  40:8 79:6
abraham 1:5
  27:23 29:19
  36:14
absence 74:6,24
absolutely 10:4
accommodate
  11:6
accountable
  22:10

accurate 12:9
  41:20 80:24
  135:20
acknowledges
  22:8
acknowledgme...
  137:1
acs 99:8
action 16:18,21
  17:18 36:23
actions 17:22
activate 96:13
actual 33:1 92:17
acute 12:22
  79:11 96:11,12
  97:7 99:7,17
  116:21,24
  121:2,16,17
  122:5
add 85:24 86:15
  88:7 89:2,2
added 86:6,8,17
  88:9 89:22
adding 89:8 90:3
additional 66:8
  74:4 76:1 77:18
  80:7
adjusted 86:6
administration
  70:4
administrative
  57:4
administrator
  1:4
admission 12:20
  30:12,15 34:4
  36:20 37:1 43:3
  43:14 44:15
  50:6,8,8 52:12
  52:14 53:10,14
  56:8,11 57:2
  67:4 68:1 78:3
  90:6 92:19
  105:1,1 115:4
  124:24 125:9

127:23,24
admissions 62:6
  94:3
admit 13:4,6
  45:17 56:23
  57:11,15,18
  61:17
admitted 33:13
  33:17 45:13
  50:12 52:13
  55:15 60:16,20
  66:6 82:21
  92:12 94:11
  95:10 110:24
  114:23 122:12
  123:24
admitting 43:1
  43:13,17 44:4
  44:12,24 52:10
  56:9,24 60:24
  61:22
adult 107:20
affidavit 91:8
ago 9:4
agree 10:1 43:19
  48:16 104:10
agreed 93:16
agreeing 99:18
agreement 4:13
  19:2,16 60:9
ahead 71:16
air 11:13 65:14
  65:15,21
al 1:10 6:15
albert 13:16
amber 103:4
amh 52:1
amount 68:8
  75:4
amy 1:18 7:13
  134:11
analgesics 39:23
  84:17
aneurism 41:1
aneurysm 22:5

55:3 71:14 72:4
  72:23 73:8,11
  73:21 74:5
  75:10,12 101:4
  107:6 119:19
  121:20,21,24
  130:21
aneurysms 72:16
  75:17,18 79:7
answer 5:5 26:15
  27:6,9,17 45:14
  98:20 107:9
  129:19,24
answering 92:1
answers 9:12
  10:20 137:7
anti 84:16
anticoagulated
  78:23
anybody 42:23
  47:7 114:11
anyway 101:12
ao 50:6,8 52:11
  56:7
aorta 76:3
aortic 22:5 40:12
  40:19 55:2
  71:14 72:4,16
  72:23 73:8,11
  73:21 74:5
  75:16,17 78:18
  79:7 82:10
  101:4 107:6
  115:1
apologize 60:5
apparently 106:2
appear 64:14
appearances 2:1
  3:1
appeared 63:13
  116:7,23
appears 47:11
  107:21 108:9
applies 21:6
apply 134:18

appointment
  22:22
appreciate 133:4
appropriate
  20:12,18 21:1,4
  67:9 78:20
  106:16 131:24
  135:6
approximately
  31:5 52:4
  133:19
area 42:9 55:10
  55:14,20 57:12
  75:14
areas 36:8
arm 125:11,12
  126:19,20
  127:3,4
arms 125:22
arranged 17:7
arrived 31:6 49:5
  117:24 118:18
arterial 25:2,5
artificial 27:7
  34:7 37:11
  73:15,19 78:5
  111:7
ascending 75:11
asked 39:13
  46:19 47:16
  63:10 90:10,23
  96:24 111:16
  127:6
asking 27:18
  43:12 74:16
  83:5 105:19
  106:9 131:22
assessment 84:5
  84:7 86:3 88:13
  90:19 98:16
  99:4 103:22
  105:4
assigned 57:1
associates 2:21
  7:6



Page 2

**assume** 10:21
102:12
**assurance** 20:15
**attached** 135:12
137:10
**attack** 69:6
130:15
**attending** 13:1,3
13:9 42:22 43:6
58:5,17 61:3,23
62:2,10 87:24
92:11 126:15
**attention** 14:3
26:20 40:24
85:3 104:17
**attorney** 135:16
**aussprung** 2:2,3
2:7 4:6 6:21,22
7:9,22 8:1
11:23 16:14,16
19:8 20:8 21:22
22:1,19 25:12
26:24 27:1 29:7
41:5,17 44:2
46:13,19 47:23
48:5 49:9,13
50:14 51:22
60:3,7 64:23
65:6 72:1,7
73:3,4 74:19
75:8 76:12,14
79:20 80:22
89:9,10 92:3
95:2,6 98:12,18
99:1 102:6
105:21,24
106:17 107:8
107:19 109:21
120:1,15
124:17 129:21
130:9 132:2,20
133:5
**authoritative**
15:15
**authority** 15:24

16:5
**available** 71:18
104:13
**await** 86:11
**aware** 21:15,17
22:2 40:16
73:24 75:13
114:12 117:18
125:21 127:8
127:12

**B**

**b** 1:3 4:8 6:13
**back** 13:12 14:14
34:16 35:2
36:22 47:24
48:3 49:24
51:20 58:7 80:6
81:7,19,21,21
82:23 83:2,11
83:16 84:8 86:4
86:21 87:9,10
87:13,22 88:1
88:16,23 91:22
96:14 98:19
105:5 109:19
119:21 120:13
129:24
**backwardlooki...**
106:10
**based** 23:5 49:4
**basically** 23:2
91:9
**bates** 51:24
**bed** 56:24 57:5,6
118:13
**bedside** 111:24
126:2,12
**behalf** 6:18,22
7:1,8,10
**believe** 35:14
40:1 41:10
42:18 46:22
47:1 49:4 50:17
52:20 54:9,11
54:13,15,19,21

57:17 59:2,21
71:12 80:24
83:16,18 102:7
103:11 104:4
104:21,23
122:10
**believed** 112:23
**bellevue** 3:4
**best** 27:20
130:16
**better** 16:15
**big** 41:6
**bit** 29:5 35:19
94:7 96:15
112:13
**blanks** 24:19
**bleed** 79:2
**bleeding** 78:14
**blood** 79:2 116:5
125:6,10,12,22
126:18 127:2
**board** 8:15 14:7
57:6
**boards** 13:19,22
14:1,4
**booth** 53:21
**bottom** 84:3
85:13 100:8
102:11 108:8
**boulevard** 1:17
2:13,18 6:11
**bracha** 1:6 6:14
**bradycardic**
122:7
**break** 10:23
11:17 120:2
**breaks** 11:4
**breath** 74:24
**brief** 33:13 49:20
51:12 115:19
120:8
**brings** 79:13
**broad** 3:4
**brought** 8:3
104:17

**bubble** 107:24
**bubblelike**
103:13 107:3
**bunch** 102:10

**C**

**call** 23:14 30:6,7
31:1 43:2,16
44:8,16 45:10
45:16,21,24
46:1,3 49:10
56:17 57:3
61:13 93:7,22
94:5 95:16 96:8
96:18,21 101:6
108:20 111:20
123:4,17
124:14,14
131:6
**called** 29:23 30:2
43:13 44:21
45:17 46:5
48:22 57:16
92:10 101:9,20
102:14 105:5
108:22 117:22
123:18
**calling** 52:15
**calls** 44:11 95:21
**camhi** 2:17 7:4,4
47:8 49:7 64:15
64:20 65:1 76:9
80:21 132:16
**cancel** 113:4
**cannula** 63:23
**cant** 9:17 23:3
29:11 52:6
99:13
**cardiac** 66:8
67:11 68:6,23
68:24 69:3
70:24 77:15,18
84:16 87:21
96:13 111:4
116:22 120:19
120:23 121:10

121:14 122:6,8
122:17 130:12
130:16 131:7
**cardiologist**
97:13 98:3
101:10 118:16
118:18 131:6
131:13
**cardiologists**
26:3 97:1,18
99:4 131:4
**cardiology** 67:14
74:9 86:8,11,17
89:3,16,19 90:1
90:5,9,12,15,20
93:18 96:3,23
97:5,13 98:5
111:15,21
113:3 114:14
117:3
**cardiovascular**
99:7,17
**cardiovascularly**
114:20
**care** 17:20 20:14
21:11 33:17
91:13 117:7,11
118:6 119:1
128:10
**cared** 112:22
**carefully** 135:4
**caring** 73:6
**cariology** 67:12
**carry** 93:15
123:22
**case** 62:1 90:8
**cat** 35:11,14,20
71:3,8,17,18
75:13 80:8
83:22 113:14
**category** 23:18
**cath** 87:21 96:13
117:4 118:5,13
118:19,21
118:23 119:11



130:15 131:18
132:4,9
**catheterization**
129:10 130:12
130:16 131:7
**cause** 94:8
**causes** 103:14
121:16
**causing** 121:6
**center** 2:18
**certain** 10:4
32:22 66:2
123:10
**certainly** 47:17
85:1
**certificate** 134:1
**certification**
134:17
**certified** 8:15
14:8
**certify** 134:4
137:4
**certifying** 134:21
**chad** 7:7
**chance** 48:7
**change** 95:12,14
96:2 97:8 109:1
116:7 126:24
127:1 136:3
**changed** 95:12
116:2,4
**changes** 122:5
135:11 137:9
**characteristic**
106:24
**charge** 109:9
**chart** 46:4 49:10
59:9 63:16 70:3
87:10 90:15
95:19 101:7,7
103:24 104:3
107:13 111:18
122:21 125:6
125:18 126:7
**check** 47:17

99:18 100:17
116:15 127:2
**checked** 23:18
24:14,14,16
26:22 115:20
**checking** 99:10
**chest** 21:19 34:12
38:20 39:12,14
46:21 52:24
53:12,17 54:6
54:10,12,14,17
54:20 55:6 67:2
68:5,19 74:7,12
75:1,7,15,24
76:8,23 77:3,4
77:21 81:7,11
81:20 84:8
88:16 115:2,8
121:17 127:8,9
**chief** 81:5,10,14
81:16,17 83:9
**children** 128:23
**chilton** 3:3
**choose** 68:2
**chosen** 13:22
**christie** 1:17 2:12
**christina** 119:13
**chronologically**
29:13
**circumstances**
17:3
**cl** 84:11
**claims** 18:10
**clear** 9:6,9,16
10:5,9 26:18,23
38:17 95:20
**clerk** 30:4 44:8
**clinical** 15:8
22:11 106:5
123:6
**clot** 79:2
**coagulation** 79:4
**collectively** 118:1
**column** 87:2
**com** 1:24

**come** 49:3 83:8
112:9 118:16
118:17
**comes** 45:16 68:3
**comfortable** 11:3
**coming** 56:18
127:24
**commencing**
1:18
**comments** 84:3
84:21 86:5
88:12 90:18
**commerce** 2:4,8
**commission**
137:21
**common** 79:6
83:11
**communicate**
103:21
**communicating**
94:2
**company** 16:9,13
18:8
**compare** 125:11
**compared**
125:23
**complain** 83:10
106:21
**complained**
68:19
**complaining**
69:10 77:3
115:2
**complaint** 39:12
53:19 67:1,5
81:5,11,15,16
81:18 83:9,12
106:2,4 107:3,5
107:23 108:4
113:1
**complaints** 114:7
42:15 97:5
**completely** 66:12
**completion** 134:7

**complies** 20:4
**computer** 47:12
80:13 85:23
86:16,19 87:14
88:2 94:16
102:20 127:10
127:14
**concern** 76:2
**concerned** 77:14
**concerning** 21:18
22:4 63:3 86:12
117:17
**concluded**
133:18
**concludes** 133:9
**conditions** 107:1
**conducted** 36:20
**confirm** 47:5
**confirmed** 37:10
**confused** 10:11
**consent** 129:9
**consider** 15:14
15:23 16:4 67:3
74:3
**considered** 121:4
**considering** 85:6
**consistent** 55:5
103:18 107:5
122:5
**consult** 42:7
44:21 45:4,6
48:17 58:13
60:13,18,22
67:12 74:9 86:8
89:3,17,19 90:1
90:5,10,12,15
90:20 93:18
96:3,23 97:5,14
97:19 98:5
99:16 111:15
111:21 112:1
113:4,8 114:17
**consultation** 4:21
86:18
**consulted** 42:7

43:9,10
**consultother**
42:2,17
**consults** 42:13
**contacted** 30:3
48:8
**continue** 66:7
**continued** 3:1
**contract** 61:11
**contracting**
20:10
**control** 134:20
**conversation**
27:4,5 32:13,14
33:9 34:6 35:6
35:24 91:16
92:5,7,22 94:21
94:24 95:8,9,24
127:22 128:3
131:9,14,15
**conversations**
62:9 91:11 92:1
110:6 127:17
127:21 128:2
128:21 129:3
132:8
**copy** 12:1 19:1
46:20 47:4 51:9
**correct** 13:17
18:19 19:17
23:3,4,7,11,16
23:20 24:23
25:3,4 26:2
37:5 38:8 39:21
52:24 53:5,23
55:3,6,21 56:6
56:15 58:24
61:24 62:4,7,11
65:10,21 66:9
66:10,13,14,18
66:20 67:20
68:13,24 69:1,4
69:6,7,10,11,20
69:24 70:1 71:1
71:5,6 72:9,13



Page 4

73:12 75:12,19
75:20,22,23
76:3 77:16,17
77:19,20,23
78:5,6,22 79:5
81:11 83:11
84:9,10 87:4
88:6,17,18,21
89:1,22 92:4
101:4 108:6,12
109:6,24 112:2
113:1,2,5,14
114:21,22
115:9,10
116:10 117:4
118:7 120:20
120:21 121:11
121:12 122:14
122:15,18
124:20 125:7,8
131:20 137:6
**corrections**
135:5,7 137:9
**couldnt** 83:20
**coumadin** 78:7,9
78:10,19,21
86:13 111:10
**counsel** 6:19 8:19
62:9
**couple** 14:22
19:24
**court** 1:1,19 6:6
7:12 9:1 27:12
106:13 134:11
135:20
**coverage** 17:7,9
17:12
**covered** 56:13
**create** 73:23
**created** 80:19
104:9
**credentials** 14:10
16:8,12
**creeping** 103:14
107:4

**critical** 115:6
119:1
**crossed** 102:12
102:16
**crosses** 102:19
**ct** 75:2 82:20
84:12,13
**cubicles** 36:12
**current** 12:11
**currently** 12:12
**curriculum** 4:12
12:1 14:16
**cut** 83:23
**cv** 12:3,5,8,10

**D**

**d** 1:9,16 2:3,3,20
4:2,4 6:15,16
7:16 134:7
137:15
**danger** 78:13,16
**dash** 55:11 58:14
**data** 36:21 80:7
**date** 1:18 6:8
12:10 135:9
137:15
**dated** 134:12
**daughter** 128:19
**day** 38:1 49:2
62:3,10 101:16
109:7 110:15
112:8,11,15,19
137:20
**daylighter** 61:9
**days** 135:16
**deal** 68:23
**dealing** 14:13
**death** 108:5
**deceased** 1:5
**decide** 130:1
**decision** 57:11,15
57:18,23 58:2
68:12 77:8
**decisions** 117:17
117:21 118:9
**deemed** 135:19

**defendant** 2:14
2:20 3:6 18:14
**defendants** 1:11
**delineation** 4:16
22:21 23:14
**department** 4:16
4:17,19 31:7
32:1 35:16 37:7
39:23 40:17
41:9 44:9 48:22
48:24 50:5,22
52:5 64:8 70:23
76:7 83:13
122:3
**deponent** 6:16
137:1
**deposed** 8:5
**deposing** 135:16
**deposition** 1:15
5:2 6:5,10,17
11:24 18:19
27:2 105:13
133:10,18
134:5,7,8 135:3
135:13,17,19
**depositions**
28:21 29:2
**describe** 36:23
**described** 34:21
35:1 38:15,23
81:24
**describes** 82:17
**description** 4:10
37:14,19 38:13
38:14
**designed** 20:12
**desire** 124:5
**desired** 61:19
**details** 38:16
**detect** 40:14
**determine**
130:17
**determined**
50:11
**developed** 97:7

**developing** 73:20
**development**
82:24
**diagnoses** 55:10
**diagnosis** 52:23
53:7,11,17
72:22 73:7
119:15 120:23
121:14 122:1
131:12
**diaphoretic**
116:4 122:7
**diarrhea** 34:19
38:2 81:8 82:16
**dictate** 59:16
**didnt** 17:17,18
33:5 48:9 55:22
67:7 68:11
77:13,21 82:23
85:12 90:9
94:17 96:2
98:20 101:6
103:20 104:14
106:7 111:17
112:14 113:11
116:22 117:16
122:24 123:13
125:20
**died** 28:15
**difference** 91:5
**different** 25:23
32:24 59:9
85:20 86:2,15
88:9 89:16 94:9
105:22 106:19
124:18
**differential**
72:21 73:7
120:22 121:13
121:21,24
131:12
**difficult** 99:9
**diminished**
116:12
**direct** 134:20

**directed** 26:19
**directing** 40:24
**direction** 5:5
**directly** 44:8
**discern** 62:24
**disciplined** 16:9
18:2
**discomfort** 111:1
**discuss** 35:4,11
43:14
**discusses** 45:11
**discussing** 124:2
**dissecting** 119:19
**dissections** 75:17
**distress** 115:22
122:8
**district** 1:1,2 6:6
6:7
**doc** 62:16 63:15
**doctor** 19:9
28:23 48:6
51:23 52:3
60:21 106:19
120:16 121:8
125:5 127:16
133:6
**doctors** 26:19
32:3 117:24
132:23
**document** 41:21
50:3 52:4,8,19
79:23 88:11
101:24 107:12
122:24
**documentation**
125:18
**documented**
31:22 122:21
**documents** 5:10
28:6,18 108:10
**doesnt** 52:17
62:17,23 68:2
87:12 91:10
**doing** 29:8 31:21
32:21 66:6 68:1



74:9 92:8 93:2
93:3 113:24
123:7 124:7
131:16 135:8
**don** 7:4
**donald** 2:17
**dont** 10:14,15
13:3,4 31:9
34:24 35:3
42:21 44:6 45:1
45:3,7 50:15,16
54:22 60:17,22
64:5 68:9 74:22
80:12 93:8,17
93:24 94:6,19
94:22 100:14
100:18,19
104:12,14,21
104:23 106:15
119:23 125:16
125:24 131:23
**doses** 70:8,10
**double** 47:17
**doubt** 54:23 99:8
**dr** 2:15 3:6 7:1,5
7:8 28:22 32:7
32:9 33:20 34:5
34:10,14 35:24
41:10,18 43:5
44:5 46:19 50:5
58:16 62:10
71:11 90:7,23
91:9,12 92:2,6
92:23 93:5,11
94:24 96:1,8
101:9,16
**draw** 20:20
**drifts** 10:13
**drug** 67:19,22
**duly** 7:17 134:4
**duties** 21:12

**E**

**e** 1:16 4:2,4,8
7:16 134:7
136:1 137:15

**earlier** 38:1,2
87:12 110:14
110:24 122:2
122:11
**eastern** 1:2 6:7
**eaten** 34:1 37:24
**eating** 82:18
**echo** 100:17,23
101:1,3,10,18
101:21
**echocardiogram**
99:11
**edit** 85:14,17
87:1 89:6
**edited** 86:20 87:3
87:7,22 88:24
91:2
**education** 13:13
**effect** 78:12
**eggs** 82:18
**einstein** 13:16
**either** 99:12
101:21
**ekg** 25:6,14,18
26:20 35:5
67:11 79:6,9,10
84:16 96:11
99:8 100:1,3
108:24 122:5
**ekgs** 25:16,20
26:5 74:10
99:19
**elaborate** 66:21
**eleanor** 8:10
**elected** 14:2
**elses** 81:16
**embolism** 121:19
**emergency** 2:20
4:16,17 7:5
15:9 28:22
29:20,21 30:4
31:6 32:1 35:16
37:6 39:23
40:17 41:8 44:9
48:22,24 50:3

**50:21 52:1,5**
57:21 58:4 64:7
70:23 76:7
83:12 87:16,20
117:23 122:3
126:16
**emergent** 131:7
**emetics** 84:16
**employed** 12:13
14:19
**employer** 14:17
**employment**
4:13 12:11 14:5
19:2,15
**ended** 109:8
**endoscopy**
113:22
**england** 15:6
**ensure** 77:15,18
133:1
**enter** 80:13
**entered** 49:10
63:8 88:5,20
94:8,15 104:4
104:11
**entering** 105:3
**entire** 10:14
59:15 85:21
**entry** 50:3 52:9
60:15 102:13
102:21
**enzymes** 66:9,15
67:11 68:6,24
69:3 74:10
77:19 84:16
99:8,19 100:1,3
122:17
**epigastric** 53:8
81:7,20 82:15
83:17,19 84:8
88:16
**episode** 38:2,3
82:16
**er** 28:11 31:4
34:2 36:9 38:3

**43:2,5 44:16,16**
48:7 53:14 54:8
58:17 70:5
72:10 79:10
81:12 82:11,17
82:21 103:8
104:2 116:8
118:3 127:23
**errata** 135:6,9,12
135:15 137:11
**especially** 83:12
**esquire** 1:4 2:3,8
2:12,17 3:3
6:14
**established** 76:19
**estate** 1:4
**estimate** 94:6
**et** 1:10 6:15
**evaluate** 34:3
36:18 67:9
71:10 101:17
114:1,6
**evaluated** 68:5
87:21
**evaluating**
126:23
**evaluation** 21:19
22:4 34:2 55:16
55:18 67:4,9
74:8 82:12,22
86:9 107:21
112:17 115:5
117:3
**evening** 98:15
128:5
**event** 29:11
116:22 120:19
120:23 121:10
121:14 122:9
**events** 14:14
91:10
**evidence** 79:11
126:4
**exactly** 17:16
39:1 59:13

**116:23 130:17**
**exam** 41:2 92:14
113:11 114:8
114:12 115:19
116:3 124:7
**examination**
7:20 24:7 36:21
40:4,6,8 115:12
115:16
**examinations**
122:13,23
123:9,15 124:6
124:19,22
**examined** 7:18
123:5 124:15
**exams** 114:5
**exclude** 71:13
**excludes** 24:4,10
**excused** 133:15
**exhibit** 11:20
19:5 22:16
41:14 51:15
71:22 79:17
98:9 102:3
107:15
**exhibit1** 12:2
**exhibit10** 107:12
**exhibit2** 19:1
**exhibit3** 22:21
**exhibit4** 41:6
**exhibit5** 51:24
**exhibit6** 71:17
**exhibit7** 79:22
**exhibit8** 98:13
**exhibit9** 102:1
**expectation** 56:4
**experience** 23:6
**experiencing**
39:14,19
**expert** 24:1
**expertise** 23:20
24:22 106:12
**expired** 119:11
**expires** 137:21
**explain** 85:16



MAGNA
LEGAL SERVICES

Page 6

explaining
  129:11
explode 82:14
exploded 37:22
extent 10:19
  29:14
extremely 116:6
extremities
  115:20
eye 98:16

**F**

face 78:14
facilitate 112:17
fact 33:22 39:18
  55:1 71:15
  78:14 114:17
  126:5
fail 135:18
fair 89:9
familiar 42:23
  76:18,23
family 8:3 14:2
  128:13,22
  132:8,12
fashion 21:10
  112:18
faster 112:18
february 14:15
  14:18 52:21
  61:2,17
federal 106:13
feel 40:11 66:24
  77:13,21
feeling 37:21
  63:11 67:23
  82:13,19
feels 27:3,7,15
  31:19
felt 38:22 55:17
  67:3 71:12
  103:13 112:16
  124:12
field 23:20 24:22
figure 39:5 59:14
filled 23:2 45:15

films 113:17
financially 17:6
find 33:6 42:9
  46:7 48:8,9,11
  48:12,13 50:24
finding 41:3 57:4
findings 33:15,20
  75:16 116:1
fine 11:16 29:8
  29:16 102:22
finish 26:12
  59:11 69:2
  87:11 88:2
finished 59:22
  88:4 129:20
  130:2
finishing 87:10
  109:7,9
first 8:17 18:18
  23:17 28:3
  29:18 31:15
  35:15 41:18
  42:1,13 43:1
  44:21 45:10
  48:16 58:21
  63:22 80:11
  87:2 88:5,19
  89:23 91:15
  92:5,7,23 93:6
  93:22 97:4
  99:23 100:12
  100:19 101:23
  104:7 112:8,11
  112:15,19
  118:2
fisher 1:9 2:20
  6:15 7:5 28:22
  32:7,9 33:20
  34:5,11,14
  35:24 42:5 43:5
  58:16
fishers 71:11
five 11:5
flip 79:24
floor 1:17 2:13

29:20 52:16
  55:23,24 56:1
  56:17 87:24
  103:11,22
  104:5 105:3
  118:13
fluids 114:3
focus 99:20
  102:23
focusing 98:15
follow 21:7 47:4
  63:6 123:22
followed 27:5
following 33:15
  76:7,11
follows 7:18
foods 33:24
force 47:1
foregoing 134:17
  137:5
form 9:22 16:12
  124:9 137:9
formatted 47:10
formulating 92:9
found 40:18
  47:20 50:2
four 2:18 65:8
  69:24 87:2
  88:20,24 122:2
fourth 20:9 84:2
free 66:24
freedman 1:3
  6:13
freese 103:4,5,5
frequency
  123:10
frightened
  128:14
front 83:4
full 8:8
fully 22:9
function 21:7
funny 27:10
  29:10
further 67:3,10

74:8 82:1,22
  115:4 122:22
  132:15

**G**

g 3:3
gallagher 3:3
garner 108:3
gary 1:3 6:13
gastroenterology
  113:8
general 32:20
  33:4 80:11
  92:16
german 3:3
getting 13:12
  29:23 66:8
gi 113:19,20
give 8:17 27:8
  35:18 47:3
  50:10 67:22
  102:1
given 12:1 18:18
  30:8 39:12
  46:22 70:10
  72:13 134:5
  137:7
giving 112:12
go 19:19 23:10
  27:21 29:13
  36:4 46:10
  47:23 49:11
  51:2 55:22 58:7
  68:21 69:12
  70:2 71:16 84:1
  85:23 86:4,21
  88:10 100:5
  103:2 109:2
  110:11,16
  111:5 112:14
  118:5,13,22
  119:20 128:11
  131:17,20
  132:4
goal 107:21
goebel 3:3 7:7,7

132:18
goes 22:7 45:16
going 10:20 14:1
  14:13 18:24
  26:10 29:12
  35:1 36:24 41:5
  50:12 58:11
  62:14 63:12,21
  66:7 82:4,13
  88:1 95:17
  96:13 100:7
  101:14,15
  106:14 107:11
  110:16 111:4
  112:18 123:14
  128:9,11 129:1
  129:7 130:17
good 7:23,24
gradient 65:18
green 50:5 62:3
grid 67:24
group 48:17
  60:13
guess 68:10
guidelines 21:8
  22:3

**H**

h 4:8 59:4,6
  80:13 83:23
hadnt 74:17 88:4
  111:18 116:3
hallway 129:7
hand 52:2
handed 69:13
hang 43:22 47:19
  129:17
happen 36:24
happened 14:14
  17:9 63:1 87:18
  89:23 90:2
  95:18 119:7
  126:11
happening 126:9
happens 30:23
  115:21


MAGNA
LEGAL SERVICES

happy 11:6 47:3
harass 10:2
hard 27:12 94:10
harrisons 15:21
havent 29:1
head 9:3 37:23
38:11,20
heading 65:2
102:24
health 132:23
hear 10:14 98:20
heart 34:7 37:11
69:6 108:24
111:7 115:18
130:15
hed 131:10
held 1:16 6:10
70:9
hell 26:15
helps 35:18
hes 92:11 118:19
hired 13:5
history 4:20 24:6
37:3,9,13 38:13
39:2,9 59:12,15
59:18,23 79:14
79:21 80:2,16
80:19 81:23
84:19 85:9,14
87:1 88:2 92:9
94:15 103:19
104:6,8 110:15
110:18,20
112:16 115:1
128:2
hockenberry 2:8
7:10
holding 36:8
home 66:20
132:4
hospital 2:15 7:3
12:14,22 13:2,6
14:11,20 16:8
18:1,4 19:17
20:11 22:9 23:1

26:1 36:19 61:1
76:15,20
127:10,14
hospitalist 61:7
61:14
hospitalization
28:15
hospitals 20:15
hour 49:1
hours 34:1 56:5
69:24 90:4
122:2
house 12:16 61:9
hpi 82:24
human 102:14
102:24
hurrying 129:12
hydration 114:3
hypotension
121:17
hypotensive
116:9 122:6
126:18

I
id 19:9,19 38:17
idea 50:10
identification
11:21 19:6
22:17 41:15
51:16 71:23
79:18 98:10
102:4 107:17
identify 6:20
46:6 99:6,16
ignore 67:5
iii 3:3
ill 31:14 44:18
52:2 71:16 98:6
101:24 132:20
illness 38:14 39:2
81:24
im 6:3,24 8:12
11:10 12:19
13:3,5 14:15
18:24 22:20

26:13 27:18,20
29:12 33:4 39:5
41:5 43:24
46:23 47:3
50:24 51:3
57:16 58:11
59:14 63:12
68:1 75:13
76:12,15 79:21
80:23 82:4
90:11 95:17
97:24 98:12,18
100:5 104:10
105:5 106:13
107:11 110:16
110:19,20,21
111:16 116:17
119:5 129:22
130:13 131:16
131:18
immediately
12:24 49:3
101:19
imperative 67:8
135:14
imperfect 22:23
important 9:11
9:14 84:23,24
impression 99:15
116:18 121:1
121:15 124:11
included 72:22
73:7 81:11
90:19 121:18
including 20:14
25:6 26:20
increase 78:15
increased 73:20
73:24
independent
117:17
index 5:2
indicate 86:18
indicated 71:12
77:9,10

indication 54:5,7
individual 77:7
123:12
infarction 116:20
inform 95:10
97:3
information 26:7
30:9 75:5 76:1
80:5 81:13 89:8
89:11
informed 58:1
132:12
informing 96:7
129:1
initial 22:22 34:6
35:5 36:14
79:10 93:10
94:13
initially 36:18
53:11 80:20
90:18
initiated 117:2
inpatient 50:20
55:13,19
inquiring 106:11
inr 78:20 86:13
99:14
instance 28:22
instruct 96:20
106:14 123:9
instructions 8:18
93:14 112:12
135:1
insurance 16:9
16:13 17:11,15
18:8
intention 124:22
interaction 36:14
93:10 110:3
interfere 11:9
internal 8:14
13:15,19,23
14:8 15:18,22
16:1
internship 13:14

interpret 25:16
25:20 26:5
62:22
interpretation
24:8 25:7,16,18
25:24 26:21
interpreted 39:4
interrupted
129:19
interviewed
36:17
introduced 8:2
involved 96:5
involves 32:15
ip 55:10,13
ischemia 66:13
isnt 27:18
issue 17:12 83:6
85:22 111:3,4
issues 11:8 99:7
99:17
iv 114:3
ive 12:2 20:6
51:23 79:23

J
j 2:3
james 2:8,12
7:10
jeanes 12:14 13:2
jfk 1:17 2:13,18
6:11
jim 6:24
job 12:15 23:8
journal 15:7
journals 15:13
june 23:11

K
kbc 107:20
keep 17:6 29:4
84:23
keeping 85:6
kept 114:2
kind 8:13 27:6,14
44:18 63:16



Page 14

132:3,9
strimbers 35:5
  35:10,11 90:8
  108:4,24
  112:16 119:22
  128:22 132:8
  132:12
studies 24:8 74:4
  92:15
study 72:3,13
  77:8
stuff 102:10
subject 135:10
subjected 75:6
submit 18:9
subscribe 15:8
subscribed
  137:19
subsequent
  36:24
subsided 38:5
substance 137:10
sufficient 75:5
suggesting 33:4
  101:1
suite 2:4,9 3:4
sulfate 69:17,19
summary 33:14
  70:4
supervision
  134:21
supplemental
  68:8
support 5:2
sure 8:21 11:10
  16:5 27:20
  29:14 43:24
  46:13 49:14
  63:19 66:23
  76:16 100:21
  110:19,20,21
  116:17 130:13
surgery 82:7
  84:20 85:2,4
  115:1

surrounding
  17:4
suspended 16:23
  17:10 18:5,9
suspension 17:4
suspicion 85:9
swear 7:14
sworn 7:17 134:4
  137:19
symptoms 34:3
  36:19 55:16
  82:19 92:14
  95:14 124:13
  125:4

    T
t 4:8 136:1
tail 17:7,8,11
take 9:2 10:23
  11:4,17 33:17
  46:7 90:10,23
  96:24 98:4
  100:24 111:16
  118:15 120:1
  125:10 128:10
taken 1:16 6:17
  9:1 16:18,22
  17:22 25:17
  28:21 49:21
  51:13 108:24
  120:9 125:23
talk 8:20 11:12
  28:3 32:2 91:15
  112:20 131:11
talked 33:22
  34:17 47:3
  58:13 82:9 90:6
  97:1
talking 21:20
  24:12 58:8
  127:23
talks 20:10 46:2
  52:9 60:19
tamponade
  121:20
tape 46:11 51:3

taste 103:15
  106:21 107:24
team 45:12 62:3
  117:23,23
  119:2
telemetry 55:11
  56:2,22 57:19
  67:11 68:12,17
  68:22 77:16
  84:15 108:23
telephone 93:22
tell 16:21 39:1
  46:24 52:3,6,7
  83:20 92:5
  94:10 95:7
  96:15,22 101:6
  108:19 110:9
  110:17 111:6,9
  128:12 129:15
telling 96:18
tenuous 132:24
term 61:8
terminology
  60:24
terms 12:11
  106:12
test 99:11 100:24
  101:2
testified 7:18
  89:7 108:14
testifying 51:4
testimony 4:4
  9:13,15 10:5
  134:5
textbook 15:24
textbooks 15:17
  15:20
thank 26:24
  74:21 117:15
thankful 90:11
thanks 47:8
thats 8:3,24
  11:16 15:9 16:2
  23:18 25:23
  26:2,14 27:6,9

29:16 32:16
34:19 37:5 38:8
39:21 43:11,12
47:14 48:16
52:14,21 53:19
56:15,17 57:2,3
60:18,18,22,23
62:4,7,11 66:10
66:18 69:1,2,4
72:8,10 78:22
81:17 86:20
87:9 88:8 89:12
89:16 91:4
92:18 95:19
100:3 102:11
102:22 112:2
112:20 114:15
118:7 123:5,6
124:18
therapeutic
  78:17
therapeutically
  78:24
therapy 63:23
  79:4
theres 10:24 11:5
  19:20 24:19
  30:12 32:19
  42:12 46:4 52:9
  56:24 60:20
  62:15 64:15
  69:16,18 70:3,8
  76:22 83:21
  86:3 95:21
  102:10,14
  105:4,7 111:4
theyre 10:10
  36:11 110:10
  111:3
thing 24:4 29:10
  29:18 36:3
  84:23 86:16,19
  88:8 89:15
  94:10 121:6
  123:23

things 23:24 24:2
  24:5,6,11,13,15
  24:17,21 31:21
  32:21,22 33:16
  33:18 37:2,24
  39:4 41:11 55:9
  63:4 66:5 67:24
  80:8 82:1 86:7
  87:11 88:1,20
  88:24 91:5
  94:13 96:4,5,16
  101:15 105:9
  109:9 115:6
  120:16 123:20
  129:7 131:16
think 18:17 21:6
  33:16 38:10,22
  41:7 43:11,23
  44:23 47:15
  59:24 60:8,15
  60:17,18,22,23
  70:15,20 77:7
  78:19 81:3
  85:22 86:10
  87:17,23 89:6
  90:9 93:17
  97:10 99:12,24
  100:1,3 103:11
  106:15 110:11
  126:24 129:18
  131:24
third 41:21 58:8
  99:21
thirty 135:16
thoracentesis
  24:20
thoracic 55:2
  72:22 73:8,20
  74:5 75:9,11,18
  76:3 79:7 101:4
  107:5 119:19
  121:20,23
  130:21
thorax 72:18
  75:3



**thought** 40:23
  43:23 46:1 67:8
  83:6 84:22
  111:2 117:9
**three** 63:13 66:19
  70:7,8
**throat** 103:14
  107:4
**time** 6:9 13:24
  18:18 30:23
  31:1,2,6,9,10
  31:17 39:14
  44:4 46:7,14
  48:2 49:15,23
  50:9 51:5,19
  52:4,18 56:20
  59:9 62:23 63:7
  71:19 73:5 74:1
  74:7 75:1 77:12
  80:24 82:8 85:8
  85:12,24 87:12
  88:5 89:24
  91:17,21 92:23
  94:5,20,22
  95:15,19
  109:14,18
  118:9 120:3,12
  123:5 124:1,15
  125:21 133:8
**timed** 35:21
  42:14 58:24
  104:8
**timeline** 29:12
  35:19
**times** 30:19
  31:12,15 94:9
**titled** 19:21
  76:17
**today** 9:12 10:20
  11:9 27:22 28:8
  33:7 55:2 82:19
**todays** 6:8 11:24
  105:13 112:8
  133:10
**told** 30:11 33:21

39:9 53:11,13
  63:10 69:8 90:8
  96:9,10 106:3,7
  110:20 111:13
  119:12 122:10
  130:11,13
**tomatoes** 82:18
**top** 37:23 38:11
  69:17 83:9
  102:13,23
**totally** 41:19
**training** 13:13
  21:8 23:5
**transcript** 9:8
  27:11 134:8,18
  135:17,19
**transcription**
  137:6
**transport** 118:20
**treat** 54:2
**treatment** 130:18
**trend** 84:15
**triage** 39:13
  53:18,20 54:12
  54:23 67:2
  81:13 115:2
**trial** 9:18
**tried** 113:4
**troponin** 70:24
**troponins** 68:23
**trouble** 90:14
  128:5
**true** 134:5
**try** 9:12 29:12
  105:23 131:16
**trying** 10:2 39:5
  59:14 128:8
  129:2
**tuesday** 1:13
**turner** 1:16 2:15
  4:4 6:16 7:1,16
  8:10 41:10,18
  48:18 101:9
  134:7 137:15
**turner1** 4:12

11:20
**turner10** 4:23
  107:16
**turner2** 4:13
  19:5
**turner3** 4:14
  22:16
**turner4** 4:16
  41:14
**turner5** 4:17
  51:15
**turner6** 4:19
  71:22
**turner7** 4:20
  79:17
**turner8** 4:21
  98:9
**turner9** 4:22
  102:3
**twice** 80:9
**two** 13:14 42:12
  55:9 68:22
  70:10 91:14
  92:1 100:5
  115:6
**twopage** 22:21
**twothirds** 102:11
**type** 113:13
  120:19,23
**types** 66:2

**U**

**uhhuh** 9:4 84:15
**um** 32:4
**umhum** 8:23
  30:16,21 53:6
  119:3
**unavailable**
  133:6
**unclear** 9:24
**uncomfortable**
  11:12 116:6
**understand** 10:7
  10:16 11:1
  32:19 38:18
  39:7 40:21

63:20
**understanding**
  22:13,24 38:21
  45:23 53:16
  57:9,14 62:8,19
  65:12 68:15,18
  71:8 73:18 76:6
  77:2 81:10 83:2
  97:17 98:2 99:3
  124:4
**understood**
  10:21 121:10
**unit** 57:19,21
  68:17
**united** 1:1 6:5
**unreferred** 45:5
  45:8,9,16,22
  56:13 58:14
**unusual** 40:18
  126:1
**updated** 80:5
  86:19 102:19
**updates** 85:24
  86:16 102:17
  102:20
**upper** 113:19
**upset** 11:14
**use** 26:7
**usual** 101:15
**usually** 32:14
  57:20 94:8
  104:24

**V**

**v** 1:8
**valve** 34:8 37:11
  73:15,19 75:10
  78:5,18 82:7,10
  82:11 84:19
  85:9 86:10
  111:7 115:1,7
**verbally** 126:12
**versus** 6:14
  126:19 127:3
**vibrating** 38:23
  82:12

**video** 6:5 46:17
  47:24 48:1
  49:18 51:8,18
  91:20 109:17
  120:6,10
**videographer**
  3:17 6:1,3 7:12
  46:14 48:2
  49:15,23 51:5
  51:19 91:17,21
  109:14,18
  120:3,12 133:8
**videotape** 1:15
  133:17
**videotaped**
  132:22
**view** 75:14
**viewed** 75:3
**vitae** 4:12 12:2
  14:16
**vital** 64:13 65:2
**voice** 29:4
**vomited** 82:17
**vomiting** 33:24
  34:18 38:3 81:8
  111:2

**W**

**wait** 26:15 27:8
**waiting** 87:24
  124:7
**walked** 110:19
**want** 8:21 10:3
  11:11,12,13
  19:24 33:6
  41:24 47:7
  86:21 99:20
  102:23 133:1
**wanted** 89:3 98:3
  101:11,19,20
  105:10 128:12
  128:18
**wants** 105:5
**warrants** 115:4
**wasnt** 26:22
  39:18 68:11



MAGNA
LEGAL SERVICES